ACCEPTED
15-25-00084-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/3/2025 10:34 AM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00084-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
12/3/2025 10:34:07 AM
CHRISTOPHER A. PRINE
Clerk

## IN THE FIFTEENTH DISTRICT COURT OF APPEALS
### AUSTIN, TEXAS

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,
Appellant,

v.

WILBARGER CREEK CONSERVATION ALLIANCE, MARILYN KELINSKE, ANNE BROCKENBROUGH, and JONATHAN BEALL,
Appellees.

On Appeal from the 126th District Court of Travis County, Texas
Cause No. D-1-GN-23-004031

## BRIEF OF APPELLEES

Christopher D. Smith
State Bar No. 24051349
(512) 659-6912
Chris.Smith@smithjolin.com

Smith Jolin PLLC
901 S. Mopac Expressway
Building 1 Suite 300
Austin, Texas 78746

Becky L. Jolin
State Bar No. 10856200
(512) 217-7758
Becky.Jolin@smithjolin.com

*Attorneys for Appellees*
*Wilbarger Creek Conservation*
*Alliance, Marilyn Kelinske,*
*Anne Brockenbrough, and*
*Jonathan Beall*

Date: December 3, 2025

**Oral Argument Requested**

i

# Identity of Parties and Counsel

**Appellant:**

Texas Commission on
Environmental Quality

**Counsel:**

Amanda Atkinson Cagle
Sara J. Ferris
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
Environmental Protection
Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 975-1582
Fax: (512) 320-0911

**Appellees:**

Wilbarger Creek
Conservation Alliance,
Marilyn Kelinske, Anne
Brockenbrough, and
Jonathan Beall

**Counsel:**

Christopher D. Smith
Becky L. Jolin
SMITH JOLIN PLLC
901 S. Mopac Expressway
Building 1 Suite 300
Austin, Texas 78746
(512) 659-6912

# Table of Contents

Identity of Parties and Counsel .................................................................ii

Appendix ...................................................................................... v

Statement of the Case .................................................................viii

Issue Presented ................................................................................ ix

Statement of Facts ................................................................... 1

Standard of Review ............................................................... 17

Argument ...................................................................... 18

    1.    Documents that the Commissioners never considered are not part of the administrative record and cannot be considered under this Court's substantial evidence review. ................................................. 18

    2.    The Appellees met their burden to show that they are "affected persons." ........................................................................ 22

    a.    The Commission's rules require persons seeking affected person status to file a brief but specific plain language written statement explaining why they will be adversely affected................................. 22

    b.    The Appellees identified a personal, justiciable interest related to the application because the discharged effluent will interfere with their use of their real property........................................... 25

    c.    The Commission's evidence supports Appellees' concerns that the water quality in Wilbarger Creek is already degraded. .................... 27

    3.    The Commission abused its discretion by denying the Appellees' hearing requests solely based on proximity. ...................................... 29

4.   The Commission's denial of the Appellees' hearing requests based solely on proximity is not supported by any evidence. ........................ 31

5.   The relevance of proximity as the determinative factor is never addressed in the administrative record. ............................................. 34

Conclusion and Prayer ........................................................................ 36

Certificate of Compliance ................................................................... 38

Certificate of Service .......................................................................... 38

# Appendix

**App. 1** – May 2, 2023, TCEQ Final Order (RR.AR 31)

**App. 2** – Apr. 4, 2025 District Court Order (CR at 121-22)

**App. 3** – Jun. 30, 2022 Apellees' Hearing Request (RR.AR Item 34 at 5-7)

**App. 4** – Jun. 29, 2022 Brockenbrough Hearing Request (RR.AR Item 34 at 32-33)

**App. 5** – Jun. 30, 2022 Kelinske Hearing Request (RR.AR Item 34 at 36-37)

**App. 6** – Oct. 19, 2022 Executive Director's Response to Comments (RR.AR Item 20)

**App. 7** – Nov. 22, 2022 Appellees' Hearing Request (RR.AR Item 34 at 11-14)

**App. 8** – Nov. 25, 2022 Brockenbrough Hearing Request (RR.AR Item 34 at 30-31)

**App. 9** – Nov. 28, 2022 Kelinske Hearing Request (RR.AR Item 34 at 34-35)

**App. 10** – Apr. 2, 2023 Executive Director's Response to Hearing Requests (RR.AR Item 23)

**App. 11** – Apr. 3, 2023 OPIC's Response to Hearing Requests (RR.AR Item 24)

# Index of Authorities

**Cases**

*Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618 (Tex. 1996) ................................................................... 26

*City of Canyon v. McBroom*, 121 S.W.3d 410 (Tex.App.-Amarillo 2003, no pet.) ............................................................................................... 26

*City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179 (Tex. 1994) ...................................................................................................... 17, 29, 30

*Coastal Transport v. Crown Cent. Petrol*, 136 S.W.3d 227 (Tex. 2004) . 34

*Dallas Ry. Terminal Co. v. Gossett*, 294 S.W.2d 377 (Tex. 1956) .......... 34

*Heat Energy Advanced Tech. Inc. v. West Tex. Coal. for Env. Justice*, 962 S.W.2d 288 (Tex. App. Austin – 1998, pet. denied) ............................ 24

*Lake Medina Conservation Soc'y v. Texas Natural Res. Conservation Comm'n*, 980 S.W.2d 511 (Tex.App.-Austin 1998, pet. denied) .......... 26

*North E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243 (Tex. 2020) ............ 17

*Tex. Comm'n on Envtl. Quality v. Sierra Club*, 455 S.W.3d 228 (Tex. App.—Austin 2014, pet. denied) ................................................. 17, 21

*Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 147 (Tex.App.-Austin 1995, writ denied) ........................ 26

*United Copper Industries v. Grissom*, 17 S.W.3d 797 (Tex. App. – Austin 2000, pet. dism'd) .................................................................................. 23

**Statutes**

33 U.S.C. § 1251(a) ................................................................................... 31

33 U.S.C. § 1342 .......................................................................................... 1

Tex. Gov't Code § 2001.174 .............................................................. 17

Tex. Gov't Code § 2001.175 .............................................................. 21

Tex. Water Code § 26.003 ................................................................ 31

Tex. Water Code § 26.027 .................................................................. 1

Tex. Water Code § 5.052(a) .............................................................. 21

Tex. Water Code § 5.115(a) .............................................................. 24

Tex. Water Code § 5.115(a-1) ........................................................... 29

Tex. Water Code § 5.115(a-1)(1)(D) ................................................. 21

**Regulations**

30 Tex. Admin. Code § 55.103(a) ...................................................... 24

30 Tex. Admin. Code § 55.201(d)(2) ............................................ 22, 24

30 Tex. Admin. Code § 55.203(c) ...................................................... 29

30 Tex. Admin. Code § 55.205(b) ...................................................... 18

30 Tex. Admin. Code § 55.251 ........................................................... 22

30 Tex. Admin. Code §307.3(77) ......................................................... 5

# Statement of the Case

Nature of the Case:      This is an appeal of a TCEQ final order granting a wastewater discharge permit. Appellees are downstream landowners who requested a contested case hearing on the wastewater discharge permit application.

Agency Disposition:      TCEQ issued an order denying Appellees' contested case hearing requests and granting the wastewater discharge permit.

Trial Court:      126th Judicial District Court, Travis County
The Honorable Laurie Eiserloh,
presiding by assignment

Trial Court
Disposition:      The district court reversed the TCEQ Order, vacated the permit, and remanded to TCEQ.

## Issue Presented

An "affected person" entitled to a contested case hearing is someone with a personal, justiciable interest in an application different from the general public. Appellees Marilyn Kelinske, Anne Brockenbrough, and Jon Beall own ranch or farm properties through which Wilbarger Creek flows for more than two miles. Their properties are three to five miles downstream of a proposed outfall through which the proposed wastewater treatment plant will discharge 800,000 gallons per day (gpd) of treated wastewater (effluent) into Wilbarger Creek. Most of the year, this discharge will be diluted only by effluent from other upstream wastewater treatment plants as it crosses the Appellees' properties. The Appellees are also board members of Wilbarger Creek Conservation Alliance, a nonprofit focused on protecting water quality in Wilbarger Creek. They filed timely hearing requests with the Commission, citing recent algae blooms and dissolved oxygen testing indicating degraded water quality on their properties. They explained how the poor water quality already hampers their ability to use their properties for wildlife conservation, ranching, and

recreation, and that additional pollutants will worsen the situation. The Appellees do not oppose the wastewater treatment plant; instead, they seek higher treatment standards in the permit to lessen the impact of the discharged effluent on their property interests. The Commission denied their hearing requests solely based on the proximity of their addresses to the proposed discharge point, ignoring that the effluent flows directly onto and through the Appellees' properties. No evidence the Commission considered suggests that the Appellees' properties are too far from the discharge point[1] to be affected differently from the general public. Did the Commission abuse its discretion by denying the hearing requests?

---

[1] The terms "discharge point" and "outfall" are used interchangeably and mean the location where treated effluent from the wastewater treatment plant is discharged from a pipe into Wilbarger Creek.

# Statement of Facts[2]

***The landowner Appellees own properties with over 2 miles of frontage on Wilbarger Creek, located 3 to 5 miles downstream from the proposed wastewater discharge point.***

SWWC Utilities, Inc. applied to the Commission for TPDES[3] Permit No. WQ0016022001 to authorize the construction of a wastewater treatment plant and the discharge of 800,000 gpd of treated wastewater into Wilbarger Creek in Travis County.[4]

Marilyn Kelinske owns a ranch on Wilbarger Creek 2.89 miles downstream from the proposed discharge point.[5] Anne Brockenbrough owns a ranch on Wilbarger Creek, 3.21 miles downstream from the proposed discharge point.[6] Jon Beall owns a farm on Wilbarger Creek

---

[2] The Administrative Record (AR) was admitted by the district court as three exhibits: Joint Exhibit 1 (RR.AR Items 1-35); Joint Exhibit 2 (RR.AR Item 46); Defendant's Exhibit 1 (RR.AR Items 36-45). RR at 5-6, 11.

[3] "TPDES" is an acronym for the Texas Pollution Discharge Elimination System, the wastewater discharge permitting program authorized under the Federal Clean Water Act through delegation to the State of Texas. *See* 33 U.S.C. § 1342; Tex. Water Code § 26.027.

[4] RR.AR Item 1 at 24 (listing Peak Flow as 0.8 MGD); RR.AR Item 29 at 3.

[5] App. 10 (RR.AR Item 23 at 13).

[6] App. 10 (RR.AR Item 23 at 13).

1

adjacent to Brockenbrough's.[7] Appellees generally agree with the Commission's statement that their properties are three to five miles downstream of the proposed discharge,[8] but dispute that the wastewater flowing across their properties will not affect them differently than it will the general public.

Collectively, Kelinske, Brockenbrough, and Beall own about two miles of Wilbarger Creek frontage. They are also board members of the Wilbarger Creek Conservation Alliance (WCCA), a nonprofit organization dedicated to preserving and protecting the water quality of Wilbarger Creek, as well as protecting wildlife and supporting working farms and ranches within the Wilbarger Creek Watershed.

***The Appellees submitted timely hearing requests, documenting the current impaired water quality in Wilbarger Creek and explaining why it interferes with wildlife conservation, livestock, and recreational uses of their properties.***

---

[7] RR.AR Item 27 at 1.

[8] TCEQ Brief at 15, though the ED's maps show Kelinske 2.89 miles from the outfall and Brockenbrough 3.21 miles. App. 10 (RR.AR Item 23 at 13) .

The TCEQ Executive Director issued her[9] preliminary decision to approve SWWC's application and a draft permit on May 9, 2022. In June 2022, the Appellees submitted three comment letters.[10]

Beall filed a comment letter on behalf of himself, Kelinske, Brockenbrough, and WCCA, requesting standing, opposing the application, and noting that the three landowners are members of WCCA.[11] He stated that existing pollution upstream from Kelinske's property "is causing a significant algae bloom" in Wilbarger Creek on Kelinske's land.[12] Beall asked the Commission to determine the cause of the algae bloom and explain how the additional discharge sought by SWWC will impact the overall health of Wilbarger Creek.[13] He also requested that the Commission establish a water quality baseline using samples taken over the past year to help set appropriate treatment

[9] When the draft permit was issued, the TCEQ Executive Director was Toby Baker. The current Executive Director is Kelly Keel. For consistency, this brief will refer to Ms. Keel as the Executive Director at all relevant times.

[10] App. 3 (RR.AR Item 34 at 5-7); App. 4 (RR.AR Item 34 at 32-33); App. 5 (RR.AR Item 34 at 36-37)

[11] App. 3 (RR.AR Item 34 at 5-7).

[12] App. 3.

[13] App. 3.

standards for the permit.[14] Beall expressed concern about the cumulative impacts of multiple wastewater treatment plants on water quality, noting "we are looking at a situation where streamflow will be predominately treated effluent," and referenced studies showing impaired water quality in Wilbarger Creek since at least 2012.[15] He concluded by asking that the permit include protective treatment standards, including a total nutrient loading of 0.1 mg/l phosphorus and 4.0 mg/l nitrogen.[16]

Brockenbrough submitted a separate electronic comment seeking standing and requesting a hearing.[17] She stated that she has "had the water quality tested several times over the last few years by the Austin Youth River Watch and each time they have found the water in Wilbarger Creek has extremely low dissolved oxygen levels indicating that the creek is already impaired or dangerously close."[18]

---

[14] App. 3.

[15] App. 3.

[16] App. 3.

[17] App. 4 (RR.AR Item 34 at 32-33).

[18] App. 4.

Brockenbrough said that with additional treated effluent, "I am afraid the creek will be permanently impaired."[19] She also asked the Commission to conduct a current water quality test of Wilbarger Creek before approving the application and requested a TMDL study.[20]

Kelinske also submitted a separate comment and hearing request.[21] She noted that in recent years, the creek "has become cloudy many times, clogged with algae, which is a sign of contamination," and that formerly abundant fish and frogs have disappeared.[22] Regarding the use of her property, Kelinske stated that her land is subject to a conservation easement, that wildlife on her property depends on the creek, that she has restricted livestock access to the creek because of contamination, and that she does not want to swim in the creek "if the water was contaminated and full of algae like it was recently."[23]

---

[19] App. 4.

[20] App. 4.TMDL or Total Maximum Daily Load is the total amount of a substance that a water body can assimilate and still meet the Texas Surface Water Quality Standards. 30 Tex. Admin. Code § 307.3(77).

[21] App. 5 (RR.AR Item 34 at 36-37).

[22] App. 5.

[23] App. 5.

***The Executive Director's response to comments did not contradict Appellees' observations of how water quality on their properties is impaired or claim that the Appellees' properties are too far from the discharge point to be affected.***

The Executive Director issued a Response to Comments, or "RTC," on October 19, 2022.[24] Regarding the Appellees' comments on existing algal blooms, water quality, and the current impairment of Wilbarger Creek, the Executive Director explained that staff conducted Tier 1 and Tier 2 antidegradation reviews of Wilbarger and performed dissolved oxygen (DO) modeling of the proposed discharge.[25] The Executive Director also stated that the effluent limits in the draft permit comply with regulatory requirements designed to help protect water clarity and "to protect against excessive algal growth."[26]

The antidegradation review and DO modeling mentioned in the RTC did not include fieldwork, water quality sampling of Wilbarger Creek on the Appellees' properties, or any investigation into the causes of the algal blooms and water quality issues described in the Appellees'

---

[24] App. 6 (RR.AR Item 20).

[25] App. 6 at 5-6.

[26] App. 6 at 5-6.

comments.[27] Nothing in the RTC document contradicts or disputes the Appellees' claims that algae blooms are an ongoing problem in Wilbarger Creek on their properties.[28] Additionally, there is no information or statement in the RTC indicating that water quality on the Appellees' properties is unaffected by the discharge due to their distance from the proposed discharge point.[29] The RTC does not address the proximity between the discharge point and the Appellees' properties.[30]

In her response to Kelinske's comments on wildlife, the Executive Director stated that the draft permit, if issued, meets all applicable requirements.[31] The Executive Director did not dispute Kelinske's assertion that the current water quality degradation has caused a decline in fish and frog populations on her property and makes no

---

[27] App. 6.
[28] App. 6.
[29] App. 6.
[30] App. 6.
[31] App. 6 at 7.

statement that impacts to wildlife will be reduced because of the distance of Kelinske's property from the point of discharge.[32]

The Executive Director's response to the Appellees' comments on cumulative impacts was that the DO modeling analysis considered multiple TPDES wastewater outfalls, including two by the City of Manor and three by the City of Pflugerville, and that the model was evaluated under hot and dry summertime conditions described as "conditions unlikely to occur for any significant time."[33] According to the Executive Director, the modeling assumed a minimum dissolved oxygen level of 5 mg/L for Wilbarger Creek.[34] The draft permit would authorize an oxygen limit of only 4 mg/L.[35] Therefore, the permit conditions, which the Executive Director claimed were protective of water quality, allow the discharge of water with dissolved oxygen levels lower than the minimum required to sustain the uses of Wilbarger Creek.[36] Like with

---

[32] App. 6 at 7.

[33] App. 6 at 6-8.

[34] App. 6 at 6.

[35] App. 6 at 2, 3.

[36] App. 6 at 8.

the other topics, the Executive Director did not state that the Appellees would not be affected by cumulative impacts due to their distance from the discharge point.[37]

In response to the Appellees' request to conduct water quality sampling to document current conditions, the Executive Director confirmed that no TMDL project had been undertaken or planned for Wilbarger Creek.[38] The Executive Director referred to the agency's Surface Water Quality Monitoring program, which he states samples water quality every two years.[39] But the Executive Director did not reference any monitoring results from Wilbarger Creek that would contradict the Appellees' statements of ongoing impairment or suggest that the testing the Appellees requested is unnecessary because of the distance between the discharge point and the Appellees' properties.

Regarding the Appellees' request for higher treatment standards, including 0.1 mg/l phosphorus and 4.0 mg/l nitrogen, the Executive

---

[37] App. 6 at 8.

[38] App. 6 at 8-9.

[39] App. 6 at 8.

Director's response does not explain whether staff considered these standards or why they were not included in the draft permit.[40] Nor does the Executive Director suggest that higher treatment standards are unnecessary due to the distance between the Appellees' property and the discharge point.[41]

The Executive Director responded to the concern that treatment plant malfunctions can negatively affect Wilbarger Creek by stating that the draft permit and its conditions prohibit unauthorized discharges and that plans for the treatment facility must be approved by the Commission.[42] The Executive Director did not imply that the Appellees would be unaffected by plant malfunctions due to the distance between the outfall and their properties.[43]

In summary, the Executive Director's response to the Appellees' comments did not involve testing the water quality of Wilbarger Creek near the Appellees' properties or investigating the cause of the algal

---

[40] App. 6 at 9.
[41] App. 6 at 9.
[42] App. 6 at 9.
[43] App. 6 at 9.

blooms. Instead, the Executive Director's assertion that the permit will safeguard water quality is entirely based on the desktop antidegradation review and the DO model. Most importantly, **nothing** in the Executive Director's response addresses proximity.

### *Appellees filed a second set of comments and hearing requests, highlighting deficiencies in the RTC.*

In response to the Executive Director's RTC, Appellees filed another joint hearing request[44] reiterating their previous comments and raising new issues.

- Noting that for most of the year, the creek flow is 100% effluent.

- Describing an April 2022 algae bloom, including photographs and noting that TCEQ never investigated the bloom or its cause.

- Noting that the monitoring referenced in the RTC has listed nitrates as a source of concern for Wilbarger Creek since 2014.

- Observing that hot, dry summertime conditions used in the DO model are not unusual, and real-world observations described by the Appellees are better indicators of cumulative impacts than the model.

- Requesting an opportunity to evaluate the DO model and its assumptions.

---

[44] App. 7 (RR.AR Item 34 at 11-14).

- Expressing additional concerns about the cumulative impacts of other treatment plants already permitted.

Brockenbrough and Kelinske filed separate second hearing requests, reiterating their concerns.[45] Kelinske also noted that she had recently obtained a TCEQ report revealing several deficiencies in one of the upstream TPDES wastewater discharges operated by the City of Manor, and that these issues had occurred repeatedly.[46]

### *The Commission determined that Appellees are not affected persons solely because of the distance between their properties and the discharge point.*

On April 3, 2023, the Executive Director and TCEQ Public Interest Counsel (OPIC) filed responses to the Appellees' hearing requests.[47] Both the Executive Director and OPIC agreed that the Appellees had timely requested a hearing in writing, provided necessary contact information, and raised relevant disputed fact issues appropriate for referral for a contested case hearing, including whether

---

[45] App. 8 (RR.AR Item 34 at 30-31); App. 9 (RR.AR Item 34 at 34-35).

[46] App. 9 (RR.AR Item 34 at 34-35).

[47] App. 10 (RR.AR Item 23); App. 11 (RR.AR Item 24).

the draft permit would protect water quality.[48] But both the Executive Director and OPIC recommended that the Commission find that the Appellees are not affected persons **solely based on proximity**.

Specifically, the only facts the ED cites in her recommendation to deny standing are the distances between the proposed outfall and the Appellees' properties, ignoring that the discharged effluent actually enters and crosses those properties, diluted only by effluent from upstream wastewater treatment plants most of the year.[49] OPIC stated: "*Given the distance between Ms. Kelinske's property and the proposed outfall, OPIC finds that she lacks the proximity to establish a personal justiciable interest which is distinct from interests common to the*

---

[48] App. 10 (RR.AR Item 23 at 6-8); App. 11 (RR.AR Item 24 at 6-12) The referrable issues included whether the draft permit is adequately protective of human health (OPIC only), whether the draft permit is protective of wildlife (both ED and OPIC), whether the draft permit is adequately protective of water quality (OPIC), whether the draft permit should require higher treatment standards (ED), whether the cumulative impacts of the proposed discharge were properly modeled and evaluated (ED), whether the draft permit adequately protects against flooding and erosion (OPIC), and whether the permit application addresses potential malfunctions at the proposed facility (ED).

[49] App. 10 (RR.AR Item 23 at 6-8) (In this document the distance to Beall's property was incorrectly calculated using his Austin mailing address.).

13

*general public,"* and used the same language for the other Appellees.[50] The Executive Director and OPIC identify no factors other than proximity to the outfall in their recommendations to deny the Appellees' standing.[51]

During the Commission's April 26, 2023, meeting, Commissioner Niermann stated that he agreed with the Executive Director and OPIC, noting that proximity is a factor in the agency's determination of whether someone is an "affected person," but it is "not dispositive."[52] He distinguished this case from another application involving the City of Liberty Hill, in which the agency granted standing to landowners farther from the discharge point than Kelinske, Brockenbrough, or Beall.[53] According to Commissioner Niermann, the key differences were that the Liberty Hill application involved discharging 4 million gpd rather than 800,000 gpd, and the City of Liberty Hill case "featured

---

[50] App. 11 (RR.AR Item 24 at 8); discussion of Brockenbrough and Beall at 7, 8.
[51] App. 10 (RR.AR Item 23); App. 11 (RR.AR Item 24).
[52] RR.AR Item 35.
[53] RR.AR Item 35.

14

evidence of actual impacts and a history of significant noncompliance."[54]

The other two Commissioners agreed with Commissioner Niermann.[55]

On May 2, the Commission issued an order denying the Appellees' hearing requests, issuing SWWC's Permit, and adopting the Executive Director's Response to Public Comment.[56] Appellees timely filed a Motion for Rehearing with the Commission,[57] which was overruled by operation of law on Jun. 26, 2023.[58] Appellees timely appealed to the district court.[59]

***In the district court, the Commission introduced new documents that were in the Executive Director's staff files but had never been presented to the Commissioners or made available to Appellees.***

When it filed its brief in district court, the Commission produced nine new documents, identified as AR Items 36, 37, and 39 through 45. These are documents from the Executive Director's staff who reviewed

---

[54] RR.AR Item 35.

[55] RR.AR Item 35.

[56] App. 1 (RR.AR Item 31).

[57] RR.AR Item 32; RR.AR Item 33.

[58] 30 Tex. Admin. Code § 80.272(e)(1).

[59] CR at 3.

the application. But they were never filed with the TCEQ Chief Clerk, presented to the Commissioners, or made available to Appellees. These backup documents were admitted into evidence, over Appellee's objection, as Defendant's Exhibit 1.[60]

---

[60] RR at 6-11.

## Standard of Review

This Court must review the Commission's denial of Appellees' affected person status for an abuse of discretion. *Tex. Comm'n on Envtl. Quality v. Sierra Club*, 455 S.W.3d 228, 235 (Tex. App.—Austin 2014, pet. denied). This Court must reverse the Commission's decision if it is not reasonably supported by substantial evidence, considering the reliable and probative evidence in the record as a whole, or if it is arbitrary, capricious, or characterized by abuse of discretion, or is a clearly unwarranted exercise of discretion. Tex. Gov't Code § 2001.174(2)(E),(F). "At its core, the substantial evidence rule is a reasonableness test or a rational basis test." *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 185 (Tex. 1994). The issue is not "whether the agency's decision is correct, but whether the record demonstrates a reasonable basis for it." *North E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 251 (Tex. 2020).

## Argument

Here, the proposed discharge will flow directly onto and through about two miles of Appellees' properties. For most of the year, the discharge will be diluted only by effluent from other upstream wastewater treatment plants. The Commission's denial of the Appellees' "affected person" status solely based on proximity, without any regulatory standard related to proximity or guidance explaining why the Commission may focus on the distance from *the point of discharge* instead of the distance from Appellees properties *to the discharged effluent*, or any evidence in the record that the Appellees' properties are too far from the discharge point to be affected, was arbitrary, capricious, an abuse of discretion, and a clearly unwarranted exercise of discretion.

1. **Documents that the Commissioners never considered are not part of the administrative record and cannot be considered under this Court's substantial evidence review.**

The Commission's substantial evidence argument heavily depends on several documents in Defendant's Exhibit 1, including:

- Water Quality Modeling Memo Working Papers, RR.AR.36 (cited in TCEQ's Brief at 4, 8, 28, and 32)

18

- Standards Implementation Memo Working Papers, RR.AR. (cited in TCEQ's Brief at 7, 27, 28, and 32)

- Implementation Procedures to Implement the Texas Surface Water Quality Standards, RR.AR.39 (cited in TCEQ's Brief at 7, 27, and 35)

- Integrated Report 2020, RR.AR.42 (cited in TCEQ's Brief at 7, 27, 31, and 32)

- Integrated Report 2022, RR.AR.43 (cited in TCEQ's Brief at 27)

- TCEQ's Surface Water Quality Monitoring System Map, RR.AR.44 (cited in TCEQ's Brief at 6)

These documents (the "Backup Documents") were never filed with the TCEQ Chief Clerk and were only produced when the Commission filed its brief before the District Court.[61]

At the time of the Commission meeting to determine whether Appellees were "affected persons," the administrative record consisted of the documents filed with the TCEQ Chief Clerk. The record even included a memo from a TCEQ attorney characterized as "Backup Documents Filed for Consideration of Hearing Requests at Agenda" (Item 24 of the administrative record) and a late-filed memo requesting

---

[61] *See* Affidavit Certifying First Supplement to the Administrative Record, which was included as part of Defendant's Exhibit 1 and is dated November 6, 2024. The Commission's Brief in district court was filed November 8, 2024. CR at 133-194.

19

that the applicant's compliance history "be included in the background material for this permit application." (Item 25 of the administrative record). Appellees agree that these two backup memos are properly part of the administrative record because they were filed with the Chief Clerk and could have been considered by the Commissioners.

In contrast, the items in the Backup Documents originated from the files of the Executive Director's staff who reviewed the application but were not filed with the Chief Clerk under Docket No. 2023-0370-MWD, were not presented to the Commissioners, and were not accessible to Appellees when they prepared their comments.

Appellees timely objected to the district court's admission of the Backup Documents, arguing that the Commissioners never reviewed them and therefore could not have relied on them as evidence in their decision.[62] This Court should exclude the Backup Documents from this appeal for the same reason.

---

[62] RR at 6-11.

There is no statutory or case law[63] basis for including backup memos or internal materials in the administrative record that were not presented to or considered by the Commissioners. Although Tex. Water Code § 5.115(a-1)(1)(D) grants the Commission discretion to consider the Executive Director's analysis and opinions, it does not automatically make all documents in staff files part of the administrative record for judicial review. For the Commission to have "considered" any of the Backup Documents in staff files, the three Commissioners[64] must have been made aware of them.

If this Court were to approve the Commission's attempt to retroactively add documents to the administrative record that were never presented to the Commissioners, it would undermine the purpose of an administrative record under the Administrative Procedure Act.

---

[63] Appellees are aware of one case, *Texas Comm'n on Envt'l Quality v. Sierra Club*, 455 S.W.3d 228, 235-36 (Tex. App.—Austin 2014, pet. denied), where a party, the Sierra Club, attempted to supplement the administrative record with agency memos that were not filed in the administrative docket. The Third Court of Appeals found that the agency decision to deny affected person status was supported by substantial evidence even if the record had included the staff memos. Thus, the court did not reach the question of whether such supplementation was permissible.

[64] The term "commission" refers to the three Commissioners, not the agency as a whole. Tex. Water Code § 5.052(a).

*See* Tex. Gov't Code § 2001.175 (limiting the record to the "proceeding" under review). The Commission—or any other Texas administrative agency—could make a decision and then, if challenged, search staff files to find papers, memos, or other documents to support the already-made decision. Opposing parties, such as the Appellees, would have no way of knowing about information not filed in the docket and would be deprived of the opportunity to challenge such information or submit additional evidence for the Commissioners to review. The Court should confine its review to the documents actually before the Commission when it denied Appellees' standing.

## 2. The Appellees met their burden to show that they are "affected persons."

### a. The Commission's rules require persons seeking affected person status to file a brief but specific plain language written statement explaining why they will be adversely affected.

The Commission's regulation on the requirements for a contested case hearing request is 30 Tex. Admin. Code § 55.201(d)(2), which states that the request must:

> *(2) identify the person's personal justiciable interest affected by the application, **including a brief, but specific, written statement explaining in plain language** the requestor's location and distance relative to the proposed facility or activity that is the subject of the application and how and why the requestor believes he or she will be adversely affected by the proposed facility or activity in a manner not common to members of the general public;*

Similarly, 30 Tex. Admin. Code § 55.251 states that a hearing request must include a "brief, but specific, written statement" explaining the requestor's location, distance, and the basis for their belief of adverse effect. The Commission's argument in this appeal—that the burden on Appellees was to rebut data about water quality, including those in agency documents that were never even filed in the docket—conflicts with the plain wording of the agency's own regulations on what is required for a hearing request.

In *United Copper Industries v. Grissom*, 17 S.W.3d 797, 802 (Tex. App. – Austin 2000, pet. dism'd), the court determined that individuals who expressed a personal justiciable interest—such as concerns about pollution due to proximity to a proposed facility—meet the criteria for being considered an "affected person" under the relevant administrative code. The court's analysis did not require the submission of additional

23

data or evidence; instead, it focused on whether the written statement was sufficient.

By referencing unfiled Backup Documents to counter Appellees' descriptions of how they will be harmed, the Commission's argument in this appeal, if endorsed by this Court, would significantly expand the "brief, but specific written statement" for a party seeking affected person status into what essentially becomes a direct case in a hearing on the merits. As the district court correctly observed:

> *The Commission's attempts in this case to show that Plaintiffs would not be affected to a sufficient degree "confuse the preliminary question of whether an individual has standing as an affected person to request a contested-case hearing with the ultimate question of whether that person will prevail in a contested-case hearing on the merits.*[65]

The minimum jurisdictional standard to establish standing does not require Appellees to prove that they will ultimately prevail on the merits at a contested case hearing. *See Heat Energy Advanced Tech. Inc. v. West Tex. Coal. for Env. Justice*, 962 S.W.2d 288, 295 (Tex. App. Austin – 1998, pet. denied). In assessing whether the Appellees' hearing

---

[65] CR at 211-12 (citing *Grissom*, 17 S.W.3d at 803).

requests are adequate, this Court should apply the brief but specific written statement requirement of 30 Tex. Admin. Code § 55.201(d)(2).

### b. The Appellees identified a personal, justiciable interest related to the application because the discharged effluent will interfere with their use of their real property.

An "affected person" is defined as "someone with a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application. An interest common to members of the general public does not qualify as a personal justiciable interest." Tex. Water Code § 5.115(a); 30 Tex. Admin. Code § 55.103(a). The interests identified by the Appellees are their right to access and use the water of Wilbarger Creek on their properties for wildlife conservation, livestock, and recreational purposes. These interests are not a general concern about water quality in the creek but a specific concern about how the proposed discharge will impact their activities on their properties.

Texas courts have consistently held that landowners whose real property is affected by pollution or environmental laws have standing.

25

*See Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 624, 627 (Tex. 1996) (landowner over Edwards Aquifer has standing to challenge the constitutionality of a statute governing the entire aquifer); *City of Canyon v. McBroom*, 121 S.W.3d 410, 415 (Tex. App.-Amarillo 2003, no pet.) (landowner in floodplain complaining of increased flood risk); *Lake Medina Conservation Soc'y v. Texas Natural Res. Conservation Comm'n*, 980 S.W.2d 511, 515-16 (Tex. App.-Austin 1998, pet. denied) (owners of lakefront property challenging water removal from the lake); *Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 147, 151 (Tex. App.-Austin 1995, writ denied) (property owners "fronting the affected area of the river" challenging water diversion). Like the Appellees in these cases, Kelinske, Brockenbrough, and Beall have standing because the discharge authorized by the permit will, with certainty, flow across and affect their properties, thus interfering with their use of those properties. Appellees are affected because their property rights will be impacted, not because they own property within an arbitrary distance from the outfall.

26

### c. The Commission's evidence supports Appellees' concerns that the water quality in Wilbarger Creek is already degraded.

Without waiving the argument above that Backup Documents not considered by the Commission are not part of the administrative record, the Backup Documents confirm the Appellees' allegations that Wilbarger Creek's water quality was already impaired before the additional pollutants from the discharge authorized by the permit.

The 2020 and 2022 Texas Integrated Reports, RR.AR Item 42 and RR.AR Item 43, list Wilbarger Creek segments that flow through the Appellees' properties in the table titled "Water Bodies with Concerns for Use Attainment and Screening Levels." Both reports assign a Level of Concern "CN" for bacteria in creek water affecting water quality for Recreation Use in two segments of Wilbarger Creek: Segment 1434D_01, which flows through Beall's property, and Segment 1434D_02, which flows through Brockenbrough's and Kelinske's properties. The reports also identify a Level of Concern "CS" for Nitrate in Segment 1434D_02 of Wilbarger Creek, affecting the creek on the Brockenbrough and Kelinske properties. In the 2022 report, 8 out of 43

samples (22.9%) exceeded nutrient screening levels for Total phosphorus, Nitrate, Chlorophyll-a, or Ammonia from the creek segment along Brockenbrough's and Kelinske's properties, indicating conditions conducive to excess algae growth.

To summarize, for Wilbarger Creek segment 1434D_01 (on Beall's property) and Wilbarger Creek Segment ID 1434D_02 (on Brockenbrough's and Kelinske's properties), TCEQ lists the level of concern for bacteria in water for recreational use as "near-nonattainment of the TSWQS based on numeric criteria." For Segment 1434D_02, TCEQ lists nitrate in water as a "concern for water quality based on screening levels."

The Integrated Reports also face notable data limitations. For example, the reports state that "some data are averaged, as with profile data, some are eliminated because criteria do not apply during certain conditions, such as low flow." Given these qualifications, it is unclear whether the dataset reflects representative conditions or whether samples were discarded.

28

In short, the data in the Integrated Reports supports the allegations in the Appellees' hearing requests about excessive algae and indicates serious, ongoing water quality problems in the creek on the Appellees' properties that will worsen with more pollutants, regardless of how far the outfall is from the properties.

### 3. The Commission abused its discretion by denying the Appellees' hearing requests solely based on proximity to the outfall.

An agency abuses its discretion if it (1) fails to consider a factor the legislature directs it to consider, (2) considers an irrelevant factor, or (3) weighs only relevant factors that the legislature requires but still reaches a completely unreasonable result. *City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex.1994). The legislature directed the Commission to adopt rules specifying the factors for determining whether a person is an "affected person." Tex. Water Code

29

§ 5.115(a-1). Following that instruction, the Commission established factors in 30 Tex. Admin. Code § 55.203(c), including:[66]

> *(1) whether the interest claimed is one protected by the law under which the application will be considered;*
>
> *(2) distance restrictions or other limitations imposed by law on the affected interest;*
>
> *(3) whether a reasonable relationship exists between the interest claimed and the activity regulated;*
>
> *(4) likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person;*
>
> *(5) likely impact of the regulated activity on use of the impacted natural resource by the person.*

Neither the Water Code nor the Commission's regulations list proximity or distance from a discharge point as an independent factor for determining an "affected person." By relying solely on proximity in its analysis, the Commission abused its discretion by ignoring the legislatively required factors it was supposed to consider and instead focusing on a factor that, by itself, is irrelevant. *City of El Paso*, 883

---

[66] Note that factors (6) (whether the hearing request was withdrawn) and (7) (applicable to governmental entities) are not relevant to this appeal and are therefore omitted.

S.W.2d at 184. Therefore, the Commission's decision that Appellees are not affected persons is unreasonable.[67]

### 4. The Commission's denial of the Appellees' hearing requests based solely on proximity is not supported by any evidence.

As mentioned above, there are five factors the Commission must evaluate to determine whether Appellees are "affected persons." Even if proximity is relevant to these factors, there is no evidence in the administrative record that the distance of the Appellees' properties from the discharge point weighs against standing. Each factor is discussed below:

*Factor 1: Whether the interest claimed is one protected by the law under which the application will be considered.*

The governing law for this application is the TPDES program authorized by Chapter 26 of the Water Code and the Federal Clean Water Act. The goals of Chapter 26 include maintaining "the quality of water in the state consistent with the public health and enjoyment" and

---

[67] *See City of El Paso*, 883 S.W.2d at 185 (substantial evidence standard is a reasonableness test).

31

"the propagation and protection of terrestrial and aquatic life." Tex.

Water Code § 26.003. The purpose of the Federal Clean Water Act is to

"restore and maintain the chemical, physical, and biological integrity of

the Nation's waters." 33 U.S.C. § 1251(a). Therefore, the interests

claimed by Appellees to use their property for wildlife conservation,

livestock, and recreation—all activities that rely on good water

quality—are interests protected by the TPDES program.

### Factor 2: Distance restrictions or other limitations imposed by law on the affected interest;

There are no distance restrictions or other limitations imposed by

law on Appellees' property interest.

### Factor 3: Whether a reasonable relationship exists between the interest claimed and the activity regulated;

The regulated activity will discharge pollutants into Wilbarger

Creek upstream of the Appellees' properties, causing the pollutants to

flow across their land (mixed with effluent from many other wastewater

treatment plants). A reasonable connection exists between the

Appellees' claimed interest in using their properties for wildlife

32

conservation, livestock, and recreation, and the pollutants that flow across their properties in the creek, which will harm those uses.

***Factor 4: Likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person;***

The Appellees' comments and hearing requests stated that their use of their properties for wildlife conservation, livestock, and recreation is already affected by existing wastewater flows, leading to impaired water quality and algae blooms, as well as reduced frog and fish populations in Wilbarger Creek. There is nothing in the administrative record indicating that the Commission investigated these allegations or identified evidence contradicting them. The addition of more pollutants into Wilbarger Creek will continue to affect the Appellees' use of their properties.

***Factor 5: Likely impact of the regulated activity on use of the impacted natural resource by the person;***

The Appellees' hearing requests showed that their use of the natural resource of Wilbarger Creek for wildlife conservation, livestock, and recreation is already affected. Adding more pollutants to already-polluted water will worsen these impacts.

## 5. The relevance of proximity as the determinative factor is never addressed in the administrative record.

Neither the RTC nor any other document in the record explains *why* the Appellees' properties are too far from the outfall to be affected. The Executive Director's antidegradation analysis, the DO modeling, and the supposedly protective provisions of the draft permit do not concern proximity but the application's merits. Each of these items is required for every TPDES permit application, and if they were enough to deny standing on their own, then no one could ever be considered an affected person in a TPDES case.

The discussions of proximity in the Executive Director's and OPIC's responses to the Appellees' hearing requests are conclusory. There is no explanation in either document for why the Appellees' properties are too far from the outfall to be affected, just statements that they are. As the Supreme Court has clarified, "bare conclusions … cannot constitute probative evidence" *Coastal Transport v. Crown Cent. Petrol*, 136 S.W.3d 227, 233 (Tex. 2004); *see Dallas Ry. Terminal Co. v. Gossett*, 294 S.W.2d 377, 380 (Tex. 1956) ("It is well settled that the naked and unsupported opinion or conclusion of a witness does not

constitute evidence of probative force and will not support a jury finding even when admitted without objection."). As such, the Executive Director's and OPIC's responses cannot constitute "substantial evidence" supporting the agency's decision.

The only other mention of proximity as a reason to deny Appellees' hearing requests is Commissioner Niermann's oral comments. He states that proximity is a factor, but does not cite any **evidence** to support the claim that Appellees are too far away to be affected. Commissioner Niermann acknowledged that the agency has granted standing to other protestants more distant than Kelinske, Brockenbrough, or Beall. He distinguished that case by noting it involved a larger discharge volume and "evidence of actual impacts." However, the record here lacks *any* evidence that the 800,000 gpd discharge volume is insufficient to affect the Appellees' use of their properties, or that the evidence of actual, current impacts documented in Appellees' hearing requests, such as the algae blooms, will not be worsened by the proposed discharge. No agency document addresses these issues.

Because the Commission abused its discretion by denying the Appellees' standing solely based on how close their properties are to the discharge point, its decision is not supported by substantial evidence and constitutes an abuse of discretion.

## Conclusion and Prayer

The issue before this Court is whether the Commission abused its discretion by denying Appellees' hearing requests. The administrative record shows that the Commission denied the requests because it believed that the Appellees' properties are too far from the discharge point to be affected. However, there is no evidence in the record explaining why the Appellees are supposedly too distant *from the discharge point* to be impacted by the discharge of additional pollutants into an already impaired creek that flows onto and through their properties. The Commission's argument that this Court should uphold its denial of standing based on the Executive Director's opinions and documents that were never presented to the Commission conflates the purpose of an initial determination of affected person status with an

evidentiary hearing on the merits. This Court should affirm the district court's order.

<div style="margin-left:50%;">

Respectfully submitted,

By: /s/ Christopher D. Smith
    Christopher D. Smith
    State Bar No. 24051349
    (512) 659-6912
    Chris.Smith@smithjolin.com

    Becky L. Jolin
    State Bar No. 10856200
    (512) 217-7758
    Becky.Jolin@smithjolin.com

    Smith Jolin PLLC
    901 S. Mopac Expressway
    Building 1 Suite 300
    Austin, Texas 78746

    Attorneys for Appellees

</div>

## Certificate of Compliance

I certify that this document contains 6,196 words in the portions of this document required to be counted under Texas Rule of Appellate Procedure 9.4(i), as measured by the undersigned's word processing software.

*/s/ Christopher D. Smith*
Christopher D. Smith

## Certificate of Service

I certify that this document was served on all counsel of record on December 3, 2025.

/s/ Christopher D. Smith
Christopher D. Smith

38

# APPENDIX 1

May 4, 2023

TO:  Persons on the attached mailing list.

RE:  SWWC Utilities, Inc.
     TCEQ Docket No. 2023-0370-MWD; TPDES Permit No. WQ0016022001

## Decision of the Commission on Application.

The Texas Commission on Environmental Quality ("TCEQ" or "Commission") has made a decision to grant the above-referenced permit application.  Enclosed with this letter is a copy of the Commission's order.  Unless a Motion for Rehearing ("MFR" or "motion") is timely filed with the chief clerk, this action of the Commission will become final.  A MFR is a request for the Commission to review its decision on the matter.  Any motion must explain why the Commission should review the decision.

## Deadline for Filing Motion for Rehearing.

A MFR must be received by the chief clerk's office no later than the 25th day after the date that the Commission's order on this application is signed.  The date of signature is indicated on the last page of the enclosed order.

Motions may be filed with the chief clerk electronically at www.tceq.texas.gov/goto/efilings or by filing an original and 7 copies with the Chief Clerk at the following address:

> Laurie Gharis, Chief Clerk
> TCEQ, MC-105
> P.O. Box 13087
> Austin, Texas 78711-3087
> Fax: 512/239-3311

In addition, a copy of the motion must be sent on the same day to each of the individuals on the attached mailing list.  A certificate of service stating that copies of the motion were sent to those on the mailing list must also be sent to the chief clerk.  The procedures for filing and serving a MFR and responses are located in 30 TAC § 80.272, Texas Governmental Code § 2001.146 as revised by Senate Bill 1267 (84th Regular Session, effective September 1, 2015), and 30 TAC §§ 1.10 and 1.11.  The hardcopy filing requirement is waived by the General Counsel pursuant to 30 TAC § 1.10(h).

The written motion must contain (1) the name and representative capacity of the person filing the motion; (2) the style and official docket number assigned by SOAH and official docket number assigned by the Commission; (3) the date of the order; (4) the particular findings of fact or conclusions of law that are the subject of the complaint and any evidentiary or legal ruling claimed to be erroneous; and (5) the legal and factual basis for the claimed error.

Unless the time for the Commission to act on the MFR is extended, the MFR is overruled by operation of law at 5:00 p.m. on the 55th day after the date that the Commission's order on this matter is signed.

If you have any questions or need additional information about the procedures described in this letter, please call the Public Education Program, toll free, at 1-800-687-4040.

Sincerely,

Laurie Gharis
Chief Clerk

LG/mt

Enclosure

MAILING LIST
SWWC Utilities, Inc.
TCEQ Docket No. 2023-0370-MWD; TPDES Permit No. WQ0016022001

FOR THE APPLICANT:

Jeffrey McIntyre, President, Texas Utilities
SWWC Utilities, Inc.
12535 Reed Road
Sugar Land, Texas 77478

Joe Torralva, Design and Construction
    Manager, Texas Utilities
SWWC Utilities, Inc.
1620 Grand Avenue Parkway, Suite 140
Pflugerville, Texas 78660

Jason Baze, P.E., Project Manager
Murfee Engineering Company, Inc.
1101 Capital of Texas Highway South
Building D-100
Austin, Texas 78746

INTERESTED PERSON(S):

See attached list.

FOR THE EXECUTIVE DIRECTOR
via electronic mail:

Anthony Tatu, Staff Attorney
Texas Commission on Environmental
Quality
Environmental Law Division, MC-173
P.O. Box 13087
Austin, Texas 78711

Melinda Luxemburg, Technical Staff
Texas Commission on Environmental
Quality
Water Quality Division, MC-148
P.O. Box 13087
Austin, Texas 78711

Ryan Vise, Deputy Director
Texas Commission on Environmental
Quality
External Relations Division
Public Education Program, MC-108
P.O. Box 13087
Austin, Texas 78711

FOR PUBLIC INTEREST COUNSEL via
electronic mail:

Jennifer Jamison, Attorney
Texas Commission on Environmental
Quality
Public Interest Counsel, MC-103
P.O. Box 13087
Austin, Texas 78711

FOR ALTERNATIVE DISPUTE
RESOLUTION
via electronic mail:

Kyle Lucas
Texas Commission on Environmental
Quality
Alternative Dispute Resolution, MC-222
P.O. Box 13087
Austin, Texas 78711

FOR THE CHIEF CLERK
via eFilings:

Docket Clerk
Texas Commission on Environmental
Quality
Office of Chief Clerk, MC-105
P.O. Box 13087
Austin, Texas 78711

BEALL , JONATHAN M
 WILBARGER CREEK CONSERVATION ALLIANCE
2503 FLORA CV
AUSTIN TX 78746-6902

BROCKENBROUGH , ANNE STEWART
 ELM RIDGE RANCH
11318 JONES RD
MANOR TX 78653-5205

KELINSKE , MARILYN
6805 LADERA NORTE
AUSTIN TX 78731-2687

KELINSKE , MARILYN
15611 LITTIG RD
MANOR TX 78653

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY



**AN ORDER** concerning the application by SWWC Utilities, Inc. for new Texas Pollutant Discharge Elimination System Permit No. WQ0016022001; TCEQ Docket No. 2023-0370-MWD.

On April 26, 2023, the Texas Commission on Environmental Quality (Commission) considered during its open meeting requests for hearing filed by Jon Beall, Anne Brockenbrough, Marilyn Kelinske, and the Wilbarger Creek Conservation Alliance concerning the application by SWWC Utilities, Inc. (Applicant) for new Texas Pollutant Discharge Elimination System Permit No. WQ0016022001. The proposed permit would authorize the discharge of treated domestic wastewater at a daily average flow not to exceed 800,000 gallons per day in the Final Phase at a site located approximately 0.42 miles southwest of the intersection of Bella Parkway and Old Texas Highway 20, in Travis County, Texas. The requests for hearing were evaluated under the requirements in the applicable statutes and Commission rules, including 30 Texas Administrative Code (TAC) Chapter 55. The Commission also considered the responses to the hearing request filed by the Executive Director and the Office of Public Interest Counsel; replies to responses, all timely public comment; and the Executive Director's Response to Comment.

After evaluation of all relevant filings, the Commission denied the hearing requests. The Commission also adopted the Executive Director's Response to Public Comment and approved

new Texas Pollutant Discharge Elimination System Permit No. WQ0016022001 to SWWC

Utilities, Inc., as recommended by the Executive Director.

NOW, THEREFORE, BE IT ORDERED BY THE TEXAS COMMISSION ON

ENVIRONMENTAL QUALITY that:

1.    All hearing requests are hereby DENIED;

2.    The new Texas Pollutant Discharge Elimination System Permit No. WQ0016022001 is hereby ISSUED to SWWC Utilities, Inc., as recommended by the Executive Director;

3.    The Executive Director's Response to Public Comment is hereby ADOPTED; and

4.    If any provision, sentence, clause or phrase of this Order is for any reason held to be invalid, the invalidity of any portion shall not affect the validity of the remaining portions of the Order.

TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY


_____
Jon Niermann, Chairman


_____5/2/23_____
Date Signed

2



TPDES PERMIT NO. WQ0016022001
*[For TCEQ office use only - EPA I.D.*
*No. TX0141569]*

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
P.O. Box 13087
Austin, Texas 78711-3087

<u>PERMIT TO DISCHARGE WASTES</u>
under provisions of
Section 402 of the Clean Water Act
and Chapter 26 of the Texas Water Code

SWWC Utilities, Inc.

whose mailing address is

12535 Reed Road
Sugar Land, Texas 77478

is authorized to treat and discharge wastes from the Majestic Manor Wastewater Treatment Facility,
SIC Code 4952

located approximately 0.42 miles southwest of the intersection of Bella Parkway and Old Texas
Highway 20, in Travis County, Texas 78653

via pipe to Wilbarger Creek, thence to Colorado River Above La Grange in Segment No. 1434 of the
Colorado River Basin

only according to effluent limitations, monitoring requirements, and other conditions set forth in this
permit, as well as the rules of the Texas Commission on Environmental Quality (TCEQ), the laws of the
State of Texas, and other orders of the TCEQ. The issuance of this permit does not grant to the
permittee the right to use private or public property for conveyance of wastewater along the discharge
route described in this permit. This includes, but is not limited to, property belonging to any individual,
partnership, corporation, or other entity. Neither does this permit authorize any invasion of personal
rights nor any violation of federal, state, or local laws or regulations. It is the responsibility of the
permittee to acquire property rights as may be necessary to use the discharge route.

This permit shall expire at midnight, **five years from the date of issuance**.

ISSUED DATE: May 2nd, 2023

_____
For the Commission

INTERIM I EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS                    Outfall Number 001

1. During the period beginning upon the date of issuance and lasting through completion of expansion to the 0.50 million gallons per day (MGD) facility, the permittee is authorized to discharge subject to the following effluent limitations:

   The daily average flow of effluent shall not exceed 0.20 MGD, nor shall the average discharge during any two-hour period (2-hour peak) exceed 556 gallons per minute.

| Effluent Characteristic | Discharge Limitations | | | | Min. Self-Monitoring Requirements | |
| --- | --- | --- | --- | --- | --- | --- |
| | Daily Avg mg/l (lbs/day) | 7-day Avg mg/l | Daily Max mg/l | Single Grab mg/l | Report Daily Avg. & Max. Single Grab | |
| | | | | | Measurement Frequency | Sample Type |
| Flow, MGD | Report | N/A | Report | N/A | Continuous | Totalizing Meter |
| Carbonaceous Biochemical Oxygen Demand (5-day) | 5 (8.3) | 10 | 20 | 30 | One/week | Grab |
| Total Suspended Solids | 5 (8.3) | 10 | 20 | 30 | One/week | Grab |
| Ammonia Nitrogen | 2 (3.3) | 5 | 10 | 15 | One/week | Grab |
| Total Phosphorus | 1 (1.7) | 2 | 4 | 6 | One/week | Grab |
| E. coli, colony-forming units or most probable number per 100 ml | 126 | N/A | N/A | 399 | One/month | Grab |

2. The effluent shall contain a total chlorine residual of at least 1.0 mg/l and shall not exceed a total chlorine residual of 4.0 mg/l after a detention time of at least 20 minutes (based on peak flow) and shall be monitored five times per week by grab sample. An equivalent method of disinfection may be substituted only with prior approval of the Executive Director.

3. The pH shall not be less than 6.0 standard units nor greater than 9.0 standard units and shall be monitored once per month by grab sample.

4. There shall be no discharge of floating solids or visible foam in other than trace amounts and no discharge of visible oil.

5. Effluent monitoring samples shall be taken at the following location(s): Following the final treatment unit.

6. The effluent shall contain a minimum dissolved oxygen of 4.0 mg/l and shall be monitored once per week by grab sample.

Page 2

INTERIM II EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS                    Outfall Number 001

1.   During the period beginning upon the completion of expansion to the 0.50 million gallons per day (MGD) facility and lasting through the completion of expansion to the 0.80 MGD facility, the permittee is authorized to discharge subject to the following effluent limitations:

     The daily average flow of effluent shall not exceed 0.50 MGD, nor shall the average discharge during any two-hour period (2-hour peak) exceed 1,389 gallons per minute.

| Effluent Characteristic | Discharge Limitations | | | | Min. Self-Monitoring Requirements | |
| --- | --- | --- | --- | --- | --- | --- |
| | Daily Avg | 7-day Avg | Daily Max | Single Grab | Report Daily Avg. & Daily Max. | |
| | mg/l (lbs/day) | mg/l | mg/l | mg/l | Measurement Frequency | Sample Type |
| Flow, MGD | Report | N/A | Report | N/A | Continuous | Totalizing Meter |
| Carbonaceous Biochemical Oxygen Demand (5-day) | 5 (21) | 10 | 20 | 30 | One/week | Composite |
| Total Suspended Solids | 5 (21) | 10 | 20 | 30 | One/week | Composite |
| Ammonia Nitrogen | 2 (8.3) | 5 | 10 | 15 | One/week | Composite |
| Total Phosphorus | 1 (4.2) | 2 | 4 | 6 | One/week | Composite |
| E. coli, colony-forming units or most probable number per 100 ml | 126 | N/A | 399 | N/A | One/month | Grab |

2.   The effluent shall contain a total chlorine residual of at least 1.0 mg/l after a detention time of at least 20 minutes (based on peak flow) and shall be monitored daily by grab sample. The permittee shall dechlorinate the chlorinated effluent to less than 0.1 mg/l total chlorine residual and shall monitor total chlorine residual daily by grab sample after the dechlorination process. An equivalent method of disinfection may be substituted only with prior approval of the Executive Director.

3.   The pH shall not be less than 6.0 standard units nor greater than 9.0 standard units and shall be monitored twice per month by grab sample.

4.   There shall be no discharge of floating solids or visible foam in other than trace amounts and no discharge of visible oil.

5.   Effluent monitoring samples shall be taken at the following location(s): Following the final treatment unit.

6.   The effluent shall contain a minimum dissolved oxygen of 4.0 mg/l and shall be monitored once per week by grab sample.

Page 2a

FINAL EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS                        Outfall Number 001

1. During the period beginning upon the completion of expansion to the 0.80 million gallons per day (MGD) facility and lasting through the date of expiration, the permittee is authorized to discharge subject to the following effluent limitations:

   The daily average flow of effluent shall not exceed 0.80 MGD, nor shall the average discharge during any two-hour period (2-hour peak) exceed 2,222 gallons per minute.

| Effluent Characteristic | Discharge Limitations | | | | Min. Self-Monitoring Requirements | |
| --- | --- | --- | --- | --- | --- | --- |
| | Daily Avg mg/l (lbs/day) | 7-day Avg mg/l | Daily Max mg/l | Single Grab mg/l | Report Daily Avg. & Daily Max. | |
| | | | | | Measurement Frequency | Sample Type |
| Flow, MGD | Report | N/A | Report | N/A | Continuous | Totalizing Meter |
| Carbonaceous Biochemical Oxygen Demand (5-day) | 5 (33) | 10 | 20 | 30 | One/week | Composite |
| Total Suspended Solids | 5 (33) | 10 | 20 | 30 | One/week | Composite |
| Ammonia Nitrogen | 2 (13) | 5 | 10 | 15 | One/week | Composite |
| Total Phosphorus | 1 (6.7) | 2 | 4 | 6 | One/week | Composite |
| *E. coli*, colony-forming units or most probable number per 100 ml | 126 | N/A | 399 | N/A | Two/month | Grab |

2. The effluent shall contain a total chlorine residual of at least 1.0 mg/l after a detention time of at least 20 minutes (based on peak flow) and shall be monitored daily by grab sample. The permittee shall dechlorinate the chlorinated effluent to less than 0.1 mg/l total chlorine residual and shall monitor total chlorine residual daily by grab sample after the dechlorination process. An equivalent method of disinfection may be substituted only with prior approval of the Executive Director.

3. The pH shall not be less than 6.0 standard units nor greater than 9.0 standard units and shall be monitored twice per month by grab sample.

4. There shall be no discharge of floating solids or visible foam in other than trace amounts and no discharge of visible oil.

5. Effluent monitoring samples shall be taken at the following location(s): Following the final treatment unit.

6. The effluent shall contain a minimum dissolved oxygen of 4.0 mg/l and shall be monitored once per week by grab sample.

Page 2b

SWWC Utilities, Inc.                           TPDES Permit No. WQ0016022001

## DEFINITIONS AND STANDARD PERMIT CONDITIONS

As required by Title 30 Texas Administrative Code (TAC) Chapter 305, certain regulations appear as standard conditions in waste discharge permits. 30 TAC § 305.121 - 305.129 (relating to Permit Characteristics and Conditions) as promulgated under the Texas Water Code (TWC) §§ 5.103 and 5.105, and the Texas Health and Safety Code (THSC) §§ 361.017 and 361.024(a), establish the characteristics and standards for waste discharge permits, including sewage sludge, and those sections of 40 Code of Federal Regulations (CFR) Part 122 adopted by reference by the Commission. The following text includes these conditions and incorporates them into this permit. All definitions in TWC § 26.001 and 30 TAC Chapter 305 shall apply to this permit and are incorporated by reference. Some specific definitions of words or phrases used in this permit are as follows:

1.  Flow Measurements

    a.  Annual average flow - the arithmetic average of all daily flow determinations taken within the preceding 12 consecutive calendar months. The annual average flow determination shall consist of daily flow volume determinations made by a totalizing meter, charted on a chart recorder and limited to major domestic wastewater discharge facilities with one million gallons per day or greater permitted flow.

    b.  Daily average flow - the arithmetic average of all determinations of the daily flow within a period of one calendar month. The daily average flow determination shall consist of determinations made on at least four separate days. If instantaneous measurements are used to determine the daily flow, the determination shall be the arithmetic average of all instantaneous measurements taken during that month. Daily average flow determination for intermittent discharges shall consist of a minimum of three flow determinations on days of discharge.

    c.  Daily maximum flow - the highest total flow for any 24-hour period in a calendar month.

    d.  Instantaneous flow - the measured flow during the minimum time required to interpret the flow measuring device.

    e.  2-hour peak flow (domestic wastewater treatment plants) - the maximum flow sustained for a two-hour period during the period of daily discharge. The average of multiple measurements of instantaneous maximum flow within a two-hour period may be used to calculate the 2-hour peak flow.

    f.  Maximum 2-hour peak flow (domestic wastewater treatment plants) - the highest 2-hour peak flow for any 24-hour period in a calendar month.

2.  Concentration Measurements

    a.  Daily average concentration - the arithmetic average of all effluent samples, composite or grab as required by this permit, within a period of one calendar month, consisting of at least four separate representative measurements.

        i.  For domestic wastewater treatment plants - When four samples are not available in a calendar month, the arithmetic average (weighted by flow) of all values in the previous four consecutive month period consisting of at least four measurements shall be utilized as the daily average concentration.

Page 3

SWWC Utilities, Inc.                                    TPDES Permit No. WQ0016022001

    ii. For all other wastewater treatment plants - When four samples are not available in a calendar month, the arithmetic average (weighted by flow) of all values taken during the month shall be utilized as the daily average concentration.

b. 7-day average concentration - the arithmetic average of all effluent samples, composite or grab as required by this permit, within a period of one calendar week, Sunday through Saturday.

c. Daily maximum concentration - the maximum concentration measured on a single day, by the sample type specified in the permit, within a period of one calendar month.

d. Daily discharge - the discharge of a pollutant measured during a calendar day or any 24-hour period that reasonably represents the calendar day for purposes of sampling. For pollutants with limitations expressed in terms of mass, the daily discharge is calculated as the total mass of the pollutant discharged over the sampling day. For pollutants with limitations expressed in other units of measurement, the daily discharge is calculated as the average measurement of the pollutant over the sampling day.

    The daily discharge determination of concentration made using a composite sample shall be the concentration of the composite sample. When grab samples are used, the daily discharge determination of concentration shall be the arithmetic average (weighted by flow value) of all samples collected during that day.

e. Bacteria concentration (*E. coli* or Enterococci) - Colony Forming Units (CFU) or Most Probable Number (MPN) of bacteria per 100 milliliters effluent. The daily average bacteria concentration is a geometric mean of the values for the effluent samples collected in a calendar month. The geometric mean shall be determined by calculating the nth root of the product of all measurements made in a calendar month, where n equals the number of measurements made; or, computed as the antilogarithm of the arithmetic mean of the logarithms of all measurements made in a calendar month. For any measurement of bacteria equaling zero, a substituted value of one shall be made for input into either computation method. If specified, the 7-day average for bacteria is the geometric mean of the values for all effluent samples collected during a calendar week.

f. Daily average loading (lbs/day) - the arithmetic average of all daily discharge loading calculations during a period of one calendar month. These calculations must be made for each day of the month that a parameter is analyzed. The daily discharge, in terms of mass (lbs/day), is calculated as (Flow, MGD x Concentration, mg/l x 8.34).

g. Daily maximum loading (lbs/day) - the highest daily discharge, in terms of mass (lbs/day), within a period of one calendar month.

3. Sample Type

a. Composite sample - For domestic wastewater, a composite sample is a sample made up of a minimum of three effluent portions collected in a continuous 24-hour period or during the period of daily discharge if less than 24 hours, and combined in volumes proportional to flow, and collected at the intervals required by 30 TAC § 319.9 (a). For industrial wastewater, a composite sample is a sample made up of a minimum of three effluent portions collected in a continuous 24-hour period or during the period of daily discharge if less than 24 hours, and combined in volumes proportional to flow, and collected at the intervals required by 30 TAC § 319.9 (b).

b. Grab sample - an individual sample collected in less than 15 minutes.

Page 4

4. Treatment Facility (facility) - wastewater facilities used in the conveyance, storage, treatment, recycling, reclamation and/or disposal of domestic sewage, industrial wastes, agricultural wastes, recreational wastes, or other wastes including sludge handling or disposal facilities under the jurisdiction of the Commission.

5. The term "sewage sludge" is defined as solid, semi-solid, or liquid residue generated during the treatment of domestic sewage in 30 TAC Chapter 312. This includes the solids that have not been classified as hazardous waste separated from wastewater by unit processes.

6. The term "biosolids" is defined as sewage sludge that has been tested or processed to meet Class A, Class AB, or Class B pathogen standards in 30 TAC Chapter 312 for beneficial use.

7. Bypass - the intentional diversion of a waste stream from any portion of a treatment facility.

**MONITORING AND REPORTING REQUIREMENTS**

1. Self-Reporting

   Monitoring results shall be provided at the intervals specified in the permit. Unless otherwise specified in this permit or otherwise ordered by the Commission, the permittee shall conduct effluent sampling and reporting in accordance with 30 TAC §§ 319.4 - 319.12. Unless otherwise specified, effluent monitoring data shall be submitted each month, to the Compliance Monitoring Team of the Enforcement Division (MC 224), by the 20th day of the following month for each discharge which is described by this permit whether or not a discharge is made for that month. Monitoring results must be submitted online using the NetDMR reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver. Monitoring results must be signed and certified as required by Monitoring and Reporting Requirements No. 10.

   As provided by state law, the permittee is subject to administrative, civil and criminal penalties, as applicable, for negligently or knowingly violating the Clean Water Act (CWA); TWC §§ 26, 27, and 28; and THSC § 361, including but not limited to knowingly making any false statement, representation, or certification on any report, record, or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or noncompliance, or falsifying, tampering with or knowingly rendering inaccurate any monitoring device or method required by this permit or violating any other requirement imposed by state or federal regulations.

2. Test Procedures

   a. Unless otherwise specified in this permit, test procedures for the analysis of pollutants shall comply with procedures specified in 30 TAC §§ 319.11 - 319.12. Measurements, tests, and calculations shall be accurately accomplished in a representative manner.

   b. All laboratory tests submitted to demonstrate compliance with this permit must meet the requirements of 30 TAC § 25, Environmental Testing Laboratory Accreditation and Certification.

3. Records of Results

   a. Monitoring samples and measurements shall be taken at times and in a manner so as to be representative of the monitored activity.

   b.  Except for records of monitoring information required by this permit related to the permittee's sewage sludge use or biosolids and disposal activities, which shall be retained for a period
of at least five years (or longer as required by 40 CFR Part 503), monitoring and reporting records, including strip charts and records of calibration and maintenance, copies of all records required by this permit, records of all data used to complete the application for this permit, and the certification required by 40 CFR § 264.73(b)(9) shall be retained at the facility site, or shall be readily available for review by a TCEQ representative for a period of three years from the date of the record or sample, measurement, report, application or certification. This period shall be extended at the request of the Executive Director.

   c.  Records of monitoring activities shall include the following:

      i.   date, time and place of sample or measurement;

      ii.  identity of individual who collected the sample or made the measurement.

      iii.  date and time of analysis;

      iv.  identity of the individual and laboratory who performed the analysis;

      v.   the technique or method of analysis; and

      vi.  the results of the analysis or measurement and quality assurance/quality control records.

The period during which records are required to be kept shall be automatically extended to the date of the final disposition of any administrative or judicial enforcement action that may be instituted against the permittee.

4.  Additional Monitoring by Permittee

If the permittee monitors any pollutant at the location(s) designated herein more frequently than required by this permit using approved analytical methods as specified above, all results of such monitoring shall be included in the calculation and reporting of the values submitted on the approved self-report form. Increased frequency of sampling shall be indicated on the self-report form.

5.  Calibration of Instruments

All automatic flow measuring or recording devices and all totalizing meters for measuring flows shall be accurately calibrated by a trained person at plant start-up and as often thereafter as necessary to ensure accuracy, but not less often than annually unless authorized by the Executive Director for a longer period. Such person shall verify in writing that the device is operating properly and giving accurate results. Copies of the verification shall be retained at the facility site and/or shall be readily available for review by a TCEQ representative for a period of three years.

6.  Compliance Schedule Reports

Reports of compliance or noncompliance with, or any progress reports on, interim and final requirements contained in any compliance schedule of the permit shall be submitted no later than 14 days following each schedule date to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224).

SWWC Utilities, Inc.                                    TPDES Permit No. WQ0016022001

7. Noncompliance Notification

   a. In accordance with 30 TAC § 305.125(9) any noncompliance which may endanger human health or safety, or the environment shall be reported by the permittee to the TCEQ. Except as allowed by 30 TAC § 305.132, report of such information shall be provided orally or by facsimile transmission (FAX) to the Regional Office within 24 hours of becoming aware of the noncompliance. A written submission of such information shall also be provided by the permittee to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) within five working days of becoming aware of the noncompliance. For Publicly Owned Treatment Works (POTWs), effective December 21, 2025, the permittee must submit the written report for unauthorized discharges and unanticipated bypasses that exceed any effluent limit in the permit using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver. The written submission shall contain a description of the noncompliance and its cause; the potential danger to human health or safety, or the environment; the period of noncompliance, including exact dates and times; if the noncompliance has not been corrected, the time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent recurrence of the noncompliance, and to mitigate its adverse effects.

   b. The following violations shall be reported under Monitoring and Reporting Requirement 7.a.:

      i.   Unauthorized discharges as defined in Permit Condition 2(g).

      ii.  Any unanticipated bypass that exceeds any effluent limitation in the permit.

      iii. Violation of a permitted maximum daily discharge limitation for pollutants listed specifically in the Other Requirements section of an Industrial TPDES permit.

   c. In addition to the above, any effluent violation which deviates from the permitted effluent limitation by more than 40% shall be reported by the permittee in writing to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) within 5 working days of becoming aware of the noncompliance.

   d. Any noncompliance other than that specified in this section, or any required information not submitted or submitted incorrectly, shall be reported to the Compliance Monitoring Team of the Enforcement Division (MC 224) as promptly as possible. For effluent limitation violations, noncompliances shall be reported on the approved self-report form.

8. In accordance with the procedures described in 30 TAC §§ 35.301 - 35.303 (relating to Water Quality Emergency and Temporary Orders) if the permittee knows in advance of the need for a bypass, it shall submit prior notice by applying for such authorization.

9. Changes in Discharges of Toxic Substances

   All existing manufacturing, commercial, mining, and silvicultural permittees shall notify the Regional Office, orally or by facsimile transmission within 24 hours, and both the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) in writing within five (5) working days, after becoming aware of or having reason to believe:

a. That any activity has occurred or will occur which would result in the discharge, on a routine or frequent basis, of any toxic pollutant listed at 40 CFR Part 122, Appendix D, Tables II and III (excluding Total Phenols) which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels":

    i. One hundred micrograms per liter (100 µg/L);

    ii. Two hundred micrograms per liter (200 µg/L) for acrolein and acrylonitrile; five hundred micrograms per liter (500 µg/L) for 2,4-dinitrophenol and for 2-methyl-4,6-dinitrophenol; and one milligram per liter (1 mg/L) for antimony;

    iii. Five (5) times the maximum concentration value reported for that pollutant in the permit application; or

    iv. The level established by the TCEQ.

b. That any activity has occurred or will occur which would result in any discharge, on a nonroutine or infrequent basis, of a toxic pollutant which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels":

    i. Five hundred micrograms per liter (500 µg/L);

    ii. One milligram per liter (1 mg/L) for antimony;

    iii. Ten (10) times the maximum concentration value reported for that pollutant in the permit application; or

    iv. The level established by the TCEQ.

10. Signatories to Reports

All reports and other information requested by the Executive Director shall be signed by the person and in the manner required by 30 TAC § 305.128 (relating to Signatories to Reports).

11. All POTWs must provide adequate notice to the Executive Director of the following:

a. Any new introduction of pollutants into the POTW from an indirect discharger which would be subject to CWA § 301 or § 306 if it were directly discharging those pollutants;

b. Any substantial change in the volume or character of pollutants being introduced into that POTW by a source introducing pollutants into the POTW at the time of issuance of the permit; and

c. For the purpose of this paragraph, adequate notice shall include information on:

    i. The quality and quantity of effluent introduced into the POTW; and

    ii. Any anticipated impact of the change on the quantity or quality of effluent to be discharged from the POTW.

SWWC Utilities, Inc.                                    TPDES Permit No. WQ0016022001

## PERMIT CONDITIONS

1. General

   a. When the permittee becomes aware that it failed to submit any relevant facts in a permit application, r submitted incorrect information in an application or in any report to the Executive Director, it shall promptly submit such facts or information.

   b. This permit is granted on the basis of the information supplied and representations made by the permittee during action on an application and relying upon the accuracy and completeness of that information and those representations. After notice and opportunity for a hearing, this permit may be modified, suspended, or revoked, in whole or in part, in accordance with 30 TAC Chapter 305, Subchapter D, during its term for good cause including, but not limited to, the following:

      i. Violation of any terms or conditions of this permit;

      ii. Obtaining this permit by misrepresentation or failure to disclose fully all relevant facts; or

      iii. A change in any condition that requires either a temporary or permanent reduction or elimination of the authorized discharge.

   c. The permittee shall furnish to the Executive Director, upon request and within a reasonable time, any information to determine whether cause exists for amending, revoking, suspending or terminating the permit. The permittee shall also furnish to the Executive Director, upon request, copies of records required to be kept by the permit.

2. Compliance

   a. Acceptance of the permit by the person to whom it is issued constitutes acknowledgment and agreement that such person will comply with all the terms and conditions embodied in the permit, and the rules and other orders of the Commission.

   b. The permittee has a duty to comply with all conditions of the permit. Failure to comply with any permit condition constitutes a violation of the permit and the Texas Water Code or the Texas Health and Safety Code, and is grounds for enforcement action, for permit amendment, revocation, or suspension, or for denial of a permit renewal application or an application for a permit for another facility.

   c. It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of the permit.

   d. The permittee shall take all reasonable steps to minimize or prevent any discharge or sludge use or disposal or other permit violation that has a reasonable likelihood of adversely affecting human health or the environment.

   e. Authorization from the Commission is required before beginning any change in the permitted facility or activity that may result in noncompliance with any permit requirements.

Page 9

f.   A permit may be amended, suspended and reissued, or revoked for cause in accordance with 30 TAC §§ 305.62 and 305.66 and TWC§ 7.302. The filing of a request by the permittee for a permit amendment, suspension and reissuance, or termination, or a notification of planned changes or anticipated noncompliance, does not stay any permit condition.

g.   There shall be no unauthorized discharge of wastewater or any other waste. For the purpose of this permit, an unauthorized discharge is considered to be any discharge of wastewater into or adjacent to water in the state at any location not permitted as an outfall or otherwise defined in the Other Requirements section of this permit.

h.   In accordance with 30 TAC § 305.535(a), the permittee may allow any bypass to occur from a TPDES permitted facility which does not cause permitted effluent limitations to be exceeded or an unauthorized discharge to occur, but only if the bypass is also for essential maintenance to assure efficient operation.

i.   The permittee is subject to administrative, civil, and criminal penalties, as applicable, under TWC §§ 7.051 - 7.075 (relating to Administrative Penalties), 7.101 - 7.111 (relating to Civil Penalties), and 7.141 - 7.202 (relating to Criminal Offenses and Penalties) for violations including, but not limited to, negligently or knowingly violating the federal CWA §§ 301, 302, 306, 307, 308, 318, or 405, or any condition or limitation implementing any sections in a permit issued under the CWA § 402, or any requirement imposed in a pretreatment program approved under the CWA §§ 402 (a)(3) or 402 (b)(8).

3.   Inspections and Entry

a.   Inspection and entry shall be allowed as prescribed in the TWC Chapters 26, 27, and 28, and THSC § 361.

b.   The members of the Commission and employees and agents of the Commission are entitled to enter any public or private property at any reasonable time for the purpose of inspecting and investigating conditions relating to the quality of water in the state or the compliance with any rule, regulation, permit or other order of the Commission. Members, employees, or agents of the Commission and Commission contractors are entitled to enter public or private property at any reasonable time to investigate or monitor or, if the responsible party is not responsive or there is an immediate danger to public health or the environment, to remove or remediate a condition related to the quality of water in the state. Members, employees, Commission contractors, or agents acting under this authority who enter private property shall observe the establishment's rules and regulations concerning safety, internal security, and fire protection, and if the property has management in residence, shall notify management or the person then in charge of his presence and shall exhibit proper credentials. If any member, employee, Commission contractor, or agent is refused the right to enter in or on public or private property under this authority, the Executive Director may invoke the remedies authorized in TWC § 7.002. The statement above, that Commission entry shall occur in accordance with an establishment's rules and regulations concerning safety, internal security, and fire protection, is not grounds for denial or restriction of entry to any part of the facility, but merely describes the Commission's duty to observe appropriate rules and regulations during an inspection.

SWWC Utilities, Inc.                                               TPDES Permit No. WQ0016022001

4. Permit Amendment and/or Renewal

    a. The permittee shall give notice to the Executive Director as soon as possible of any planned physical alterations or additions to the permitted facility if such alterations or additions would require a permit amendment or result in a violation of permit requirements. Notice shall also be required under this paragraph when:

        i. The alteration or addition to a permitted facility may meet one of the criteria for determining whether a facility is a new source in accordance with 30 TAC § 305.534 (relating to New Sources and New Dischargers); or

        ii. The alteration or addition could significantly change the nature or increase the quantity of pollutants discharged. This notification applies to pollutants that are subject neither to effluent limitations in the permit, nor to notification requirements in Monitoring and Reporting Requirements No. 9; or

        iii. The alteration or addition results in a significant change in the permittee's sludge use or disposal practices, and such alteration, addition, or change may justify the application of permit conditions that are different from or absent in the existing permit, including notification of additional use or disposal sites not reported during the permit application process or not reported pursuant to an approved land application plan.

    b. Prior to any facility modifications, additions, or expansions that will increase the plant capacity beyond the permitted flow, the permittee must apply for and obtain proper authorization from the Commission before commencing construction.

    c. The permittee must apply for an amendment or renewal at least 180 days prior to expiration of the existing permit in order to continue a permitted activity after the expiration date of the permit. If an application is submitted prior to the expiration date of the permit, the existing permit shall remain in effect until the application is approved, denied, or returned. If the application is returned or denied, authorization to continue such activity shall terminate upon the effective date of the action. If an application is not submitted prior to the expiration date of the permit, the permit shall expire and authorization to continue such activity shall terminate.

    d. Prior to accepting or generating wastes which are not described in the permit application, or which would result in a significant change in the quantity or quality of the existing discharge, the permittee must report the proposed changes to the Commission. The permittee must apply for a permit amendment reflecting any necessary changes in permit conditions, including effluent limitations for pollutants not identified and limited by this permit.

    e. In accordance with the TWC § 26.029(b), after a public hearing, notice of which shall be given to the permittee, the Commission may require the permittee, from time to time, for good cause, in accordance with applicable laws, to conform to new or additional conditions.

SWWC Utilities, Inc.                                    TPDES Permit No. WQ0016022001

f.  If any toxic effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is promulgated under CWA § 307(a) for a toxic pollutant which is present in the discharge and that standard or prohibition is more stringent than any limitation on the pollutant in this permit, this permit shall be modified or revoked and reissued to conform to the toxic effluent standard or prohibition. The permittee shall comply with effluent standards or prohibitions established under CWA § 307(a) for toxic pollutants within the time provided in the regulations that established those standards or prohibitions, even if the permit has not yet been modified to incorporate the requirement.

5.  Permit Transfer

a.  Prior to any transfer of this permit, Commission approval must be obtained. The Commission shall be notified in writing of any change in control or ownership of facilities authorized by this permit. Such notification should be sent to the Applications Review and Processing Team (MC 148) of the Water Quality Division.

b.  A permit may be transferred only according to the provisions of 30 TAC § 305.64 (relating to Transfer of Permits) and 30 TAC § 50.133 (relating to Executive Director Action on Application or WQMP update).

6.  Relationship to Hazardous Waste Activities

This permit does not authorize any activity of hazardous waste storage, processing, or disposal that requires a permit or other authorization pursuant to the Texas Health and Safety Code.

7.  Relationship to Water Rights

Disposal of treated effluent by any means other than discharge directly to water in the state must be specifically authorized in this permit and may require a permit pursuant to TWC Chapter 11.

8.  Property Rights

A permit does not convey any property rights of any sort, or any exclusive privilege.

9.  Permit Enforceability

The conditions of this permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstances, is held invalid, the application of such provision to other circumstances, and the remainder of this permit, shall not be affected thereby.

10. Relationship to Permit Application

The application pursuant to which the permit has been issued is incorporated herein; provided, however, that in the event of a conflict between the provisions of this permit and the application, the provisions of the permit shall control.

SWWC Utilities, Inc.                                    TPDES Permit No. WQ0016022001

11. Notice of Bankruptcy

    a. Each permittee shall notify the Executive Director, in writing, immediately following the filing of a voluntary or involuntary petition for bankruptcy under any chapter of Title 11 (Bankruptcy) of the United States Code (11 USC) by or against:

        i. the permittee;

        ii. an entity (as that term is defined in 11 USC, § 101(14)) controlling the permittee or listing the permit or permittee as property of the estate; or

        iii. an affiliate (as that term is defined in 11 USC, § 101(2)) of the permittee.

    b. This notification must indicate:

        i. the name of the permittee;

        ii. the permit number(s);

        iii. the bankruptcy court in which the petition for bankruptcy was filed; and

        iv. the date of filing of the petition.

## OPERATIONAL REQUIREMENTS

1. The permittee shall at all times ensure that the facility and all of its systems of collection, treatment, and disposal are properly operated and maintained. This includes, but is not limited to, the regular, periodic examination of wastewater solids within the treatment plant by the operator in order to maintain an appropriate quantity and quality of solids inventory as described in the various operator training manuals and according to accepted industry standards for process control. Process control, maintenance, and operations records shall be retained at the facility site, or shall be readily available for review by a TCEQ representative, for a period of three years.

2. Upon request by the Executive Director, the permittee shall take appropriate samples and provide proper analysis in order to demonstrate compliance with Commission rules. Unless otherwise specified in this permit or otherwise ordered by the Commission, the permittee shall comply with all applicable provisions of 30 TAC Chapter 312 concerning sewage sludge or biosolids use and disposal and 30 TAC §§ 319.21 - 319.29 concerning the discharge of certain hazardous metals.

3. Domestic wastewater treatment facilities shall comply with the following provisions:

    a. The permittee shall notify the Municipal Permits Team, Wastewater Permitting Section (MC 148) of the Water Quality Division, in writing, of any facility expansion at least 90 days prior to conducting such activity.

    b. The permittee shall submit a closure plan for review and approval to the Municipal Permits Team, Wastewater Permitting Section (MC 148) of the Water Quality Division, for any closure activity at least 90 days prior to conducting such activity. Closure is the act of permanently taking a waste management unit or treatment facility out of service and includes the permanent removal from service of any pit, tank, pond, lagoon, surface impoundment and/or other treatment unit regulated by this permit.

Page 13

SWWC Utilities, Inc.                                      TPDES Permit No. WQ0016022001

4. The permittee is responsible for installing prior to plant start-up, and subsequently maintaining, adequate safeguards to prevent the discharge of untreated or inadequately treated wastes during electrical power failures by means of alternate power sources, standby generators, and/or retention of inadequately treated wastewater.

5. Unless otherwise specified, the permittee shall provide a readily accessible sampling point and, where applicable, an effluent flow measuring device or other acceptable means by which effluent flow may be determined.

6. The permittee shall remit an annual water quality fee to the Commission as required by 30 TAC Chapter 21. Failure to pay the fee may result in revocation of this permit under TWC § 7.302(b)(6).

7. Documentation

   For all written notifications to the Commission required of the permittee by this permit, the permittee shall keep and make available a copy of each such notification under the same conditions as self-monitoring data are required to be kept and made available. Except for information required for TPDES permit applications, effluent data, including effluent data in permits, draft permits and permit applications, and other information specified as not confidential in 30 TAC §§ 1.5(d), any information submitted pursuant to this permit may be claimed as confidential by the submitter. Any such claim must be asserted in the manner prescribed in the application form or by stamping the words confidential business information on each page containing such information. If no claim is made at the time of submission, information may be made available to the public without further notice. If the Commission or Executive Director agrees with the designation of confidentiality, the TCEQ will not provide the information for public inspection unless required by the Texas Attorney General or a court pursuant to an open records request. If the Executive Director does not agree with the designation of confidentiality, the person submitting the information will be notified.

8. Facilities that generate domestic wastewater shall comply with the following provisions; domestic wastewater treatment facilities at permitted industrial sites are excluded.

   a. Whenever flow measurements for any domestic sewage treatment facility reach 75% of the permitted daily average or annual average flow for three consecutive months, the permittee must initiate engineering and financial planning for expansion and/or upgrading of the domestic wastewater treatment and/or collection facilities. Whenever the flow reaches 90% of the permitted daily average or annual average flow for three consecutive months, the permittee shall obtain necessary authorization from the Commission to commence construction of the necessary additional treatment and/or collection facilities. In the case of a domestic wastewater treatment facility which reaches 75% of the permitted daily average or annual average flow for three consecutive months, and the planned population to be served or the quantity of waste produced is not expected to exceed the design limitations of the treatment facility, the permittee shall submit an engineering report supporting this claim to the Executive Director of the Commission.

      If in the judgment of the Executive Director the population to be served will not cause permit noncompliance, then the requirement of this section may be waived. To be effective, any waiver must be in writing and signed by the Director of the Enforcement

Division (MC 219) of the Commission, and such waiver of these requirements will be reviewed upon expiration of the existing permit; however, any such waiver shall not be interpreted as condoning or excusing any violation of any permit parameter.

b.  The plans and specifications for domestic sewage collection and treatment works associated with any domestic permit must be approved by the Commission and failure to secure approval before commencing construction of such works or making a discharge is a violation of this permit and each day is an additional violation until approval has been secured.

c.  Permits for domestic wastewater treatment plants are granted subject to the policy of the Commission to encourage the development of area-wide waste collection, treatment, and disposal systems. The Commission reserves the right to amend any domestic wastewater permit in accordance with applicable procedural requirements to require the system covered by this permit to be integrated into an area-wide system, should such be developed; to require the delivery of the wastes authorized to be collected in, treated by or discharged from said system, to such area-wide system; or to amend this permit in any other particular to effectuate the Commission's policy. Such amendments may be made when the changes required are advisable for water quality control purposes and are feasible on the basis of waste treatment technology, engineering, financial, and related considerations existing at the time the changes are required, exclusive of the loss of investment in or revenues from any then existing or proposed waste collection, treatment or disposal system.

9.  Domestic wastewater treatment plants shall be operated and maintained by sewage plant operators holding a valid certificate of competency at the required level as defined in 30 TAC Chapter 30.

10. For Publicly Owned Treatment Works (POTWs), the 30-day average (or monthly average) percent removal for BOD and TSS shall not be less than 85%, unless otherwise authorized by this permit.

11. Facilities that generate industrial solid waste as defined in 30 TAC § 335.1 shall comply with these provisions:

a.  Any solid waste, as defined in 30 TAC § 335.1 (including but not limited to such wastes as garbage, refuse, sludge from a waste treatment, water supply treatment plant or air pollution control facility, discarded materials, discarded materials to be recycled, whether the waste is solid, liquid, or semisolid), generated by the permittee during the management and treatment of wastewater, must be managed in accordance with all applicable provisions of 30 TAC Chapter 335, relating to Industrial Solid Waste Management.

b.  Industrial wastewater that is being collected, accumulated, stored, or processed before discharge through any final discharge outfall, specified by this permit, is considered to be industrial solid waste until the wastewater passes through the actual point source discharge and must be managed in accordance with all applicable provisions of 30 TAC Chapter 335.

c.  The permittee shall provide written notification, pursuant to the requirements of 30 TAC § 335.8(b)(1), to the Corrective Action Section (MC 127) of the Remediation Division informing the Commission of any closure activity involving an Industrial Solid Waste Management Unit, at least 90 days prior to conducting such an activity.

SWWC Utilities, Inc.                    TPDES Permit No. WQ0016022001

    d.  Construction of any industrial solid waste management unit requires the prior written notification of the proposed activity to the Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division. No person shall dispose of industrial solid waste, including sludge or other solids from wastewater treatment processes, prior to fulfilling the deed recordation requirements of 30 TAC § 335.5.

    e.  The term "industrial solid waste management unit" means a landfill, surface impoundment, waste-pile, industrial furnace, incinerator, cement kiln, injection well, container, drum, salt dome waste containment cavern, or any other structure vessel, appurtenance, or other improvement on land used to manage industrial solid waste.

    f.  The permittee shall keep management records for all sludge (or other waste) removed from any wastewater treatment process. These records shall fulfill all applicable requirements of 30 TAC § 335 and must include the following, as it pertains to wastewater treatment and discharge:

        i.   Volume of waste and date(s) generated from treatment process;
        ii.  Volume of waste disposed of on-site or shipped off-site;
        iii. Date(s) of disposal;
        iv. Identity of hauler or transporter;
        v.   Location of disposal site; and
        vi.  Method of final disposal.

        The above records shall be maintained on a monthly basis. The records shall be retained at the facility site, or shall be readily available for review by authorized representatives of the TCEQ for at least five years.

12.  For industrial facilities to which the requirements of 30 TAC § 335 do not apply, sludge and solid wastes, including tank cleaning and contaminated solids for disposal, shall be disposed of in accordance with THSC § 361.

TCEQ Revision 06/2020

SWWC Utilities, Inc.                              TPDES Permit No. WQ0016022001

## SLUDGE PROVISIONS

The permittee is authorized to dispose of sludge or biosolids only at a Texas Commission on Environmental Quality (TCEQ) authorized land application site, co-disposal landfill, wastewater treatment facility, or facility that further processes sludge. **The disposal of sludge or biosolids by land application on property owned, leased or under the direct control of the permittee is a violation of the permit unless the site is authorized with the TCEQ. This provision does not authorize Distribution and Marketing of Class A or Class AB Biosolids. This provision does not authorize the permittee to land apply biosolids on property owned, leased or under the direct control of the permittee.**

**SECTION I.      REQUIREMENTS APPLYING TO ALL SEWAGE SLUDGE OR BIOSOLIDS LAND APPLICATION**

### A. General Requirements

1.  The permittee shall handle and dispose of sewage sludge or biosolids in accordance with 30 TAC § 312 and all other applicable state and federal regulations in a manner that protects public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present in the sludge or biosolids.

2.  In all cases, if the person (permit holder) who prepares the sewage sludge supplies the sewage sludge to another person for land application use or to the owner or lease holder of the land, the permit holder shall provide necessary information to the parties who receive the sludge to assure compliance with these regulations.

3.  The land application of processed or unprocessed chemical toilet waste, grease trap waste, grit trap waste, milk solids, or similar non-hazardous municipal or industrial solid wastes, or any of the wastes listed in this provision combined with biosolids, WTP residuals or domestic septage is prohibited unless the grease trap waste is added at a fats, oil and grease (FOG) receiving facility as part of an anaerobic digestion process.

### B. Testing Requirements

1.  Sewage sludge or biosolids shall be tested once during the term of this permit in accordance with the method specified in both 40 CFR Part 261, Appendix II and 40 CFR Part 268, Appendix I [Toxicity Characteristic Leaching Procedure (TCLP)] or other method that receives the prior approval of the TCEQ for the contaminants listed in 40 CFR Part 261.24, Table 1. Sewage sludge or biosolids failing this test shall be managed according to RCRA standards for generators of hazardous waste, and the waste's disposition must be in accordance with all applicable requirements for hazardous waste processing, storage, or disposal. Following failure of any TCLP test, the management or disposal of sewage sludge or biosolids at a facility other than an authorized hazardous waste processing, storage, or disposal facility shall be prohibited until such time as the permittee can demonstrate the sewage sludge or biosolids no longer exhibits the hazardous waste toxicity characteristics (as demonstrated by the results of the TCLP tests). A written report shall be provided to both the TCEQ Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division and the Regional Director (MC Region 11) within seven (7) days after failing the TCLP Test.

Page 17

The report shall contain test results, certification that unauthorized waste management has stopped, and a summary of alternative disposal plans that comply with RCRA standards for the management of hazardous waste. The report shall be addressed to: Director, Permitting and Registration Support Division (MC 129), Texas Commission on Environmental Quality, P.O. Box 13087, Austin, Texas 78711-3087. In addition, the permittee shall prepare an annual report on the results of all sludge toxicity testing. This annual report shall be submitted to the TCEQ Regional Office (MC Region 11) and the Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30th of each year. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

2. Biosolids shall not be applied to the land if the concentration of the pollutants exceeds the pollutant concentration criteria in Table 1. The frequency of testing for pollutants in Table 1 is found in Section I.C. of this permit.

TABLE 1

| Pollutant | Ceiling Concentration (Milligrams per kilogram)* |
|---|---|
| Arsenic | 75 |
| Cadmium | 85 |
| Chromium | 3000 |
| Copper | 4300 |
| Lead | 840 |
| Mercury | 57 |
| Molybdenum | 75 |
| Nickel | 420 |
| PCBs | 49 |
| Selenium | 100 |
| Zinc | 7500 |

* Dry weight basis

3. Pathogen Control

All sewage sludge that is applied to agricultural land, forest, a public contact site, or a reclamation site must be treated by one of the following methods to ensure that the sludge meets either the Class A, Class AB or Class B biosolids pathogen requirements.

a. For sewage sludge to be classified as Class A biosolids with respect to pathogens, the density of fecal coliform in the sewage sludge must be less than 1,000 most probable number (MPN) per gram of total solids (dry weight basis), or the density of Salmonella sp. bacteria in the sewage sludge must be less than three MPN per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. In addition, one of the alternatives listed below must be met:

Alternative 1 - The temperature of the sewage sludge that is used or disposed shall be maintained at or above a specific value for a period of time. See 30 TAC § 312.82(a)(2)(A) for specific information;

Page 18

SWWC Utilities, Inc.                                   TPDES Permit No. WQ0016022001

Alternative 5 (PFRP) - Sewage sludge that is used or disposed of must be treated in one of the Processes to Further Reduce Pathogens (PFRP) described in 40 CFR Part 503, Appendix B. PFRP include composting, heat drying, heat treatment, and thermophilic aerobic digestion; or

Alternative 6 (PFRP Equivalent) - Sewage sludge that is used or disposed of must be treated in a process that has been approved by the U. S. Environmental Protection Agency as being equivalent to those in Alternative 5.

b.  For sewage sludge to be classified as Class AB biosolids with respect to pathogens, the density of fecal coliform in the sewage sludge must be less than 1,000 MPN per gram of total solids (dry weight basis), or the density of *Salmonella* sp. bacteria in the sewage sludge be less than three MPN per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. In addition, one of the alternatives listed below must be met:

Alternative 2 - The pH of the sewage sludge that is used or disposed shall be raised to above 12 std. units and shall remain above 12 std. units for 72 hours.

The temperature of the sewage sludge shall be above 52° Celsius for 12 hours or longer during the period that the pH of the sewage sludge is above 12 std. units.

At the end of the 72-hour period during which the pH of the sewage sludge is above 12 std. units, the sewage sludge shall be air dried to achieve a percent solids in the sewage sludge greater than 50%; or

Alternative 3 - The sewage sludge shall be analyzed for enteric viruses prior to pathogen treatment. The limit for enteric viruses is less than one Plaque-forming Unit per four grams of total solids (dry weight basis) either before or following pathogen treatment. See 30 TAC § 312.82(a)(2)(C)(i-iii) for specific information. The sewage sludge shall be analyzed for viable helminth ova prior to pathogen treatment. The limit for viable helminth ova is less than one per four grams of total solids (dry weight basis) either before or following pathogen treatment. See 30 TAC § 312.82(a)(2)(C)(iv-vi) for specific information; or

Alternative 4 - The density of enteric viruses in the sewage sludge shall be less than one Plaque-forming Unit per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. The density of viable helminth ova in the sewage sludge shall be less than one per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed.

c.  Sewage sludge that meets the requirements of Class AB biosolids may be classified a Class A biosolids if a variance request is submitted in writing that is supported by substantial documentation demonstrating equivalent methods for reducing odors and written approval is granted by the executive director. The executive director may deny the variance request or revoke that approved variance if it is determined that the variance may potentially endanger human health or the environment or create nuisance odor conditions.

d.  Three alternatives are available to demonstrate compliance with Class B biosolids criteria.

Page 19

SWWC Utilities, Inc.                    TPDES Permit No. WQ0016022001

Alternative 1

i.   A minimum of seven random samples of the sewage sludge shall be collected within 48 hours of the time the sewage sludge is used or disposed of during each monitoring episode for the sewage sludge.

ii.  The geometric mean of the density of fecal coliform in the samples collected shall be less than either 2,000,000 MPN per gram of total solids (dry weight basis) or 2,000,000 Colony Forming Units per gram of total solids (dry weight basis).

Alternative 2 - Sewage sludge that is used or disposed of shall be treated in one of the Processes to Significantly Reduce Pathogens (PSRP) described in 40 CFR Part 503, Appendix B, so long as all of the following requirements are met by the generator of the sewage sludge.

i.   Prior to use or disposal, all the sewage sludge must have been generated from a single location, except as provided in paragraph v. below;

ii.  An independent Texas Licensed Professional Engineer must make a certification to the generator of a sewage sludge that the wastewater treatment facility generating the sewage sludge is designed to achieve one of the PSRP at the permitted design loading of the facility. The certification need only be repeated if the design loading of the facility is increased. The certification shall include a statement indicating the design meets all the applicable standards specified in Appendix B of 40 CFR Part 503;

iii. Prior to any off-site transportation or on-site use or disposal of any sewage sludge generated at a wastewater treatment facility, the chief certified operator of the wastewater treatment facility or other responsible official who manages the processes to significantly reduce pathogens at the wastewater treatment facility for the permittee, shall certify that the sewage sludge underwent at least the minimum operational requirements necessary in order to meet one of the PSRP. The acceptable processes and the minimum operational and record keeping requirements shall be in accordance with established U.S. Environmental Protection Agency final guidance;

iv.  All certification records and operational records describing how the requirements of this paragraph were met shall be kept by the generator for a minimum of three years and be available for inspection by commission staff for review; and

v.   If the sewage sludge is generated from a mixture of sources, resulting from a person who prepares sewage sludge from more than one wastewater treatment facility, the resulting derived product shall meet one of the PSRP, and shall meet the certification, operation, and record keeping requirements of this paragraph.

Alternative 3 - Sewage sludge shall be treated in an equivalent process that has been approved by the U.S. Environmental Protection Agency, so long as all of the following requirements are met by the generator of the sewage sludge.

i.   Prior to use or disposal, all the sewage sludge must have been generated from a single location, except as provided in paragraph v. below;

ii. Prior to any off-site transportation or on-site use or disposal of any sewage sludge generated at a wastewater treatment facility, the chief certified operator of the wastewater treatment facility or other responsible official who manages the processes to significantly reduce pathogens at the wastewater treatment facility for the permittee, shall certify that the sewage sludge underwent at least the minimum operational requirements necessary in order to meet one of the PSRP. The acceptable processes and the minimum operational and record keeping requirements shall be in accordance with established U.S. Environmental Protection Agency final guidance;

iii. All certification records and operational records describing how the requirements of this paragraph were met shall be kept by the generator for a minimum of three years and be available for inspection by commission staff for review;

iv. The Executive Director will accept from the U.S. Environmental Protection Agency a finding of equivalency to the defined PSRP; and

v. If the sewage sludge is generated from a mixture of sources resulting from a person who prepares sewage sludge from more than one wastewater treatment facility, the resulting derived product shall meet one of the Processes to Significantly Reduce Pathogens, and shall meet the certification, operation, and record keeping requirements of this paragraph.

In addition to the Alternatives 1 – 3, the following site restrictions must be met if Class B biosolids are land applied:

i. Food crops with harvested parts that touch the biosolids /soil mixture and are totally above the land surface shall not be harvested for 14 months after application of biosolids.

ii. Food crops with harvested parts below the surface of the land shall not be harvested for 20 months after application of biosolids when the biosolids remain on the land surface for 4 months or longer prior to incorporation into the soil.

iii. Food crops with harvested parts below the surface of the land shall not be harvested for 38 months after application of biosolids when the biosolids remain on the land surface for less than 4 months prior to incorporation into the soil.

iv. Food crops, feed crops, and fiber crops shall not be harvested for 30 days after application of biosolids.

v. Domestic livestock shall not be allowed to graze on the land for 30 days after application of biosolids.

vi. Turf grown on land where biosolids are applied shall not be harvested for 1 year after application of the biosolids when the harvested turf is placed on either land with a high potential for public exposure or a lawn.

vii. Public access to land with a high potential for public exposure shall be restricted for 1 year after application of biosolids.

SWWC Utilities, Inc.                    TPDES Permit No. WQ0016022001

    viii. Public access to land with a low potential for public exposure shall be restricted for 30 days after application of biosolids.

    ix. Land application of biosolids shall be in accordance with the buffer zone requirements found in 30 TAC § 312.44.

4. Vector Attraction Reduction Requirements

All bulk sewage sludge that is applied to agricultural land, forest, a public contact site, or a reclamation site shall be treated by one of the following Alternatives 1 through 10 for vector attraction reduction.

Alternative 1 -  The mass of volatile solids in the sewage sludge shall be reduced by a minimum of 38%.

Alternative 2 -  If Alternative 1 cannot be met for an anaerobically digested sludge, demonstration can be made by digesting a portion of the previously digested sludge anaerobically in the laboratory in a bench-scale unit for 40 additional days at a temperature between 30° and 37° Celsius. Volatile solids must be reduced by less than 17% to demonstrate compliance.

Alternative 3 -  If Alternative 1 cannot be met for an aerobically digested sludge, demonstration can be made by digesting a portion of the previously digested sludge with percent solids of two percent or less aerobically in the laboratory in a bench-scale unit for 30 additional days at 20° Celsius. Volatile solids must be reduced by less than 15% to demonstrate compliance.

Alternative 4 -  The specific oxygen uptake rate (SOUR) for sewage sludge treated in an aerobic process shall be equal to or less than 1.5 milligrams of oxygen per hour per gram of total solids (dry weight basis) at a temperature of 20° Celsius.

Alternative 5 -  Sewage sludge shall be treated in an aerobic process for 14 days or longer. During that time, the temperature of the sewage sludge shall be higher than 40° Celsius and the average temperature of the sewage sludge shall be higher than 45° Celsius.

Alternative 6 -  The pH of sewage sludge shall be raised to 12 or higher by alkali addition and, without the addition of more alkali shall remain at 12 or higher for two hours and then remain at a pH of 11.5 or higher for an additional 22 hours at the time the sewage sludge is prepared for sale or given away in a bag or other container.

Alternative 7 -  The percent solids of sewage sludge that does not contain unstabilized solids generated in a primary wastewater treatment process shall be equal to or greater than 75% based on the moisture content and total solids prior to mixing with other materials. Unstabilized solids are defined as organic materials in sewage sludge that have not been treated in either an aerobic or anaerobic treatment process.

Alternative 8 -    The percent solids of sewage sludge that contains unstabilized solids generated in a primary wastewater treatment process shall be equal to or greater than 90% based on the moisture content and total solids prior to mixing with other materials at the time the sludge is used. Unstabilized solids are defined as organic materials in sewage sludge that have not been treated in either an aerobic or anaerobic treatment process.

Alternative 9 -    i.    Biosolids shall be injected below the surface of the land.

                      ii.    No significant amount of the biosolids shall be present on the land surface within one hour after the biosolids are injected.

                      iii.    When sewage sludge that is injected below the surface of the land is Class A or Class AB with respect to pathogens, the biosolids shall be injected below the land surface within eight hours after being discharged from the pathogen treatment process.

Alternative 10-    i.    Biosolids applied to the land surface or placed on a surface disposal site shall be incorporated into the soil within six hours after application to or placement on the land.

                      ii.    When biosolids that is incorporated into the soil is Class A or Class AB with respect to pathogens, the biosolids shall be applied to or placed on the land within eight hours after being discharged from the pathogen treatment process.

## C.  Monitoring Requirements

| | |
|---|---|
| Toxicity Characteristic Leaching Procedure (TCLP) Test | - once during the term of this permit |
| PCBs | - once during the term of this permit |

All metal constituents and fecal coliform or *Salmonella* sp. bacteria shall be monitored at the appropriate frequency shown below, pursuant to 30 TAC § 312.46(a)(1):

| Amount of biosolids (*)<br>metric tons per 365-day period | Monitoring Frequency |
|---|---|
| 0 to less than 290 | Once/Year |
| 290 to less than 1,500 | Once/Quarter |
| 1,500 to less than 15,000 | Once/Two Months |
| 15,000 or greater | Once/Month |

(*) *The amount of bulk biosolids applied to the land (dry wt. basis).*

Representative samples of sewage sludge shall be collected and analyzed in accordance with the methods referenced in 30 TAC § 312.7.

Page 23

SWWC Utilities, Inc.                                    TPDES Permit No. WQ0016022001

Identify each of the analytic methods used by the facility to analyze enteric viruses, fecal coliforms, helminth ova, *Salmonella* sp., and other regulated parameters.

Identify in the following categories (as applicable) the sewage sludge or biosolids treatment process or processes at the facility: preliminary operations (e.g., sludge or biosolids grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

Identify the nature of material generated by the facility (such as a biosolid for beneficial use or land-farming, or sewage sludge or biosolids for disposal at a monofill) and whether the material is ultimately conveyed off-site in bulk or in bags.

**SECTION II.  REQUIREMENTS SPECIFIC TO BULK SEWAGE SLUDGE FOR APPLICATION TO THE LAND MEETING CLASS A, CLASS AB or B BIOSOLIDS PATHOGEN REDUCTION AND THE CUMULATIVE LOADING RATES IN TABLE 2, OR CLASS B PATHOGEN REDUCTION AND THE POLLUTANT CONCENTRATIONS IN TABLE 3**

For those permittees meeting Class A, Class AB or B pathogen reduction requirements and that meet the cumulative loading rates in Table 2 below, or the Class B pathogen reduction requirements and contain concentrations of pollutants below listed in Table 3, the following conditions apply:

**A. Pollutant Limits**

Table 2

| Pollutant | Cumulative Pollutant Loading Rate (pounds per acre)* |
|---|---|
| Arsenic | 36 |
| Cadmium | 35 |
| Chromium | 2677 |
| Copper | 1339 |
| Lead | 268 |
| Mercury | 15 |
| Molybdenum | Report Only |
| Nickel | 375 |
| Selenium | 89 |
| Zinc | 2500 |

Table 3

| Pollutant | Monthly Average Concentration (milligrams per kilogram)* |
|---|---|
| Arsenic | 41 |
| Cadmium | 39 |
| Chromium | 1200 |
| Copper | 1500 |
| Lead | 300 |
| Mercury | 17 |
| Molybdenum | Report Only |
| Nickel | 420 |
| Selenium | 36 |
| Zinc | 2800 |

*Dry weight basis

**B. Pathogen Control**

All bulk sewage sludge that is applied to agricultural land, forest, a public contact site, a reclamation site, shall be treated by either Class A, Class AB or Class B biosolids pathogen reduction requirements as defined above in Section I.B.3.

SWWC Utilities, Inc.                                    TPDES Permit No. WQ0016022001

### C. Management Practices

1. Bulk biosolids shall not be applied to agricultural land, forest, a public contact site, or a reclamation site that is flooded, frozen, or snow-covered so that the bulk biosolids enters a wetland or other waters in the State.

2. Bulk biosolids not meeting Class A biosolids requirements shall be land applied in a manner which complies with Applicability in accordance with 30 TAC §312.41 and the Management Requirements in accordance with 30 TAC § 312.44.

3. Bulk biosolids shall be applied at or below the agronomic rate of the cover crop.

4. An information sheet shall be provided to the person who receives bulk Class A or AB biosolids sold or given away. The information sheet shall contain the following information:

   a. The name and address of the person who prepared the Class A or AB biosolids that are sold or given away in a bag or other container for application to the land.

   b. A statement that application of the biosolids to the land is prohibited except in accordance with the instruction on the label or information sheet.

   c. The annual whole sludge application rate for the biosolids application rate for the biosolids that does not cause any of the cumulative pollutant loading rates in Table 2 above to be exceeded, unless the pollutant concentrations in Table 3 found in Section II above are met.

### D. Notification Requirements

1. If bulk biosolids is applied to land in a State other than Texas, written notice shall be provided prior to the initial land application to the permitting authority for the State in which the bulk biosolids are proposed to be applied. The notice shall include:

   a. The location, by street address, and specific latitude and longitude, of each land application site.

   b. The approximate time period bulk biosolids will be applied to the site.

   c. The name, address, telephone number, and National Pollutant Discharge Elimination System permit number (if appropriate) for the person who will apply the bulk biosolids.

2. The permittee shall give 180 days prior notice to the Executive Director in care of the Wastewater Permitting Section (MC 148) of the Water Quality Division of any change planned in the biosolids disposal practice.

### E. Record Keeping Requirements

The documents will be retained at the facility site and/or shall be readily available for review by a TCEQ representative. The person who prepares bulk sewage sludge or a biosolids material shall develop the following information and shall retain the information at the facility site and/or shall be readily available for review by a TCEQ representative for a period

Page 26

SWWC Utilities, Inc.                                    TPDES Permit No. WQ0016022001

of <u>five years</u>. If the permittee supplies the sludge to another person who land applies the sludge, the permittee shall notify the land applier of the requirements for record keeping found in 30 TAC § 312.47 for persons who land apply.

1. The concentration (mg/kg) in the sludge of each pollutant listed in Table 3 above and the applicable pollutant concentration criteria (mg/kg), <u>or</u> the applicable cumulative pollutant loading rate and the applicable cumulative pollutant loading rate limit (lbs/ac) listed in Table 2 above.

2. A description of how the pathogen reduction requirements are met (including site restrictions for Class AB and Class B biosolids, if applicable).

3. A description of how the vector attraction reduction requirements are met.

4. A description of how the management practices listed above in Section II.C are being met.

5. The following certification statement:

   "I certify, under penalty of law, that the applicable pathogen requirements in 30 TAC § 312.82(a) or (b) and the vector attraction reduction requirements in 30 TAC § 312.83(b) have been met for each site on which bulk biosolids are applied. This determination has been made under my direction and supervision in accordance with the system designed to ensure that qualified personnel properly gather and evaluate the information used to determine that the management practices have been met. I am aware that there are significant penalties for false certification including fine and imprisonment."

6. The recommended agronomic loading rate from the references listed in Section II.C.3. above, as well as the actual agronomic loading rate shall be retained. The person who applies bulk biosolids shall develop the following information and shall retain the information at the facility site and/or shall be readily available for review by a TCEQ representative <u>indefinitely</u>. If the permittee supplies the sludge to another person who land applies the sludge, the permittee shall notify the land applier of the requirements for record keeping found in 30 TAC § 312.47 for persons who land apply:

   a. A certification statement that all applicable requirements (specifically listed) have been met, and that the permittee understands that there are significant penalties for false certification including fine and imprisonment. See 30 TAC § 312.47(a)(4)(A)(ii) or 30 TAC § 312.47(a)(5)(A)(ii), as applicable, and to the permittee's specific sludge treatment activities.

   b. The location, by street address, and specific latitude and longitude, of each site on which biosolids is applied.

   c. The number of acres in each site on which bulk biosolids are applied.

   d. The date and time biosolids are applied to each site.

   e. The cumulative amount of each pollutant in pounds/acre listed in Table 2 applied to each site.

   f. The total amount of biosolids applied to each site in dry tons.

Page 27

SWWC Utilities, Inc.                                   TPDES Permit No. WQ0016022001

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

## F. Reporting Requirements

The permittee shall report annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division, by September 30th of each year the following information. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1. Identify in the following categories (as applicable) the sewage sludge or biosolids treatment process or processes at the facility: preliminary operations (e.g., sludge or biosolids grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2. Identify the nature of material generated by the facility (such as a biosolid for beneficial use or land-farming, or sewage sludge for disposal at a monofill) and whether the material is ultimately conveyed off-site in bulk or in bags.

3. Results of tests performed for pollutants found in either Table 2 or 3 as appropriate for the permittee's land application practices.

4. The frequency of monitoring listed in Section I.C. that applies to the permittee.

5. Toxicity Characteristic Leaching Procedure (TCLP) results.

6. PCB concentration in sludge or biosolids in mg/kg.

7. Identity of hauler(s) and TCEQ transporter number.

8. Date(s) of transport.

9. Texas Commission on Environmental Quality registration number, if applicable.

10. Amount of sludge or biosolids disposal dry weight (lbs/acre) at each disposal site.

11. The concentration (mg/kg) in the sludge of each pollutant listed in Table 1 (defined as a monthly average) as well as the applicable pollutant concentration criteria (mg/kg) listed in Table 3 above, or the applicable pollutant loading rate limit (lbs/acre) listed in Table 2 above if it exceeds 90% of the limit.

12. Level of pathogen reduction achieved (Class A, Class AB or Class B).

13. Alternative used as listed in Section I.B.3.(a. or b.). Alternatives describe how the pathogen reduction requirements are met. If Class B biosolids, include information on how site restrictions were met.

14. Identify each of the analytic methods used by the facility to analyze enteric viruses, fecal coliforms, helminth ova, *Salmonella* sp., and other regulated parameters.

15. Vector attraction reduction alternative used as listed in Section I.B.4.

Page 28

SWWC Utilities, Inc.                                    TPDES Permit No. WQ0016022001

16. Amount of sludge or biosolids transported in dry tons/year.

17. The certification statement listed in either 30 TAC § 312.47(a)(4)(A)(ii) or 30 TAC § 312.47(a)(5)(A)(ii) as applicable to the permittee's sludge or biosolids treatment activities, shall be attached to the annual reporting form.

18. When the amount of any pollutant applied to the land exceeds 90% of the cumulative pollutant loading rate for that pollutant, as described in Table 2, the permittee shall report the following information as an attachment to the annual reporting form.

    a. The location, by street address, and specific latitude and longitude.

    b. The number of acres in each site on which bulk biosolids are applied.

    c. The date and time bulk biosolids are applied to each site.

    d. The cumulative amount of each pollutant (i.e., pounds/acre) listed in Table 2 in the bulk biosolids applied to each site.

    e. The amount of biosolids (i.e., dry tons) applied to each site.

    The above records shall be maintained on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

**SECTION III.      REQUIREMENTS APPLYING TO ALL SEWAGE SLUDGE OR BIOSOLIDS DISPOSED IN A MUNICIPAL SOLID WASTE LANDFILL**

A.   The permittee shall handle and dispose of sewage sludge or biosolids in accordance with 30 TAC § 330 and all other applicable state and federal regulations to protect public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present. The permittee shall ensure that the sewage sludge or biosolids meets the requirements in 30 TAC § 330 concerning the quality of the sludge disposed in a municipal solid waste landfill.

B.   If the permittee generates sewage sludge or biosolids and supplies that sewage sludge or biosolids to the owner or operator of a municipal solid waste landfill (MSWLF) for disposal, the permittee shall provide to the owner or operator of the MSWLF appropriate information needed to be in compliance with the provisions of this permit.

C.   The permittee shall give 180 days prior notice to the Executive Director in care of the Wastewater Permitting Section (MC 148) of the Water Quality Division of any change planned in the sewage sludge or biosolids disposal practice.

D.   Sewage sludge or biosolids shall be tested once during the term of this permit in accordance with the method specified in both 40 CFR Part 261, Appendix II and 40 CFR Part 268, Appendix I (Toxicity Characteristic Leaching Procedure) or other method, which receives the prior approval of the TCEQ for contaminants listed in Table 1 of 40 CFR § 261.24. Sewage sludge or biosolids failing this test shall be managed according to RCRA standards for generators of hazardous waste, and the waste's disposition must be in accordance with all applicable requirements for hazardous waste processing, storage, or disposal.

Following failure of any TCLP test, the management or disposal of sewage sludge or biosolids at a facility other than an authorized hazardous waste processing, storage, or disposal facility shall be prohibited until such time as the permittee can demonstrate the sewage sludge or biosolids no longer exhibits the hazardous waste toxicity characteristics (as demonstrated by the results of the TCLP tests). A written report shall be provided to both the TCEQ Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division and the Regional Director (MC Region 11) of the appropriate TCEQ field office within 7 days after failing the TCLP Test.

The report shall contain test results, certification that unauthorized waste management has stopped, and a summary of alternative disposal plans that comply with RCRA standards for the management of hazardous waste. The report shall be addressed to: Director, Permitting and Registration Support Division (MC 129), Texas Commission on Environmental Quality, P. O. Box 13087, Austin, Texas 78711-3087. In addition, the permittee shall prepare an annual report on the results of all sludge toxicity testing. This annual report shall be submitted to the TCEQ Regional Office (MC Region 11) and the Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30 of each year.

E.   Sewage sludge or biosolids shall be tested as needed, in accordance with the requirements of 30 TAC Chapter 330.

F.   Record Keeping Requirements

The permittee shall develop the following information and shall retain the information for five years.

SWWC Utilities, Inc.                                   TPDES Permit No. WQ0016022001

    1.   The description (including procedures followed and the results) of all liquid Paint Filter Tests performed.

    2.   The description (including procedures followed and results) of all TCLP tests performed.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

G.  Reporting Requirements

The permittee shall report annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30th of each year the following information. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

    1.   Identify in the following categories (as applicable) the sewage sludge or biosolids treatment process or processes at the facility: preliminary operations (e.g., sludge or biosolids grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

    2.   Toxicity Characteristic Leaching Procedure (TCLP) results.

    3.   Annual sludge or biosolids production in dry tons/year.

    4.   Amount of sludge or biosolids disposed in a municipal solid waste landfill in dry tons/year.

    5.   Amount of sludge or biosolids transported interstate in dry tons/year.

    6.   A certification that the sewage sludge or biosolids meets the requirements of 30 TAC § 330 concerning the quality of the sludge disposed in a municipal solid waste landfill.

    7.   Identity of hauler(s) and transporter registration number.

    8.   Owner of disposal site(s).

    9.   Location of disposal site(s).

    10. Date(s) of disposal.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

**SECTION IV.    REQUIREMENTS APPLYING TO SLUDGE OR BIOSOLIDS TRANSPORTED TO ANOTHER FACILITY FOR FURTHER PROCESSING**

These provisions apply to sludge or biosolids that is transported to another wastewater treatment facility or facility that further processes sludge or biosolids. These provisions are intended to allow transport of sludge or biosolids to facilities that have been authorized to accept sludge or biosolids. These provisions do not limit the ability of the receiving facility to determine whether to accept the sludge or biosolids, nor do they limit the ability of the receiving facility to request additional testing or documentation.

**A.  General Requirements**

1.  The permittee shall handle and dispose of sewage sludge or biosolids in accordance with 30 TAC Chapter 312 and all other applicable state and federal regulations in a manner that protects public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present in the sludge.

2.  Sludge or biosolids may only be transported using a registered transporter or using an approved pipeline.

**B.  Record Keeping Requirements**

1.  For sludge or biosolids transported by an approved pipeline, the permittee must maintain records of the following:

    a.    the amount of sludge or biosolids transported;

    b.    the date of transport;

    c.    the name and TCEQ permit number of the receiving facility or facilities;

    d.    the location of the receiving facility or facilities;

    e.    the name and TCEQ permit number of the facility that generated the waste; and

    f.    copy of the written agreement between the permittee and the receiving facility to accept sludge or biosolids.

2.  For sludge transported by a registered transporter, the permittee must maintain records of the completed trip tickets in accordance with 30 TAC § 312.145(a)(1)-(7) and amount of sludge or biosolids transported.

3.  The above records shall be maintained on-site on a monthly basis and shall be made available to the TCEQ upon request. These records shall be retained for at least five years.

SWWC Utilities, Inc.                                          TPDES Permit No. WQ0016022001

## C.  Reporting Requirements

The permittee shall report the following information annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division, by September 30th of each year. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1.  Identify in the following categories (as applicable) the sewage sludge or biosolids treatment process or processes at the facility: preliminary operations (e.g., sludge or biosolids grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2.  the annual sludge or biosolids production;

3.  the amount of sludge or biosolids transported;

4.  the owner of each receiving facility;

5.  the location of each receiving facility; and

6.  the date(s) of disposal at each receiving facility.

TCEQ Revision 06/2020

Page 33

SWWC Utilities, Inc.                                    TPDES Permit No. WQ0016022001

**OTHER REQUIREMENTS**

1.  The permittee shall employ or contract with one or more licensed wastewater treatment facility operators or wastewater system operations companies holding a valid license or registration according to the requirements of 30 TAC Chapter 30, Occupational Licenses and Registrations, and in particular 30 TAC Chapter 30, Subchapter J, Wastewater Operators and Operations Companies.

    This Category C facility must be operated by a chief operator or an operator holding a Class C license or higher. The facility must be operated a minimum of five days per week by the licensed chief operator or an operator holding the required level of license or higher. The licensed chief operator or operator holding the required level of license or higher must be available by telephone or pager seven days per week. Where shift operation of the wastewater treatment facility is necessary, each shift that does not have the on-site supervision of the licensed chief operator must be supervised by an operator in charge who is licensed not less than one level below the category for the facility.

2.  The facility is not located in the Coastal Management Program boundary.

3.  Prior to construction of the Interim I, Interim II, and Final phases, the permittee shall submit sufficient evidence of legal restrictions prohibiting residential structures within the part of the buffer zone not owned by the permittee according to 30 TAC § 309.13(e)(3). The evidence of legal restrictions shall be submitted to the Executive Director in care of the TCEQ Wastewater Permitting Section (MC 148). The permittee shall comply with the requirements of 30 TAC § 309.13(a) through (d). See Attachment A1, A2 and A3.)

4.  The permittee shall provide facilities for the protection of its wastewater treatment facility from a 100-year flood.

5.  In accordance with 30 TAC § 319.9, a permittee that has at least twelve months of uninterrupted compliance with its bacteria limit may notify the commission in writing of its compliance and request a less frequent measurement schedule. To request a less frequent schedule, the permittee shall submit a written request to the TCEQ Wastewater Permitting Section (MC 148) for each phase that includes a different monitoring frequency. The request must contain all of the reported bacteria values (Daily Avg. and Daily Max/Single Grab) for the twelve consecutive months immediately prior to the request. If the Executive Director finds that a less frequent measurement schedule is protective of human health and the environment, the permittee may be given a less frequent measurement schedule. For this permit, 1/month may be reduced to 1/quarter in the Interim I and II phases and 2/month may be reduced to 1/month in the Final phase. **A violation of any bacteria limit by a facility that has been granted a less frequent measurement schedule will require the permittee to return to the standard frequency schedule and submit written notice to the TCEQ Wastewater Permitting Section (MC 148).** The permittee may not apply for another reduction in measurement frequency for at least 24 months from the date of the last violation. The Executive Director may establish a more frequent measurement schedule if necessary to protect human health or the environment.

6.  Prior to construction of the Interim I, Interim II, and Final phase treatment facilities, the permittee shall submit to the TCEQ Wastewater Permitting Section (MC 148) a summary transmittal letter in accordance with the requirements in 30 TAC § 217.6(d). If requested by the Wastewater Permitting Section, the permittee shall submit plans and specifications and a final engineering design report which comply with 30 TAC Chapter 217, Design Criteria for Domestic Wastewater Systems. The permittee shall clearly show how the treatment system will meet the permitted effluent limitations required on Pages 2, 2a, and 2b of this permit. A copy of the summary transmittal letter shall be available at the plant site for inspection by authorized representatives of the TCEQ.

SWWC Utilities, Inc.                                      TPDES Permit No. WQ0016022001

7.  Reporting requirements according to 30 TAC §§ 319.1-319.11 and any additional effluent reporting requirements contained in this permit are suspended from the effective date of the permit until plant startup or discharge from the facility described by this permit, whichever occurs first. The permittee shall provide written notice to the TCEQ Regional Office (MC Region 11) and the Applications Review and Processing Team (MC 148) of the Water Quality Division, in writing at least forty-five days prior to plant startup or anticipated discharge, whichever occurs first, and prior to completion of each additional phase on Notification of Completion Form 20007.

**Attachment A1 – Buffer Zone Map**
**WQ0016022001 – SWWC Utilities, Inc.**
**Majestic Manor WWTP**



**Attachment A2 – Buffer Zone Map**
**WQ0016022001 – SWWC Utilities, Inc.**
**Majestic Manor WWTP**



**Attachment A3 – Buffer Zone Map**
**WQ0016022001 – SWWC Utilities, Inc.**
**Majestic Manor WWTP**



# APPENDIX 2

APPENDIX 2 - 001

CAUSE NO. D-1-GN-23-004031

| | | |
|---|---|---|
| WILBARGER CREEK CONSERVATION | § | IN THE DISTRICT COURT |
| ALLIANCE, MARILYN KELINSKE, ANNE | § | |
| BROCKENBROUGH, AND JONATHAN BEALL, | § | |
|     *PLAINTIFFS* | § | |
| | § | 126th JUDICIAL DISTRICT |
| V. | § | |
| | § | |
| TEXAS COMMISSION ON ENVIRONMENTAL | § | |
| QUALITY, | § | |
|     *DEFENDANT* | § | TRAVIS COUNTY, TEXAS |

## ORDER ON PETITION FOR JUDICIAL REVIEW

On March 3, 2025, the Court heard this matter on the merits. After considering the briefs, the evidence including the administrative record, and the arguments of counsel, the Court **FINDS**:

1.  The Commission improperly determined Plaintiffs are not affected persons.

2.  "An affected person is one who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affect by the application. An interest that is common to members of the general public does not qualify as a personal justiciable interest. This standard does not require parties to show that they will ultimately prevail on the merits; it simply requires them to show that they will potentially suffer harm or have a justiciable interest that will be affected." *United Copper Indus., Inc. v. Grissom,* 17 S.W.3d 797, 802–03 (Tex. App.—Austin 2000, pet. dism'd) (cleaned up).

3.  Plaintiffs have the burden to make a minimum jurisdictional showing of a justiciable interest. *See* TEX. WATER CODE § 5.115(a); 30 TEX. ADMIN CODE § 55.203(a), (b); *Heat Energy Advanced Tech., Inc. v. W. Dallas Coal. For Envtl. Justice,* 962 S.W.2d 288, 295 (Tex. App.—Austin 1998, pet. denied). Plaintiffs met their burden by submitting hearing requests under 30 Texas Administrative Code § 55.201, which included the statutorily required information and explained how Plaintiffs would be harmed by the proposed permit, including evidence of harms they have experienced from prior allowances of wastewater discharge into Wilbarger Creek.

4.  The Commission denied Plaintiffs affected-person status because of the distance between their property and the proposed discharge point. The denial did not reference any data showing the proposed permit would have no effect on Plaintiffs because of distance, and the Commission's argument and evidence in this case do not explain why Plaintiffs are too far away to be impacted. The Commission's attempts in this case to

show that Plaintiffs would not be affected to a sufficient degree "confuse[] the preliminary question of whether an individual has standing as an affected person to request a contested-case hearing with the ultimate question of whether that person will prevail in a contested-case hearing on the merits." *See Grissom*, 17 S.W.3d at 803.

5.  Plaintiffs WCCA, Kelinske, Brockenbrough, and Beall are affected persons entitled to a contested case hearing on the SWWC permit application and the Executive Director's draft permit.

The Court therefore **GRANTS** Plaintiffs' Petition, **REVERSES** the Commission's May 2, 2023 Order in Docket No. 2023-0370-MWD, **VACATES** the Commission's May 2, 2023 issuance of TPDES Permit No. WQ0016022001, and **REMANDS** this case to the Commission to determine the number and scope of the specific factual issues to be referred to SOAH.

Date: April 4, 2025

THE HONORABLE LAURIE EISERLOH
455th District Court

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 05/09/2025 09:23:04

VELVA L. PRICE
DISTRICT CLERK

By Deputy:

# APPENDIX 3

June 30, 2022

To:     TCEQ
Fm:    Wilbarger Creek Conservation Alliance

Re:    Majestic Manor WWTP Permit WQ0016022001

The WCCA hereby requests standing and submits the following comments concerning the Majestic Manor WWTP Permit Application.

Existing pollution upstream from the Kalinske Ranch on Wilbarger Creek at 15611 Littig Rd is causing a significant algae bloom as it flows east through the Kalinske Ranch.

We respectfully request the following actions by TCEQ -
- Wilbarger Creek already receives discharges from Shadow Glen and the City of Manor upstream of my property and that of 2 other WCCA Board members.
- Determine the cause of the existing algae bloom before adding more treated effluent. How does the TCEQ determine the cause of existing problems, and what effect will this information have on the new Majestic Manor permit?
- Pflugerville's new WWTP is permitted to discharge 24 mgd. Since that plant is not online yet, We really don't know what the upper reaches of the creek are going to look like in terms of stream flow and water quality after that plant goes online. WCCA requests the TCEQ include this effluent discharge in considering the Majestic Manor permit.
- If all of Pflugerville's effluent is going to Wilbarger, it seems irresponsible to permit additional significant volumes of discharges before the true impacts of Pflugerville's regional plant are more clear.
- The city of Pflugerville's EIS says Wilbarger Creek supposedly has 15.75 MGD of capacity. Is all of this already accounted for in Pflugerville's permit? If so, what is left for Majestic Manor?
- How will the additional discharge of Majestic Manor affect the overall health of Wilbarger Creek?
- Pre-existing conditions should determine the performance standards TCEQ requires for this new treatment plant.
- Does TCEQ have a good water quality baseline? If so, how current is it? The algae bloom seems to have appeared in the last 6 months..
- WCCA requests a current baseline using samples taken during the past year. Please establish a current baseline by taking water quality samples above and below the discharge points of the 5 existing and proposed WWTPs on Wilbarger

Creek: Pflugerville, Shadowglen, Manor, Majestic Manor and Elgin. Wouldn't it be prudent to do this now, prior to approval and construction of Majestic Manor?

- Wouldn't such accurate and timely information help establish the necessary treatment standard for Majestic Manor?
- With the Pflugerville plant already permitted, we are looking at a situation where streamflow will be predominately treated effluent. Continuing to permit additional discharges gives the impression that Wilbarger should simply become a conduit for transporting treated wastewater down to the Colorado river.
- Impairment of Wilbarger Creek has been known for years. The out of date historical information contained in the 2012 water quality study linked below demonstrates impairment. We consider this kind of information, updated and current, vital to making the best decision on Majestic Manor. http://www.austintexas.gov/watershed_protection/publications/document.cfm?id=203919

We believe the treatment standards should be set at the highest possible and achievable limits. Wilbarger Creek should be maintained as a healthy, functioning ecosystem. Isn't it easier and less expensive to prevent problems than to fix them in the future? To this end, we request the TCEQ consider requiring the most protective currently available treatment standards and techniques -

- A limit on total nutrient loading of 0.1 mg/liter phosphorus and 4 mg/liter nitrogen. Wastewater treatment technology is remarkable in terms of how well it can be done. This is a permit that requires it.
- Wet ponds, wetlands and sheet flow over a vegetated buffer - We request this technology on treated effluent prior to discharge into Wilbarger Creek. The use of a few acres devoted to these methods would significantly improve stream inputs.
- Land application - No discharge permits and land applications are required in the Highland Lakes and Barton Springs Zone. What justification is there to not have similar requirements in the Wilbarger Creek watershed? If developers can meet those requirements elsewhere, why shouldn't they do the same in the Wilbarger Creek watershed?
- Beneficial reuse - We appear to be entering another severe drought. Some of that water might be better used for irrigation, wetlands or other beneficial reuse. A reuse plan for Majestic Manor would preserve our potable water resources. Maybe now is the time to start including beneficial reuse in all permits?
- Chlorination is necessary to ensure harmful bacteria is killed. Unfortunately, the usual minimum residual levels in discharges is high enough to kill or stress fish and other aquatic life. If a portion of Wilbarger Creek is predominantly treated effluent, that portion of the Creek will not support much life. Irrigation or

discharging first to a pond or wetland prior to entering Wilbarger Creek could help mitigate that.

- Treatment plant malfunctions are unfortunately predictable, and sometimes outside the control of plant operators. Power outages, floods, mechanical failures, etc. can quickly result in exceedances of permit limits, even in a well run plant. Since Wilbarger creek is so small at this point, the impacts of an unauthorized discharge will be much more severe than a similar discharge into a larger river. Consider Round Rock's problems at the Brushy Creek WWTP, which have been well documented over the last several months. Land application, beneficial reuse, etc. would provide a better buffer in the unfortunate event that the plant has problems.
- The unknown future negative impacts of Pflugerville's WWTP and others indicate TCEQ should err on the side of caution. Downstream neighbors, taxpayers and aquatic environments should not have to suffer so that this wastewater operator can save a little money.
- The developers will make a lot of money. We urge the TCEQ to require the highest possible standards. The costs can be recovered in land sale prices.

In addition, WCCA requests -

- Standing for our organization to participate in the TCEQ process for Majestic Manor WWTP.
- Standing as individuals for three of the members of our WCCA Board who own significant stretches of both sides of Wilbarger Creek downstream of Majestic Manor: myself, Marilyn Kelinske, and Anne Brockenbrough. We request they be granted standing as individuals

Finally, the actual discharge point is not clear from the notice. It should be stated with more specificity in the application, but this detail is not in the public notice. It seems like an unreasonable burden to require us to obtain and read the entire application, just to see where this discharge is going to be.

Respectfully submitted,

Jon Beall, President

Wilbarger Creek Conservation Alliance

# APPENDIX 4



## Debbie Zachary

**From:** PUBCOMMENT-OCC
**Sent:** Tuesday, July 5, 2022 11:27 AM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001

PML+
H

**From:** Elmridgeranch@yahoo.com <Elmridgeranch@yahoo.com>
**Sent:** Wednesday, June 29, 2022 11:07 PM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Anne Stewart Brockenbrough

**EMAIL:** Elmridgeranch@yahoo.com

**COMPANY:** Elm Ridge Ranch

**ADDRESS:** 11318 JONES RD
MANOR TX 78653-5205

**PHONE:** 5127898699

**FAX:**

**COMMENTS:** My name is Anne Brockenbrough and I am writing in regards to the SWWC Utilities, Inc application for a new Texas Pollutant Discharge Elimination System (TPDES) Permit # WQ0016022001. I would like to request standing, a public hearing, and to be placed on the permanent mailing list for this applicant and for Travis County. I own and live on a working ranch approximately 3 miles down stream of the proposed Majestic Manor waste water treatment plant. I

 

own land on both sides of Wilbarger Creek, and over the past 25 years, I have seen what used to be a seasonally intermittent creek—often completely dry—now running very high all the time due to the treated effluent being pumped in constantly from several waste water treatment plants upstream—including Manor, Shadow Glen and soon Pflugerville. The water is often times right up under the bridge on Jones Road and has caused increased flooding of my land and Jones Road which now has to be repaired every year. Wilbarger Creek now floods several times a year—every time there is a big rain. This causes my fences to blow out and livestock to escape. Last year we lost 17 head of cattle— and many of the surrounding neighbors cattle end up on my place because their cattle either escape or get washed down stream. It is becoming increasingly impossible to run a profitable working ranch. I am concerned that adding even more waste water into Wilbarger Creek will cause further erosion and loss of my land as well as my livestock. It will also impair the water quality even more. I have had the water quality tested several times over the last few years by the Austin Youth River Watchers (AYRW) and each time they have found the water in Wilbarger Creek has extremely low dissolved oxygen levels indicating that the creek is already impaired or dangerously close. With the addition of treated effluent coming from Plugerville and Majestic Manor, I am afraid the creek will be permanently impaired. I ask that TCEQ do a current test of the water in Wilbarger down stream of the Manor plant before you approve this permit. You are welcome to come on my ranch and test the water any time. I think a TMDL study is needed. If this permit application is approved I would hope that you would hold all the plants currently discharging into Wilbarger Creek to much higher standards and investigate the cause of the water impairment before it is too late. Again, I would like to request standing in this case and also request a public hearing. Please put me on the mailing list for this case as well as for Travis County. Thank you for your consideration. Anne Brockenbrough Elm Ridge Ranch 11318 Jones Road Manor, Tx 78653 Elmridgeranch@yahoo.com (512)789-8699

# APPENDIX 5

Debbie Zachary

**From:** PUBCOMMENT-OCC
**Sent:** Tuesday, July 5, 2022 11:30 AM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001
**Attachments:** Majestic Marsh WWTP2.pdf

eComment = H
Attachment = H

**From:** makoph@hotmail.com <makoph@hotmail.com>
**Sent:** Thursday, June 30, 2022 10:18 AM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

REGULATED ENTY NAME MAJESTIC MANOR WWTP

RN NUMBER: RN111305389

PERMIT NUMBER: WQ0016022001

DOCKET NUMBER:

COUNTY: TRAVIS

PRINCIPAL NAME: SWWC UTILITIES INC

CN NUMBER: CN603264763

FROM

NAME: MARILYN KELINSKE

EMAIL: makoph@hotmail.com

COMPANY:

ADDRESS: 6805 LADERA NORTE
AUSTIN TX 78731-2687

PHONE: 5127961196

FAX:

COMMENTS: I would like to request individual standing in this matter as a property owner on Wilbarger. I also want to ask for a public hearing.

To the Office of Chief Clerk
TCEQ
Re: Draft permit WQ0016022001

I own property on Littig Road and Wilbarger Creek and its tributaries run across my property.
When I purchased the property the creek was clear. In recent years it has become cloudy many times,
clogged with algae, which is a sign of contamination. No longer can the fish and frogs that were
abundant earlier be found. I understand that Pflugerville is discharging effluent directly into Wilbarger.
I hold that this is the reason for the changes I have observed. But what has been done about this? What
changes have been made to prevent this occurrence in the future?
With all the population growth in the area, there is going to be more and more pressure to discharge
effluent into Wilbarger. This does not bode well for Wilbarger or the Colorado River it drains into or
the Edwards Aquifer recharge zone. All these waters will suffer if Wilbarger suffers.
Numerous studies have shown that nitrogen and phosphorus levels are markedly increased when
effluent is discharged into water. This is evidence of clear contamination and poses dangers on many
fronts.
Wilbarger is a source of water for wildlife. My land has a conservation easement on it for wildlife and
with the population growth all around, it has become a haven for it. The animals depend on clean
water from the creek for survival. I do have horses and livestock on my property but have restricted
their access to the creek water because of the contamination. The creek is also a place for fishing and
swimming. The fish are minimal in numbers now but they can rebound if the water is protected.
People should be able to enjoy swimming in the creek but all of us would not want to do so if the water
was contaminated and full of algae like it was recently.

The amount of flow is also a concern for me. When I purchased the property, the creek was dry except
during winter rains. Now it flows year round but often is too deep after rains to allow me access to the
back ¾ of my property. What effect would 800,000 gallons daily have on this?
I am concerned about the increased flooding of Wilbarger that occurs with modest rains now. What
happens when effluent is mixed with stormwater and overflows on hundreds of acres adjacent to the
banks of the creek. What effect on vegetation and the animals does this have? Have studies been done
to know the answer? How long would this effect last?
Add to this that a decision to divert the discharge of treated effluent from existing Manor subdivisions
from Gilleland Creek to Wilbarger has been made recently.
Based on all these concerns, I oppose any new discharge of effluent directly into Wilbarger Creek.
It is imperative that higher treatment standards be required.

I would like to request individual standing in this matter and request a public hearing regarding
Majestic Manor.

Thank you.

Marilyn Kelinske

# APPENDIX 6

## TCEQ PERMIT NO. WQ0016022001

| | | |
|---|---|---|
| **APPLICATION BY SWWC UTILITIES, INC. FOR TPDES PERMIT NO. WQ0016022001** | § § § | **BEFORE THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY** |

### EXECUTIVE DIRECTOR'S RESPONSE TO PUBLIC COMMENT

The Executive Director (ED) of the Texas Commission on Environmental Quality (the commission or TCEQ) files this Response to Public Comment (RTC) on the application by SWWC Utilities, Inc., for a new Texas Pollutant Discharge Elimination System (TPDES) Permit No. WQ0016022001 and the ED's preliminary decision. As required by Title 30 Texas Administrative Code (30 TAC) Section (§) 55.156, before a permit is issued, the ED prepares a response to all timely, relevant and material, or significant comments. The Office of Chief Clerk received timely comment from Jonathan Beall, representing Wilbarger Creek Conservation Alliance (WCCA), Marilyn Kelinske, and Anne Brockenbrough. This response addresses all timely public comments received, whether or not withdrawn.

If you need more information about this permit application or the wastewater permitting process, please call the TCEQ Public Education Program at 1-800-687-4040. General information about the TCEQ can be found at our website at www.tceq.texas.gov.

### I. BACKGROUND

#### A. Description of Facility

SWWC Utilities, Inc., submitted an application to the Texas Commission on Environmental Quality (TCEQ) for a new Texas Pollutant Discharge Elimination System (TPDES) Permit No. WQ0016022001 to authorize the discharge of treated domestic wastewater at a daily average flow not to exceed 200,000 gallons per day (gpd) in the Interim I phase, a daily average flow not to exceed 500,000 gpd in the Interim II phase, and a daily average flow not to exceed 800,000 gpd in the Final phase.

The Majestic Manor Wastewater Treatment Plant (WWTP) will be an activated sludge process plant operated in the complete mix mode. Treatment units in all phases will include a bar screen, one aeration basin, one final clarifier, one sludge digester/sludge holding tank, an effluent filter, and one chlorine contact chamber. Treatment units in the Interim II and Final phases will increase in size and capacity. The facility has not been constructed.

Sludge generated from the treatment facility will be hauled by a registered transporter to Walnut Creek Wastewater Treatment Facility, Permit No. WQ0010543011, to be digested, dewatered, and then disposed of with the bulk of the sludge from the plant accepting the sludge. The draft permit also authorizes the disposal of sludge at a TCEQ-authorized land application site, co-disposal landfill, wastewater treatment facility, or facility that further processes sludge.

The plant site will be located approximately 0.42 miles southwest of the intersection of Bella Parkway and Old Texas Highway 20, in Travis County, Texas 78653.

Outfall Location

| Outfall Number | Latitude | Longitude |
|---|---|---|
| 001 | 30.333492 N | 97.538169 W |

The treated effluent will be discharged via pipe to Wilbarger Creek, thence to Colorado River Above La Grange in Segment No. 1434 of the Colorado River Basin. The unclassified receiving water use is high aquatic life use for Wilbarger Creek. The designated uses for Segment No. 1434 are primary contact recreation, public water supply, and exceptional aquatic life use. The effluent limitations in the draft permit will maintain and protect the existing instream uses. All determinations are preliminary and subject to additional review and/or revisions.

The draft permit includes the following proposed effluent limitations and monitoring requirements. All flows, except the two-hour peak flow are expressed in million gallons per day (MGD). The two-hour (2-hr) peak flow is expressed in gallons per minute (gpm). All pH values are expressed in standard units (SU). Concentration values are expressed in milligrams per liter (mg/L). Mass-based values are expressed as pounds per day (lbs/day). Bacteria values are expressed in colony-forming units (cfu) or most probable number (MPN) per 100 milliliters (cfu or MPN/100 mL).

Interim I Phase: during the period beginning upon the date of issuance and lasting through the completion of expansion to the 0.50 MGD facility.

| Outfall | Pollutant | Draft Permit Effluent Limitations | | | | |
|---------|-----------|-----------|------|----------|-----------|-------------|
| | | Daily Avg | | 7-day Avg | Daily Max | Single Grab |
| | | lbs/day | mg/L | mg/L | mg/L | mg/L |
| 001 | Flow | 0.20 MGD | | 556 gpm (2-hr peak) | Report MGD | - |
| | Carbonaceous Biochemical Oxygen Demand, 5-day (CBOD$_5$) | 8.3 | 5 | 10 | 20 | 30 |
| | Total Suspended Solids (TSS) | 8.3 | 5 | 10 | 20 | 30 |
| | Ammonia Nitrogen (NH$_3$-N) | 3.3 | 2 | 5 | 10 | 15 |
| | Total Phosphorus (TP) | 1.7 | 1 | 2 | 4 | 6 |
| | E. coli, CFU or MPN per 100 mL | 126 | | - | - | 399 |
| | Dissolved Oxygen (DO), min | 4.0 mg/L | | - | - | - |
| | Chlorine, Total Residual | 1.0 mg/L, min | | | 4.0 mg/L, max | |
| | pH, standard units (SU) | 6.0, min | | - | 9.0 | - |

Interim II Phase: during the period beginning upon the completion of expansion to the 0.50 MGD facility and lasting through the completion of expansion to the 0.80 MGD facility.

| Outfall | Pollutant | Draft Permit Effluent Limitations | | | | |
|---|---|---|---|---|---|---|
| | | Daily Avg | | 7-day Avg | Daily Max | Single Grab |
| | | lbs/day | mg/L | mg/L | mg/L | mg/L |
| 001 | Flow | 0.50 MGD | | 1,389 gpm (2-hr peak) | Report MGD | - |
| | Carbonaceous Biochemical Oxygen Demand, 5-day (CBOD$_5$) | 21 | 5 | 10 | 20 | 30 |
| | Total Suspended Solids (TSS) | 21 | 5 | 10 | 20 | 30 |
| | Ammonia Nitrogen (NH$_3$-N) | 8.3 | 2 | 5 | 10 | 15 |
| | Total Phosphorus (TP) | 4.2 | 1 | 2 | 4 | 6 |
| | E. coli, CFU or MPN per 100 mL | 126 | | - | 399 | - |
| | Dissolved Oxygen (DO), min | 4.0 mg/L | | - | - | - |
| | Chlorine, Total Residual[1] | 1.0 mg/L, min | | | 4.0 mg/L, max | |
| | pH, standard units (SU) | 6.0, min | | - | 9.0 | - |

Final Phase: During the period beginning upon the completion of expansion to the 0.80 MGD facility and lasting through the date of expiration.

| Outfall | Pollutant | Draft Permit Effluent Limitations | | | | |
|---|---|---|---|---|---|---|
| | | Daily Avg | | 7-day Avg | Daily Max | Single Grab |
| | | lbs/day | mg/L | mg/L | mg/L | mg/L |
| 001 | Flow | 0.80 MGD | | 2,222 gpm (2-hr peak) | Report MGD | - |
| | Carbonaceous Biochemical Oxygen Demand, 5-day (CBOD$_5$) | 33 | 5 | 10 | 20 | 30 |
| | Total Suspended Solids (TSS) | 33 | 5 | 10 | 20 | 30 |
| | Ammonia Nitrogen (NH$_3$-N) | 13 | 2 | 5 | 10 | 15 |
| | Total Phosphorus (TP) | 6.7 | 1 | 2 | 4 | 6 |
| | E. coli, CFU or MPN per 100 mL | 126 | | - | 399 | - |
| | Dissolved Oxygen (DO), min | 4.0 mg/L | | - | - | - |
| | Chlorine, Total Residual[1] | 1.0 mg/L, min | | | 4.0 mg/L, max | |
| | pH, standard units (SU) | 6.0, min | | - | 9.0 | - |

[1] The permittee shall dechlorinate the chlorinated effluent to less than 0.1 mg/l total chlorine residual and shall monitor total chlorine residual daily by grab sample after the dechlorination process.

## B. Procedural Background

The permit application was received on July 28, 2021 and declared administratively complete on November 17, 2021. The Notice of Receipt and Intent to Obtain a Water Quality Permit (NORI) was published in English on December 16, 2021, in the Austin American Statesman newspaper. The Notice of Application and Preliminary Decision (NAPD) was published in English on June 30, 2022, in the Austin American Statesman newspaper. The public comment period ended on August 1, 2022.

This application was filed on or after February 12, 2019; therefore, this application is subject to the procedural requirements adopted pursuant to House Bill (HB) 801, 76th Legislature (1999), and Senate Bill (SB) 709, 84th Legislature (2015), both implemented by the Commission in its rules in 30 TAC Chapter 39, 50, and 55. The Texas Legislature enacted Senate Bill 709, effective September 1, 2015, amending the requirements for comments and contested case hearings. This application is subject to those changes in the law.

## C. Access to Rules, Laws and Records

Please consult the following websites to access the rules and regulations applicable to this permit:

- the Secretary of State website: https://www.sos.state.tx.us;

- TCEQ rules in Title 30 of the Texas Administrative Code (TAC): www.sos.state.tx.us/tac/ (select "View the current Texas Administrative Code" on the right, then "Title 30 Environmental Quality");

- Texas statutes: www.statutes.capitol.texas.gov/;

- the TCEQ website: www.tceq.texas.gov (for downloadable rules in Adobe PDF format, select "Rules" then "Current Rules and Regulations," then "Download TCEQ Rules");

- Federal rules in Title 40 of the Code of Federal Regulations: www.ecfr.gov; and

- Federal environmental laws: http://www2.epa.gov/laws-regulations. Federal environmental laws and executive orders: www2.epa.gov/laws-regulations/laws-and-executive-orders.

Commission records for this application and draft permit are available for viewing and copying at the TCEQ's main office in Austin, 12100 Park 35 Circle, Building F, 1st Floor (Office of the Chief Clerk), until final action is taken.

The permit application for this facility, Statement of Basis/Technical Summary and Executive Director's Preliminary Decision (Statement of Basis), and proposed draft permit are available for viewing and copying at Manor City Hall, 105 East Eggleston Street, Manor, Texas.

### D. Acronyms

**CBOD$_5$**- 5-day Carbonaceous Biochemical Oxygen Demand

**DO**- Dissolved Oxygen

**ED**- Executive Director

**EPA**- Environmental Protection Agency

**GPM**- Gallons per Minute

**HB**- House Bill

**IPs**- Procedures to Implement the Texas Surface Water Quality Standards

**MGD**- Million Gallons per Day

**mg/L**- Milligrams per Liter

**NAPD**- Notice of Application and Preliminary Decision

**NH$_3$-N**- Ammonia-Nitrogen

**NORI**- Notice of Receipt of Application and Intent to Obtain a Water Quality Permit

**NPDES**- National Pollutant Discharge Elimination System

**pH**- Potential Hydrogen

**RTC**- Response to Comments

**SU**- Standard Units

**SWQM**- Surface Water Quality Monitoring

**TAC**- Texas Administrative Code

**TCEQ**- Texas Commission on Environmental Quality

**TLAP-** Texas Land Application Permit

**TP-** Total Phosphorus

**TSS-** Total Suspended Solids

**TMDL**- Total Maximum Daily Load

**TNR**- Transportation and Natural Resources

**TPDES**- Texas Pollutant Discharge Elimination System

**TPWD**- Texas Parks and Wildlife Department

**TSWQS**- Texas Surface Water Quality Standards

**TWC**- Texas Water Code

**WWTF**- Wastewater Treatment Facility

**WWTP**- Wastewater Treatment Plant

## II. COMMENTS AND RESPONSES

**COMMENT 1:**

Ms. Kelinske commented that Wilbarger Creek and its tributaries run across her property and in recent years the creek has become cloudy many times and clogged with algae. Fish and frogs that earlier were abundant are no longer found. Ms. Brockenbrough is concerned that adding more wastewater to the creek will impair the water quality even more. Mr. Beall asked how the discharge will affect the health of Wilbarger Creek and asked that TCEQ determine the cause of the existing algae bloom before adding more treated effluent.

**RESPONSE 1:**

The draft permit was developed to protect aquatic life and human health in accordance with the TSWQS 30 TAC Chapter 307 and was established to be protective of human health and the environment, provided that the applicant operates and maintains the facility according to TCEQ rules and the requirements in the draft permit. As part of

the permit application process, TCEQ must determine the uses of the receiving water and set effluent limits that are protective of those uses. The effluent limits in the draft permit are set to maintain and protect the existing instream uses. Wilbarger Creek has been assigned a High Aquatic Life Use and corresponding 5.0 mg/L DO criterion in the TSWQS. These criteria are designed to ensure that aquatic life will be protected.

The proposed discharge for the Majestic Manor WWTF is to the perennial portion of Wilbarger Creek, which has high aquatic life use designation. To address potential algal blooms, a nutrient screening was conducted for this permit application, and it was determined that nutrient limits were needed. A TP limit of 1.0 mg/L was recommended for all discharge flow phases and incorporated into the draft permit. This TP limit meets the requirement for the Colorado River Watershed Protection Rule, 30 TAC Chapter 311, Subchapter E and should prevent any further or potential degradation from the proposed discharge. In addition, the draft permit includes a 2.0 mg/L ammonia-nitrogen limit for all discharge flow phases.

In accordance with 30 TAC §307.5 and the TCEQ IPs (June 2010), an antidegradation review of the receiving waters was performed. A Tier 1 antidegradation review has preliminarily determined that existing water quality uses will not be impaired by this permit action. Numerical and narrative criteria to protect existing uses will be maintained. A Tier 2 review has preliminarily determined that no significant degradation of water quality is expected in Wilbarger Creek and Colorado River Above La Grange, which have been identified as having high and exceptional aquatic life uses, respectively. Existing uses will be maintained and protected. The preliminary determination can be reexamined and may be modified if new information is received.

TCEQ staff performed a DO modeling analysis of the proposed discharge using an uncalibrated QUAL-TX model. Based on model results, the effluent limits included in the draft permit for $CBOD_5$, $NH_3$-N, and minimum DO for the three proposed flow phases are predicted to be adequate to ensure that instream DO levels will be maintained consistent with these established criteria. As mentioned above, the effluent limits in the draft permit also comply with the requirements of 30 TAC Chapter 311, Subchapter E that requires effluent limits of 5 mg/L TSS, which helps protect water clarity, and 1.0 mg/L TP to protect against excessive algal growth.

**COMMENT 2:**

Ms. Brockenbrough is concerned that adding more wastewater into the creek will cause increased flooding and erosion on her property. Ms. Brockenbrough states that over the past 25 years the creek has changed from being a seasonal intermittent stream to a continuously flowing stream, often with a high flow, due to added effluent from Manor and Shadow Glen wastewater treatment plants both located upstream of her property. The increased flooding has caused fences to blow out and livestock to escape. Ms. Kelinske is concerned about the increased flooding caused by Wilbarger Creek that occurs with modest rains. She also is concerned about its effect on vegetation and animals.

**RESPONSE 2:**

TPDES permits establish terms and conditions that are intended to provide water quality pollution control. Therefore, the ED's review of an application for a TPDES permit focuses on controlling the discharge of pollutants into water in the state. TCEQ does not have the authority to regulate flooding in the wastewater permitting process unless there is an associated water quality concern. The draft permit includes effluent limits and other requirements that it must meet even during rainfall events and periods of flooding.

Finally, the draft permit does not authorize any invasion of personal rights nor any violation of federal, state, or local laws or regulations. As stated in subsection C of

the Background Information (Access to Rules, Laws, and Records), the proposed permit does not limit any landowner's ability to seek private action against the applicant.

For flooding concerns, please contact the local floodplain administrator for Travis County (Call Travis County TNR 512-854-9383; Email TNR.Web@TravisCountyTx.gov.

**COMMENT 3:**

Ms. Kelinske expressed concern about negative impact on wildlife living on a conservation easement on her property. She stated that with the population growth around, her property has become a haven for wildlife. Ms. Kelinske further expressed concern about using the creek water for horses and livestock due to the contamination of the water.

**RESPONSE 3:**

The TSWQS in 30 TAC Chapter 307 require that discharges may not degrade the receiving waters and may not result in situations that impair existing, attainable, or designated uses, and that surface waters not be toxic to aquatic life, terrestrial wildlife, livestock, or domestic animals.

As stated in Response 1, the draft permit was developed in accordance with the TSWQS to be protective of water quality, provided that the applicant operates and maintains the proposed WWTF according to TCEQ rules and the draft permit's requirements. The methodology outlined in the IPs (June 2010) is designed to ensure compliance with the TSWQS.

Specifically, the methodology is designed to ensure that no source will be allowed to discharge any wastewater that 1) results in instream aquatic toxicity, 2) causes a violation of an applicable narrative or numerical state water quality standard, 3) results in the endangerment of a drinking water supply, or 4) results in aquatic bioaccumulation that threatens human health. The ED has made a preliminary determination that the draft permit, if issued, meets all statutory and regulatory requirements.

Finally, TPWD is the state agency that oversees and protects wildlife and their habitat. TPWD can be contacted by phone at 1-800-792-1112 or by mail at 4200 Smith School Road, Austin, Texas 78744.

**COMMENT 4:**

Ms. Kelinske opposes any new discharge directly into Wilbarger Creek because the creek already receives discharges from other sources such as Pflugerville and Manor subdivisions. Mr. Beall expressed concern about the capacity of Wilbarger Creek as the creek already receives treated effluent from Shadow Glen and the City of Manor. He stated that Pflugerville's new regional WWTP, which is not online yet, is permitted to discharge 24 MGD. He expressed concern about future negative impacts of Pflugerville's WWTP and stated that TCEQ should err on the side of caution and requested that TCEQ include this effluent discharge in considering the Majestic Manor permit as the stream flow will be predominately treated effluent. Mr. Beall stated that it seems irresponsible to permit additional discharges before the true impacts of Pflugerville's regional plant are clearer. Downstream neighbors, taxpayers, and aquatic environment should not have to suffer so that this wastewater operator can save a little money.

**RESPONSE 4:**

Part of the technical review process is for TCEQ staff to perform a DO modeling analysis to ensure the permit's effluent limits and other requirements will support the DO criterion and, therefore, protect the aquatic life use of the receiving waterbodies (i.e., Wilbarger Creek).

---

The model for Wilbarger Creek used to assess whether the DO criteria for the stream is met, is a large model that contains multiple TPDES wastewater outfalls (including but not limited to the City of Manor [TPDES permit Nos. WQ0012900001 and WQ001412901] and City of Pflugerville [TPDES permit Nos. WQ0011845005 and WQ0014642001]). When running the model, all contributing dischargers are entered at their full permitted flow. Furthermore, to ensure that DO modeling results and corresponding effluent limit recommendations are conservative and protective under all conditions, Wilbarger Creek was evaluated under what are expected to be the most unfavorable of environmental conditions, specifically hot and dry summertime conditions. This combination of conditions is unlikely to occur for any significant period of time, so it represents a very conservative, worst-case modeling scenario. Even under these conservative model assumptions, instream DO levels were predicted to be maintained above the criterion established for Wilbarger Creek (5.0 mg/L).

The City of Pflugerville currently has two TPDES permits that discharge to Wilbarger Creek (TPDES Permit Nos. WQ0011845005 and WQ0014642001). Permit No. WQ0011845005 (issued July 25, 2022) authorizes a daily average flow of 6.0 MGD for the Interim phase and 15.75 MGD for the final phase. Permit No. WQ0014642001 (issued December 6, 2019) authorizes a daily average flow of 0.15 MGD, 0.475 MGD, and 0.95 MGD for the Interim phases and 3.0 MGD for the final phase.

The Wilbarger Creek Regional WWTF referenced by Mr. Beall (https://www.pflugervilletx.gov/city-government/capital-improvement-program-cip/projects-overview/wilbarger-creek-regional-wastewater-treatment-facility) does not currently hold a TPDES wastewater permit that authorizes the daily average discharge of 24 MGD. If the City does apply for such a permit, the application will undergo a full technical review by TCEQ to determine if the discharge conditions proposed in the application would be sufficient to protect the human health and aquatic life uses of the receiving waterbodies.

## COMMENT 5:

Ms. Brockenbrough requested that TCEQ test the water in Wilbarger Creek downstream from the proposed Majestic Manor WWTF before approving the permit. She believes a TMDL study is needed. Ms. Kelinske asks if studies have been done to understand the effect on vegetation and animals when increased flooding occurs due to effluent mixed with stormwater overflow over hundreds of acres of land adjacent to the banks of the creek. Ms. Kelinske also asks how long this effect would last. Mr. Beall asks if TCEQ has a good water quality baseline of Wilbarger Creek, and if so, how old is it? Mr. Beall requests a current baseline be taken during the last year. Samples should be taken above and below the discharge points on the 5 existing and proposed WWTP on Wilbarger Creek: Pflugerville, Shadow Glen, Manor, Majestic Manor, and Elgin.

## RESPONSE 5:

TMDL projects are conducted on water bodies that have been found to be impaired for some specific constituent(s) or other water quality-related parameter(s). Such impairments are documented in the Texas 303(d) list (Category 5) portion of the Texas Integrated Report of Surface Water Quality, which is updated every two years. Wilbarger Creek is not listed as impaired on the 303(d) list and no TMDL projects have been developed for the Wilbarger Creek watershed, nor are any currently underway or planned.

The SWQM program of the TCEQ conducts an updated assessment of water quality in water bodies throughout the state (including Wilbarger Creek) every two years, comparing observed water quality from sampling data against various applicable water quality criteria. TCEQ has water quality information that is collected at an active SWQM Station approximately 2.25 miles downstream of the Majestic Manor WWTF. In addition,

there are other active SWQM stations further upstream and downstream on Wilbarger Creek, in which current water quality data is being collected.

**COMMENT 6:**

Ms. Kelinske, Ms. Brockenbrough, and Mr. Beall request that higher treatment standards be required for facilities discharging into Wilbarger Creek. Mr. Beall asks that TCEQ consider using the highest possible treatment standards to include the most protective and available techniques:

- A limit of total nutrients of 0.1 mg/l phosphorus and 4 mg/l nitrogen.
- Discharge the treated effluent to wet ponds, wetlands, and sheet flow over a vegetated buffer to significantly improve stream inputs and to mitigate negative effects from chlorination of the discharge.
- Use land application permits – or no discharge permits.
- Beneficial reuse – irrigation, wetlands, or other beneficial reuse to preserve potable water resources.

**RESPONSE 6:**

TCEQ does not have the authority to mandate the method of disposal of treated effluent if an applicant adheres to the rules and provisions of TWC Chapter 26 and 30 TAC Chapters 217, 305, 307, and 309.

A TLAP authorizes the disposal of treated effluent by means of surface irrigation, subsurface irrigation, or evaporation. The effluent must be treated to the pollutant concentrations prescribed in 30 TAC § 309.4. If SWWC Utilities Inc. changes the proposed method of disposal this would require further review by the TCEQ and additional public notice.

Treated effluent may also be used for beneficial use pursuant to 30 TAC Chapter 210, relating to "Use of Reclaimed Water," however this authorization requires that either a TPDES or TLAP permit be obtained first.

The current draft permit contains an $NH_3$-N of 2.0 mg/L for all proposed flow phases, which is the minimum required by the Colorado River Watershed Protection Rule (30 TAC Chapter 311, Subchapter E).

**COMMENT 7:**

Mr. Beall expressed concern about malfunctions of treatment plants due to power outages, floods, mechanical failures, etc. resulting in exceedances of permit limits, even in a well-run plant. Mr. Beall stated that it would have a severe impact on Wilbarger Creek because it is so small. Using land application, beneficial reuse etc. will provide a buffer if a plant has problems.

**RESPONSE 7:**

The draft permit prohibits unauthorized discharge of wastewater or any other waste and includes appropriate requirements. For example, a permittee must maintain adequate safeguards to prevent the discharge of untreated or inadequately treated wastes during electrical power failures by means of alternate power sources, standby generators, or retention of inadequately treated wastewater. In addition, the plans and specifications for domestic sewage collection and treatment works associated with any domestic wastewater permit must be approved by TCEQ. All these permit provisions are designed to help prevent unauthorized discharges of raw sewage. Except as allowed by 30 TAC § 305.132, the SWWC Utilities Inc. will be required to report any unauthorized discharge to TCEQ within 24 hours and the SWWC Utilities Inc. will be subject to potential enforcement action for failure to comply with TCEQ rules or the permit.

If you would like to file a complaint about the facility concerning its compliance with provisions of its permit or with TCEQ rules, you may call the TCEQ Environmental Complaints Hot Line at 1-888-777-3186 or the TCEQ Region 11 Office at 512-339-2929. Citizen complaints may also be filed on-line at https://www.tceq.texas.gov/assets/public/compliance/monops/complaints/complaints.html.

**COMMENT 8:**

Mr. Beall stated that the actual discharge point is not clear from the notice and that it seems like an unreasonable burden to require people to obtain and read the application to find the discharge point.

**RESPONSE 8:**

The ED acknowledges the comment.

## III. CHANGES MADE TO THE DRAFT PERMIT IN RESPONSE TO COMMENTS

No changes were made to the draft permit in response to comments.

Respectfully submitted,

Texas Commission on Environmental Quality

Toby Baker
Executive Director

Charmaine Backens, Deputy Director
Environmental Law Division

Anthony Tatu, Staff Attorney
Environmental Law Division
State Bar No. 00792869
P.O. Box 13087, MC 173
Austin, Texas 78711-3087
Phone: (512) 239-5778
Fax: (512) 239-0606

REPRESENTING THE EXECUTIVE DIRECTOR
OF THE TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

## CERTIFICATE OF SERVICE

I certify that on October 19, 2022, the "Executive Director's Response to Public Comment" for Permit No. WQ0016022001 was filed with the Texas Commission on Environmental Quality's Office of the Chief Clerk.

Anthony Tatu, Staff Attorney
Environmental Law Division
State Bar No. 00792869

# APPENDIX 7

# Request for a Contested Case Hearing, Majestic Manor
## WQ0016022001

November 26, 2022

TO:   TCEQ
FM:   Wilbarger Creek Conservation Alliance (WCCA),
       Jon Beall, President, WCCA
       Anne Brockenbrough, VP, WCCA
       Marilyn Kelinske, M.D., Board Member, WCCA

RE:   Request for a Contested Case Hearing on the Draft Permit for Majestic Manor
WQ0016022001

We as individuals and collectively as WCCA protest the TCEQ's issuance of the Draft Permit, and request a Contested Case Hearing. TCEQ must do more to preserve the water quality of Wilbarger Creek and prevent further degradation..

*West of the Travis County line, Wilbarger Creek historically was a small, intermittent* stream. It had high flows only periodically, then quickly subsided into stagnant pools that soon evaporated. Now Wilbarger Creek flows through our properties year round at most times a few inches deep and a few feet wide consisting entirely of treated effluent from Manor and Shadowglen WWTPs.

- Ms. Brockenbrough, Dr. Kelinske and I request and should receive individual standing because we each own property on both sides of Wilbarger Creek. Although our properties are almost 5 miles downstream from the WWTP, most of the year the creek flow is 100% effluent. Thus the discharge will impact our property.
- WCCA, a 501c organization, should also receive standing. The mission of WCCA includes to preserve and protect the water quality of Wilbarger Creek.
- Evidence already exists of unacceptable amounts of pollution in the Creek without the additional discharges of the new Pflugerville and proposed Majestic Manor WWTPs. The photos attached of Wilbarger Creek as it flows through the Kelinske property show a significant algae bloom in April 2022. The Response to Comments gives no indication TCEQ took any action to investigate this existing problem.
- The Response to Comments makes reference to TCEQ Water Quality monitoring stations (SWQM). All reports since 2014 already list nitrates as a source of concern.

Page 1 of 4

- The Federal Environmental Review EID of the new Pflugerville WWTP, which states the hydraulic capacity to be 24 mgd, examines the Cumulative Impacts only within the Pflugerville city limits, not impacts on the downstream humans, livestock, wildlife and agricultural uses. It seems very strange to examine the impact of sewage effluent only upstream of the discharge. This may be a violation of NEPA.
- The Response to Comments states modeling used worst case scenarios: the maximum permitted flows during hot, dry summertime conditions. We take issue with the statement that follows: …conditions unlikely to occur for any significant period of time…. We believe the real world impacts already observed by protestants and photo evidence are better indicators of cumulative impacts on the creek than any model.
- We need an opportunity to evaluate the modeling supporting the draft permit, and an opportunity to discuss with the staff the assumptions in the model and the model itself.
- Pflugerville's new WWTP is permitted to discharge 15 mgd. Since that plant is under construction, we really cannot know the actual impacts on the creek in terms of stream flow and water quality until after that plant goes online. If all of Pflugerville's effluent is going to WilbargerCreek, it seems irresponsible to permit additional significant volumes of discharges into the Creek before the true impacts of Pflugerville's regional plant are more clear.
- Pflugerville says their new WWTP will grow to 24 mgd. https://www.pflugervilletx.gov/city-government/capital-improvement-program-cip/projects-overview/wilbarger-creek-regional-wastewater-treatment-facility
- The city of Pflugerville's EID says Wilbarger Creek supposedly has 15.75 MGD of capacity. Is all of this already accounted for in Pflugerville's permit? If so, what is left for Majestic Manor?
- How will the additional discharge of Majestic Manor affect the overall health of Wilbarger Creek?
- Pre-existing conditions and future development pressure should determine the performance standards TCEQ requires for Majestic Manor and all other new treatment plants.
- The additional remedies referred to in our comments and reiterated below, are already in use in other parts of Travis County. These can have a significant beneficial impact on the future health of Wilbarger Creek for wildlife, agricultural and recreational uses and the Colorado River.

Given the pending and recently issued permits, we request TCEQ set the treatment standards at the highest possible and achievable limits. Wilbarger Creek should be maintained as a healthy, functioning ecosystem.

- A limit on total nutrient loading of 0.1 mg/liter phosphorus. Wastewater treatment technology is remarkable in terms of how well it can function. This is a permit that requires it.
- Wet ponds, wetlands and sheet flow over a vegetated buffer - We request this technology on treated effluent prior to discharge into Wilbarger Creek. The use of a few acres devoted to these methods would significantly improve stream inputs.
- Land application - No discharge permits and land applications are required in the Highland Lakes and Barton Springs Zone. What justification is there to not have similar requirements in the Wilbarger Creek watershed? If developers can meet those requirements elsewhere, why not in the Wilbarger Creek watershed?
- Beneficial reuse - We appear to be entering another severe drought. Some of that water might be better used for irrigation, wetlands or other beneficial reuse. A reuse plan for Majestic Manor would preserve our potable water resources. Maybe now is the time to start including beneficial reuse in all permits?
- Chlorination is necessary to ensure harmful bacteria is killed. Unfortunately, the usual minimum residual levels in discharges is high enough to kill or stress fish and other aquatic life. If a portion of Wilbarger Creek is predominantly or all treated effluent, that portion of the Creek will not support much life. Irrigation or discharging first to a pond or wetland prior to entering Wilbarger Creek could help mitigate that.
- Treatment plant malfunctions are unfortunately predictable, and sometimes outside the control of plant operators. Power outages, floods, mechanical failures, etc. can quickly result in exceedances of permit limits, even in a well run plant. Since Wilbarger creek is so small at this point, the impacts of an unauthorized discharge will be much more severe than a similar discharge into a larger river. Consider Round Rock's problems at the Brushy Creek WWTP, which have been well documented over the last several months. Land application, beneficial reuse, wet ponds, vegetative filter strips, etc. would provide a better buffer in the unfortunate event that the plant has problems.
- The unknown future negative impacts of Pflugerville's WWTP and others indicate TCEQ should err on the side of caution. Downstream neighbors, taxpayers, terrestrial wildlife and aquatic environments should not have to suffer so that this wastewater operator can save a little money.
- Anne Brockenbrough - I have had the water quality tested several times over the last few years by the Austin Youth River Watchers (AYRW) and each time they have found the water in Wilbarger Creek has extremely low dissolved oxygen levels indicating that the creek is already impaired or dangerously

Page 3 of 4

close. With the addition of treated effluent coming from Pflugerville and Majestic Manor, I am afraid the creek will be permanently impaired. I ask that TCEQ do a current test of the water in Wilbarger downstream of the Manor plant before you approve this permit. You are welcome to come on my ranch and test the water any time.

- Marilyn Kelinske - Wilbarger is a source of water for wildlife. My land has a conservation easement on it for wildlife and with the population growth all around, it has become a haven for it. The animals depend on clean water from the creek for survival. I do have horses and livestock on my property but have restricted their access to the creek water because of the contamination. The creek is also a place for fishing and swimming. The fish are minimal in numbers now but they can rebound if the water is protected. People should be able to enjoy swimming in the creek but all of us would not want to do so if the water was contaminated and full of algae like it was recently.

Respectfully submitted,

Jon Beall, President, WCCA
2503 Flora Cove
Austin, TX 78746
512-632-1760

Anne Brockenbrough, VP, WCCA
11318 Jones Rd
Manor, TX 78653
512-278-8699

Marilyn Kelinske, Board Member, WCCA
15611 Littig Rd
Manor, TX 78652
512-796-1196

Page 4 of 4

# APPENDIX 8

  

## Ellie Guerra

**From:** PUBCOMMENT-OCC
**Sent:** Monday, November 28, 2022 10:51 AM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001

H

**From:** elmridgeranch@yahoo.com <elmridgeranch@yahoo.com>
**Sent:** Friday, November 25, 2022 11:44 PM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Anne Stewart Brockenbrough

**EMAIL:** elmridgeranch@yahoo.com

**COMPANY:** Elm Ridge Ranch

**ADDRESS:** 11318 JONES RD
MANOR TX 78653-5205

**PHONE:** 5127898699

**FAX:**

**COMMENTS:** My name is Anne Brockenbrough and I am writing to ask for standing and to request a contested case hearing in regards to the SWWC Utilities, Inc's Permit # WQ0016022001. I own a working ranch approximately 3 miles downstream of the proposed Majestic Manor waste water treatment plant. I own land on both sides of Wilbarger Creek and for the past 25 years I have seen what used to be a seasonally intermittent creek—often completely dry—now running very high all the time (just a few feet under the bridge on Jones Road now) due to the constant pumping of

1

  

treated effluent from several waste water treatment plants upstream. This has caused repeated flooding every time there is a big rain, erosion of my land, and severe damage to all my fencing, I am very concerned about the water quality in the creek which my cattle depend on for water. I have had the water tested several times by the Austin Youth River Watchers and each time the results show extremely low dissolved oxygen, indicating that the creek is already impaired or dangerously close. I am concerned that the addition of even more treated effluent from the proposed Majestic Manor Waste Water Treatment Plant will cause the creek to be permanently impaired. I ask that TCEQ do a current test of the water in Wilbarger below the Manor plant before this new plant is approved. I think a TMDL study is needed and I think it will show that TCEQ needs to hold all the waste water treatment plants that are currently discharging into Wilbarger Creek to a higher standard. I believe that plants on the west side discharging into Barton Creek are held to a higher standard and I believe the same should be done for Wilbarger Creek. Again, I ask for standing and I would like to request a contested case hearing. Thank you for your consideration— Anne Brockenbrough

# APPENDIX 9

## Ellie Guerra

**From:** PUBCOMMENT-OCC
**Sent:** Tuesday, November 29, 2022 8:13 AM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001

H

**From:** makoph@hotmail.com <makoph@hotmail.com>
**Sent:** Monday, November 28, 2022 10:57 PM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Marilyn Kelinske

**EMAIL:** makoph@hotmail.com

**COMPANY:**

**ADDRESS:** 6805 LADERA NORTE
AUSTIN TX 78731-2687

**PHONE:** 5127961196

**FAX:**

**COMMENTS:** I would like to request a contested case hearing and certification of being an affected person. When I first bought my property at 11561 Littig Road, Wilbarger Creek was only a wet weather creek and then it required lots of rain to even have any flow. Now, due to discharges from sewer plants, the creek runs year round with a fairly rapid flow. When rain occurs, like this past weekend, the creek becomes impassable for several days. I cannot access almost 80% of my property due to the inability to cross the creek. With continued proposals to discharge more and more treated

1

  

effluent into Wilbarger, I believe I will be cut off from accessing the majority of my property. In addition I have observed multiple algae blooms in the water which are evidence of contamination by treatment discharges. I recently received a report from TCEQ in response to a complaint, and it revealed multiple deficiencies of the Manor treatment facility, including sand filtration which was OFFLINE. This contamination, which has occured multiple times as documented by TCEQ, makes the water downstream unsuitable for safe drinking by my animals or any of the wildlife currently living on the property. With increased discharges into the creek from current treatment plants or new ones, there are increased chances for the creek to be further contaminated. I no longer hear or see the frogs in the creek. They used to be prominent and I believe this is due to the lower water quality. It is imperative that this creek be protected. Its water flows into the Colorado, which is a source for drinking water down the line.

# APPENDIX 10

Jon Niermann, *Chairman*
Emily Lindley, *Commissioner*
Bobby Janecka, *Commissioner*
Erin E. Chancellor, *Interim Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

April 3, 2023

Ms. Laurie Gharis, Chief Clerk
Office of the Chief Clerk
Texas Commission on Environmental Quality
P.O. Box 13087, MC- 105
Austin, Texas 78711-3087

**RE: Application by SWWC Utilities Inc for Permit No. WQ0016022001;**
**TCEQ Docket No. 2023-0370-MWD**

Dear Ms. Gharis:

Enclosed for filing with the Texas Commission on Environmental Quality (Commission) is the Executive Director's Response to Hearing Requests.

Please do not hesitate to contact me at Anthony.Tatu@tceq.texas.gov or (512) 239-5778 if you have any questions. Thank you for your attention to this matter.

Respectfully submitted,

Anthony Tatu, Staff Attorney
Environmental Law Division

Enclosure

Cc: Mailing List

**TCEQ DOCKET NO. 2023-0370-MWD**

| | | |
|---|---|---|
| **APPLICATION BY** | § | **BEFORE THE TEXAS** |
| **SWWC UTILITIES INC.** | § | **COMMISSION** |
| **FOR PERMIT NO.** | § | **ON** |
| **WQ0016022001** | § | **ENVIRONMENTAL QUALITY** |

---

### EXECUTIVE DIRECTOR'S RESPONSE TO HEARING REQUESTS

---

## I.   Introduction

The Executive Director of the Texas Commission on Environmental Quality (TCEQ or Commission) files this Response to Hearing Requests (Response) on the application of SWWC Utilities for new TPDES Permit No. WQ0016022001. The Office of the Chief Clerk (OCC) received 18 hearing requests filed by 3 individuals and one organization. Anne Brockenbrough, Marilyn Kelinske, and Jonathan Beall all filed individual hearing requests. In addition, they filed a hearing request on behalf of the Wilbarger Creek Conservation Alliance (WCCA).

Attached for Commission consideration is a Geographic Information Systems (GIS) map of requestors in the area of the facility (Attachment A). The Draft Permit, Technical Summary, Executive Director's Preliminary Decision, and the Executive Director's Response to Public Comment can be found in the Agenda backup materials filed for the Commission's consideration.

## II.   Description of the Facility

SWWC Utilities, Inc., submitted an application to the Texas Commission on Environmental Quality (TCEQ) for a new Texas Pollutant Discharge Elimination System (TPDES) Permit No. WQ0016022001 to authorize the discharge of treated domestic wastewater at a daily average flow not to exceed 200,000 gallons per day (gpd) in the Interim I phase, a daily average flow not to exceed 500,000 gpd in the Interim II phase, and a daily average flow not to exceed 800,000 gpd in the Final phase.

The treated effluent will be discharged via pipe to Wilbarger Creek, thence to Colorado River above La Grange in Segment No. 1434 of the Colorado River Basin. The unclassified receiving water use is high aquatic life use for Wilbarger Creek. The designated uses for Segment No. 1434 are primary contact recreation, public water supply, and exceptional aquatic life use. The effluent limitations in the draft permit will maintain and protect the existing instream uses. The plant site will be located approximately 0.42 miles southwest of the intersection of Bella Parkway and Old Texas Highway 20, in Travis County, Texas 78653.

## III. Procedural Background

The permit application was received on July 28, 2021 and declared administratively complete on September 17, 2021. The Notice of Receipt and Intent to Obtain a Water Quality Permit (NORI) was published in English on December 16, 2021, in the *Austin American Statesman* newspaper. The Notice of Application and Preliminary Decision (NAPD) was published in English on June 30, 2022, in the *Austin American Statesman* newspaper. The public comment period ended on August 1, 2022.

This application was filed on or after February 12, 2019; therefore, this application is subject to the procedural requirements adopted pursuant to House Bill (HB) 801, 76th Legislature (1999), and Senate Bill (SB) 709, 84th Legislature (2015), both implemented by the Commission in its rules in 30 TAC Chapter 39, 50, and 55. The Texas Legislature enacted Senate Bill 709, effective September 1, 2015, amending the requirements for comments and contested case hearings. This application is subject to those changes in the law.

## IV. Evaluation of Hearing Requests

House Bill 801 established statutory procedures for public participation in certain environmental permitting proceedings, specifically regarding public notice and public comment and the Commission's consideration of hearing requests. The Commission implemented HB 801 by adopting procedural rules in Title 30 of the Texas Administrative Code (30 TAC) chapters 39, 50, and 55. Senate Bill 709 revised the requirements for submitting public comment and the Commission's consideration of hearing requests. This application was declared administratively complete on September 17, 2021; therefore, it is subject to the procedural requirements adopted pursuant to HB 801 and SB 709.

### A. Legal Authority to Respond to Hearing Requests

"The Executive Director, the public interest counsel, and applicant may submit written responses to [hearing] requests . . . ."[1]

Responses to hearing requests must specifically address:

(a) whether the requestor is an affected person;

(b) whether issues raised in the hearing request are disputed;

(c) whether the dispute involves questions of fact or law;

(d) whether the issues were raised during the public comment period;

(e) whether the hearing request is based on issues raised solely in a public comment withdrawn by the commenter in writing by filing a withdrawal

---

[1] 30 TAC §55.209(d).

Executive Director's Response to Hearing Requests                                    Page 2
SWWC Utilities Inc.
TPDES Permit No. WQ0016022001
TCEQ Docket No. 2023-0370-MWD

letter with the chief clerk prior to the filing of the Executive Director's Response to Comment;

(f) whether the issues are relevant and material to the decision on the application; and

(g) a maximum expected duration for the contested case hearing.[2]

### B. Hearing Request Requirements

In order for the Commission to consider a hearing request, the Commission must first determine whether the request meets certain requirements.

A request for a contested case hearing by an affected person must be in writing, filed with the chief clerk within the time provided . . ., based only on the requestor's timely comments, and not based on an issue that was raised solely in a public comment withdrawn by the commenter in writing by filing a withdrawal letter with the chief clerk prior to the filing of the Executive Director's Response to Comment.[3]

A hearing request must substantially comply with the following:

(1) give the name, address, daytime telephone number, and where possible, fax number of the person who files the request. If the request is made by a group or association, the request must identify one person by name, address, daytime telephone number, and where possible, fax number, who shall be responsible for receiving all official communications and documents for the group;

(2) identify the person's justiciable interest affected by the application, including a brief, but specific, written statement explaining in plain language the requestor's location and distance relative to the proposed facility or activity that is the subject of the application and how and why the requestor believes he or she will be adversely affected by the proposed facility or activity in a manner not common to members of the general public;

(3) request a contested case hearing;

(4) list all relevant and material disputed issues of fact that were raised during the public comment period by the requestor and that are the basis of the hearing request. To facilitate the commission's determination of the number and scope of issues to be referred to hearing, the requestor should, to the extent possible, specify any of the executive director's responses to comments that the requestor disputes and the factual basis of the dispute and list any disputed issues of law; and

(5) provide any other information specified in the public notice of application.[4]

---

[2] 30 TAC §55.209(e).
[3] 30 TAC §55.201(c).
[4] 30 TAC §55.201(d).

### C. Requirement that Requestor be an Affected Person

In order to grant a contested case hearing, the commission must determine that a requestor is an affected person.

> (a) For any application, an affected person is one who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application. An interest common to members of the general public does not qualify as a personal justiciable interest.

> (b) Governmental entities, including local governments and public agencies with authority under state law over issues raised by the application may be considered affected persons.

> (c) In determining whether a person is an affected person, all factors shall be considered, including, but not limited to, the following:

>> (1) whether the interest claimed is one protected by the law under which the application will be considered;

>> (2) distance restrictions or other limitations imposed by law on the affected interest;

>> (3) whether a reasonable relationship exists between the interest claimed and the activity regulated;

>> (4) likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person;

>> (5) likely impact of the regulated activity on use of the impacted natural resource by the person; and

>> (6) whether the requestor timely submitted comments on the application which were not withdrawn; and

>> (7) for governmental entities, their statutory authority over or interest in the issues relevant to the application.[5]

> (d) In making this determination, the commission may also consider, to the extent consistent with case law:

>> (1) the merits of the underlying application and supporting documentation in the commission's administrative record, including whether the application meets the requirements for permit issuance;

>> (2) the analysis and opinions of the executive director; and

>> (3) any other expert reports, affidavits, opinions, or data submitted by the executive director, the applicant, or hearing requestor.[6]

---

[5] 30 TAC § 55.203.
[6] 30 TAC § 55.203.

Executive Director's Response to Hearing Requests                                  Page 4
SWWC Utilities Inc.
TPDES Permit No. WQ0016022001
TCEQ Docket No. 2023-0370-MWD

## D. *Referral to the State Office of Administrative Hearings*

"When the commission grants a request for a contested case hearing, the commission shall issue an order specifying the number and scope of the issues to be referred to SOAH for a hearing."[7] "The commission may not refer an issue to SOAH for a contested case hearing unless the commission determines that the issue: (1) involves a disputed question of fact or a mixed question of law and fact; (2) was raised during the public comment period by an affected person; and (3) is relevant and material to the decision on the application."[8]

## V.    Analysis of the Requests

The Executive Director has analyzed the hearing requests to determine whether they comply with Commission rules, who qualifies as an affected person, what issues may be referred for a contested case hearing, and what is the appropriate length of the hearing.

### A. Whether the Individual Requestors Complied with 30 TAC §§ 55.201(c) and (d).

The Executive Director reviewed the factors found in 30 TAC §§ 55.201(c) and (d), and 55.205 for determining if an individual or group meets the requirements for a contested case hearing and recommends the Commission find that Marilyn Kelinske, Anne Brockenbrough, Jonathan Beall and WCCA are not affected persons.

### 1.  Marilyn Kelinske

The Executive Director reviewed the factors found in 30 TAC §§ 55.201(c) and (d), and 55.203 for determining if a person is an affected person and recommends the Commission find that Marilyn Kelinske is not an affected person.

Ms. Kelinske submitted timely hearing requests in writing, provided the required contact information, and raised issues that are the basis of her hearing requests in her timely comments. Ms. Kelinske states that she owns property on 11561 Littig Road. According to the GIS map prepared by the TCEQ this property is approximately 2.8 miles downstream from the proposed outfall. Ms. Kelinske's concerns are common to the general public, and she failed to prove that she has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application not common to members of the general public and is not an affected person. Based on the available information, the Executive Director recommends finding that Ms. Kelinske is not an affected person.

Ms. Kelinske raised Issues 1, 2, 3, and 4, in her requests.

---

[7] 30 TAC § 50.115(b).
[8] 30 TAC § 50.115(c).

2. Anne Brockenbrough

The Executive Director reviewed the factors found in 30 TAC §§ 55.201(c) and (d), and 55.203 for determining if a person is an affected person and recommends the Commission find that Anne Brockenbrough is not an affected person.

Ms. Brockenbrough submitted timely hearing requests in writing, provided the required contact information, and raised issues that are the basis of her hearing requests in her timely comments. Ms. Brockenbrough states that she owns and lives on a working ranch three miles downstream from the proposed facility, which is reflected in the attached GIS map. Ms. Brockenbrough's concerns are common to the general public, and she failed to prove that she has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application not common to members of the general public. Based on the available information, the Executive Director cannot recommend finding that Ms. Brockenbrough is an affected person.

3. Jonathan Beall

The Executive Director reviewed the factors found in 30 TAC §§ 55.201(c) and (d), and 55.203 for determining if a person is an affected person and recommends the Commission find that Jonathan Beall is not an affected person.

Mr. Beall submitted timely hearing requests in writing, provided the required contact information, and raised issues that are the basis of his hearing requests in timely comments. Mr. Beall states that he owns property 5 miles downstream from the proposed facility but does not provide an address for this property. Mr. Beall's mailing address is reflected on the attached GIS map. Mr. Beall's concerns are common to the general public, and he failed to prove that he has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application not common to members of the general public. Based on the available information, the Executive Director cannot recommend finding that Mr. Beall is an affected person.

4. Wilbarger Creek Conservation Alliance (WCCA)

The Executive Director reviewed the factors found in 30 TAC §§ 55.201(c) and (d), and 55.205 for determining if a group or organization is an affected person and recommends the Commission find that WCCA is not an affected person.

In addition to the requirements in 30 TAC § 55.201 and 30 TAC § 55.203, a request for a contested case hearing by a group or association on an application filed on or after September 1, 2015 must meet the requirements in 30 TAC § 55.205(b).

30 TAC § 55.205(b) requires that the organization identify one or more members of the group or association would otherwise have standing to request a hearing in their own right. In their hearing request, WCCA failed to identify any member of the organization who had a justiciable interest that could be affected by this application.

WCCA submitted a timely hearing request in writing, provided the required contact information, and raised the issues that are the basis of their hearing request in their timely comments. According to the hearing request, the mission of the WCCA is to preserve and protect the water quality of Wilbarger Creek. WCCA identified Marilyn Kelinske, Anne Brockenbrough, and Jonathan Beall as members who own property downstream from the proposed site. The hearing request states their properties are almost 5 miles downstream, but the proposed discharge will affect all of them. The hearing request also raises the issue of cumulative impacts to Wilbarger Creek. Therefore, as WCCA failed to identify any members of the association who would otherwise have standing to request a hearing in their own right, the Executive Director has determined that WCCA has not met this this requirement for associational standing and should not be considered an affected person.

WCCA raised Issues 1, 2, 3, and 4, in its requests.

**B. <u>Whether the Issues Raised May be Referred to SOAH for a Contested Case Hearing.</u>**

The Executive Director has identified issues of disputed questions of fact or mixed questions of law and fact, raised during the comment period, in requests for a contested case hearing, and relevant to the decision on the application that could be referred to SOAH if the commission determines that a requestor is an affected person. The issues discussed were raised during the public comment period and addressed in the RTC. None of the issues were withdrawn. All identified issues in this response are considered disputed, unless otherwise noted.

*A. Referable Issues to SOAH for a Contested Case Hearing*

**Issue 1:** Whether the draft is protective of aquatic life and terrestrial wildlife in and adjacent to Wilbarger Creek. (RTC no. 1 and no. 3) The issue involves a disputed question of mixed fact and law, was raised during the comment period, was not withdrawn, and is relevant and material to the issuance of the draft permit. <u>The Executive Director recommends the Commission refer this issue to SOAH.</u>

**Issue 2:** Whether the draft permit should require higher treatment standards to include the most protective and available techniques. (RTC no. 6) The issue involves a disputed question of fact, was raised during the comment period, was not withdrawn, and is relevant and material to the issuance of the draft permit. <u>The Executive Director recommends the Commission refer this issue to SOAH.</u>

**Issue 3:** Whether the cumulative impacts of the proposed discharge into Wilbarger Creek were properly modeled and evaluated. (RTC No. 4) The issue involves a disputed question of mixed fact and law, was raised during the comment period, was not withdrawn, and is relevant and material to the issuance of the draft permit. <u>The Executive Director recommends the Commission refer this issue to SOAH.</u>

**Issue 4:** Whether the permit application addresses potential malfunctions at the proposed facility. (RTC no. 7) The issue involves a disputed question of fact, was raised during the comment period, was not withdrawn, and is relevant and material to the issuance of the draft permit. <u>The Executive Director recommends the Commission refer this issue to SOAH.</u>

*B. Issues that are not relevant or Material to the Commission's Consideration or that are Matters of Law or Policy.*

**Issue 1:** Whether the proposed discharge will result in increased flooding and erosion in Wilbarger Creek. (RTC No. 2) The issue involves a disputed question of fact, was raised during the comment period and was not withdrawn. However, it is not relevant and material to the issuance of the draft permit as it is not something TCEQ reviews as part of the application process. <u>Therefore, the Executive Director does not recommend the Commission refer this issue to SOAH.</u>

## VI.  Contested Case Hearing Duration

If there is a contested case hearing on this application, the Executive Director recommends that the duration of the hearing be six months from the preliminary hearing to the presentation of a proposal for decision to the Commission.

## VII.  Executive Director's Recommendation

The Executive Director recommends the following actions by the Commission:

1. The Executive Director recommends the Commission deny the Requests for Hearing filed by Marilyn Kelinske, Anne Brockenbrough, Jonathan Beall and the Wilbarger Creek Conservation Alliance.

2. If referred to SOAH, that the duration of the hearing be six months from the preliminary hearing to the presentation of the proposal for decision to the Commission.

3. If referred to SOAH, concurrently refer the matter to Alternative Dispute Resolution.

4. If referred to SOAH, refer the issues 1-4 listed above in part V of this response.

Executive Director's Response to Hearing Requests
SWWC Utilities Inc.
TPDES Permit No. WQ0016022001
TCEQ Docket No. 2023-0370-MWD

Page 8

Respectfully submitted,

Texas Commission on Environmental Quality

Erin Chancellor
Interim Executive Director

Guy Henry, Acting Deputy Director
Environmental Law Division

Anthony Tatu , Staff Attorney
Environmental Law Division
State Bar No. 00792869
P.O. Box 13087, MC 173
Austin, Texas 78711-3087
Phone (512) 239-5778

REPRESENTING THE EXECUTIVE DIRECTOR OF
THE TEXAS COMMISSION
ON ENVIRONMENTAL QUALITY

Executive Director's Response to Hearing Requests
SWWC Utilities Inc.
TPDES Permit No. WQ0016022001
TCEQ Docket No. 2023-0370-MWD

Page 9

## VIII. CERTIFICATE OF SERVICE

I certify that on, April 3, 2023, the "Executive Director's Response to Hearing Requests" on the application by SWWC Utilities TPDES Permit No. WQ0002659000 was filed with the TCEQ's Office of the Chief Clerk, and a complete copy was served to all persons listed on the attached mailing list via hand delivery, facsimile transmission, inter-agency mail, electronic submittal, or by deposit in the U.S. Mail.

Anthony Tatu, Staff Attorney
Environmental Law Division
State Bar No. 00792869
P.O. Box 13087, MC 173
Austin, Texas 78711-3087
Phone (512) 239-5778
Fax: (512) 239-0626

MAILING LIST
SWWC Utilities, Inc.
TCEQ Docket No. 2023-0370-MWD; TPDES Permit No. WQ0016022001

## FOR THE APPLICANT

Jeffrey McIntyre, President
Texas Utilities
SWWC Utilities, Inc.
12535 Reed Road
Sugar Land, Texas 77478

Joe Torralva, Design and Construction
    Manager, Texas Utilities
SWWC Utilities, Inc.
1620 Grand Avenue Parkway, Suite 140
Pflugerville, Texas 78660

Jason Baze, P.E., Project Manager
Murfee Engineering Company, Inc.
1101 Capital of Texas Highway South
D-100
Austin, Texas 78746

## FOR THE EXECUTIVE DIRECTOR
via electronic mail:

Anthony Tatu, Staff Attorney
Texas Commission on Environmental
Quality
Environmental Law Division, MC-173
P.O. Box 13087
Austin, Texas 78711
Anthony.tatu@tceq.texas.gov

Melinda Luxemburg, Technical Staff
Texas Commission on Environmental
Quality
Water Quality Division, MC-148
P.O. Box 13087
Austin, Texas 78711
Melinda.luxemburg@tceq.texas.gov

Ryan Vise, Deputy Director
Texas Commission on Environmental
Quality
External Relations Division
Public Education Program, MC-108
P.O. Box 13087
Austin, Texas 78711
Pep@tceq.texas.gov

## FOR ALTERNATIVE DISPUTE RESOLUTION
via electronic mail:

Kyle Lucas
Texas Commission on Environmental
Quality
Alternative Dispute Resolution, MC-222
P.O. Box 13087
Austin, Texas 78711
Kyle.lucas@tceq.texas.gov

## FOR THE CHIEF CLERK
via eFilings:

Docket Clerk
Texas Commission on Environmental
Quality
Office of Chief Clerk, MC-105
P.O. Box 13087
Austin, Texas 78711

## REQUESTER(S)

Jonathan M. Beall
Wilbarger Creek Conservation Alliance
2503 Flora Cove
Austin, Texas 78746

Anne Stewart Brockenbrough
Elm Ridge Ranch
11318 Jones Road
Manor, Texas 78653

Marilyn Kelinske
15611 Littig Road
Manor, Texas 78653

Marilyn Kelinske
6805 Ladera Norte
Austin, Texas 78731

# SWWC Utilities

Map Requested by TCEQ Office of Legal Services
for Commissioners' Agenda



**Protecting Texas by**
*Reducing and*
*Preventing Pollution*

Texas Commission on Environmental Quality
GIS Team (Mail Code 197)
P.O. Box 13087
Austin, Texas 78711-3087
Date: 3/24/2023
CRF 0086257
Cartographer: eschrade

○ Requestors
▲ Outfall
〰 1 mi Discharge Route
⌒ 0.5 mi Radius
⌒ 1.0 mi Radius
⌒ 1.5 mi Radius

Distances Between Requestors and Outfall:

1) Anne Stewart Brockenbrough - 3.21 mi

2) Marilyn Kelinske - 2.89 mi

3) Johnathan M Beall - 15.65 mi

Source: The location of the facility was provided
by the TCEQ Office of Legal Services (OLS).
OLS obtained the site location information from the
applicant and the requestor information from the
requestor

This map was generated by the Information Resources
Division of the Texas Commission on Environmental
Quality. This product is for informational purposes and
may not have been prepared for or be suitable for legal,
engineering, or surveying purposes. It does not repre-
sent an on-the-ground survey and represents only the
approximate relative location of property boundaries.
For more information concerning this map, contact the
Information Resource Division at (512) 239-0800.

# SWWC Utilities

Map Requested by TCEQ Office of Legal Services
for Commissioners' Agenda



**Protecting Texas by
Reducing and
Preventing Pollution**

Texas Commission on Environmental Quality
GIS Team (Mail Code 197)
P.O. Box 13087
Austin, Texas 78711-3087
Date: 3/24/2023
CRF 0086257
Cartographer: cschrade

N

○ Requestors
▲ Outfall
〰 1 mi Discharge Route
◠ 0.5 mi Radius
◠ 1.0 mi Radius
◠ 1.5 mi Radius

Distances Between Requestors and Outfall:

1) Anne Stewart Brockenbrough - 3.21 mi

2) Marilyn Kelinske - 2.89 mi

3) Johnathan M Beall - 15.65 mi

Source: The location of the facility was provided
by the TCEQ Office of Legal Services (OLS).
OLS obtained the site location information from the
applicant and the requestor information from the
requestor.

This map was generated by the Information Resources
Division of the Texas Commission on Environmental
Quality. This product is for informational purposes and
may not have been prepared for or be suitable for legal,
engineering, or surveying purposes. It does not repre-
sent an on-the-ground survey and represents only the
approximate relative location of property boundaries.
For more information concerning this map, contact the
Information Resource Division at (512) 239-0800.

The facility is located in Travis County. The Circle (green) in
the left inset map represents the approximate location of the facility
in Travis County. The inset map on the right represents the location of Travis
County (red) in the state of Texas.

Travis County

Travis

0    1.5    3
Miles

# Aakefa Khan

| | |
|---|---|
| **From:** | Brenda.Kouri@tceq.texas.gov |
| **Sent:** | Monday, April 3, 2023 3:19 PM |
| **To:** | EFiling |
| **Subject:** | Filing on Permit Number/Docket Number 2023-0370-MWD |
| **Attachments:** | SWWC RTH.pdf |

**FILING CONFIRMATION NUMBER** 508551152023093

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:** 2023-0370-MWD

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC, CN603264763

**FROM**

**FILED BY:**

**FILED FOR NAME:** Anthony Tatu

**E-MAIL:** Brenda.Kouri@tceq.texas.gov

**PHONE:** 512-239-5778

**DOCUMENT NAME:** SWWC RTH.pdf

*Based on 30 TAC Section 1.10(h), the TCEQ General Counsel has waived the filing requirements of Section 1.10(c) to allow the filing of documents using this online system. The General Counsel also has waived the requirements of Section 1.10(e) so that the time of filing your documents is the time this online system receives your filings. Filings are considered timely if received by close of business (usually 5:00 p.m. CST) on the deadline date unless otherwise ordered. If your document is 20 pages or less (including cover letter, mailing list, and attachments) and it is for Commission consideration at an open meeting, the General Counsel has also waived the requirement of Section 1.10(d) to file paper copies with the Office of the Chief Clerk.*

1

# APPENDIX 11

Jon Niermann, *Chairman*
Emily Lindley, *Commissioner*
Bobby Janecka, *Commissioner*
Erin E. Chancellor, *Interim Executive Director*



Garrett T. Arthur, *Public Interest Counsel*

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

April 3, 2023

Laurie Gharis, Chief Clerk
Texas Commission on Environmental Quality
Office of the Chief Clerk (MC-105)
P.O. Box 13087
Austin, Texas  78711-3087

RE:  **SWWC Utilities, Inc. (Applicant)**
     **TCEQ Docket No. 2023-0370-MWD**

Dear Ms. Gharis:

Enclosed for filing is the Office of Public Interest Counsel's Response to Requests for Hearing in the above-entitled matter.

Sincerely,

Jennifer Jamison, Attorney
Assistant Public Interest Counsel

cc:  Mailing List

TCEQ Public Interest Counsel, MC 103 • P.O. Box 13087 • Austin, Texas 78711-3087 • 512-239-6363 • Fax 512-239-6377

Austin Headquarters: 512-239-1000 • tceq.texas.gov • How is our customer service? tceq.texas.gov/customersurvey
printed on recycled paper

DOCKET NO. 2023-0370-MWD

| | | |
|---|---|---|
| APPLICATION BY SWWC | § | BEFORE THE |
| UTILITIES, INC. FOR PERMIT | § | TEXAS COMMISSION ON |
| NO. WQ0016022001 | § | ENVIRONMENTAL QUALITY |
| | § | |

### THE OFFICE OF PUBLIC INTEREST COUNSEL'S RESPONSE
### TO REQUESTS FOR HEARING

**To the Members of the Texas Commission on Environmental Quality:**

The Office of Public Interest Counsel (OPIC) at the Texas Commission on Environmental Quality (TCEQ or the Commission) files this Response to Requests for Hearing in the above-captioned matter and respectfully submits the following.

## I.    INTRODUCTION

### A.    Summary of Position

Before the Commission is an application by SWWC Utilities, Inc., (SWWC or Applicant) for a new Texas Pollutant Discharge Elimination System (TPDES) Permit No. WQ0016022001. The Commission received timely comments and requests for a contested case hearing from Anne Brockenbrough, Marilyn Kelinske, Jon Beall, and the Wilbarger Creek Conservation Alliance (WCCA). For the reasons stated herein, OPIC respectfully recommends the Commission deny all pending hearing requests.

### B.    Background of Facility

On July 28, 2021, SWWC applied to the TCEQ for new TPDES permit WQ0015264001 to authorize the discharge of treated domestic wastewater. If issued, this permit would authorize discharge at a daily average flow not to exceed 200,000 gallons per day (gpd) in the Interim I phase, 500,000 gpd in the Interim II phase, 800,000 gpd in the Final phase.

OPIC's Response to Requests for Hearing

The proposed plant site is located approximately 0.42 miles southwest of the intersection of Bella Parkway and Old Texas Highway 20, in Travis County. The treated effluent would be discharged via pipe to Wilbarger Creek, then to the Colorado River above La Grange in Segment No. 1434 of the Colorado River Basin. The unclassified receiving water use is high aquatic life use for Wilbarger Creek. The designated uses for Segment No. 1434 are primary contact recreation, public water supply, and exceptional aquatic life use.

## C.    Procedural Background

TCEQ received the application for a new permit on July 28, 2021, and declared it administratively complete on November 17, 2021. Applicant published the Notice of Receipt and Intent to Obtain a Water Quality Permit (NORI) on December 16, 2021, in the *Austin American Statesman*. Applicant published the Notice of Application and Preliminary Decision (NAPD) on June 30, 2022, in the *Austin American Statesman* newspaper. The comment period for the application closed on August 1, 2022. The Chief Clerk mailed the ED's Decision and Response to Comments (RTC) on October 26, 2022, and the deadline for filing a request for a contested case hearing was November 28, 2022.

## II.    APPLICABLE LAW

The Application was filed after September 1, 2015 and is therefore subject to the procedural rules adopted pursuant to Senate Bill 709. Tex. S.B. 709, 84th Leg., R.S. (2015). Under 30 Texas Administrative Code (TAC) § 55.201(c), a hearing request by an affected person must be in writing, must be timely filed, may not be based on an issue raised solely in a public comment which has been withdrawn, and, for applications filed on or after September 1, 2015, must be based only on the affected person's timely comments.

Section 55.201(d) states that a hearing request must substantially comply with the following:

    (1) give the name, address, daytime telephone number, and, where possible, fax number of the person who files the request;

    (2) identify the requestor's personal justiciable interest affected by the application, including a brief, but specific, written statement explaining in plain language the requestor's location and distance relative to the proposed facility or activity that is the subject of the application and how and why the requestor believes he or she will be adversely affected by the proposed facility or activity in a manner not common to members of the general public;

    (3) request a contested case hearing;

    (4) list all relevant and material disputed issues of fact that were raised by the requestor during the public comment period and that are the basis of the hearing request. To facilitate the Commission's determination of the number and scope of issues to be referred to hearing, the requestor should, to the extent possible, specify any of the ED's responses to the requestor's comments that the requestor disputes, the factual basis of the dispute, and list any disputed issues of law; and

    (5) provide any other information specified in the public notice of application.

Under 30 TAC § 55.203(a), an "affected person" is one who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application. An interest common to members of the general public does not qualify as a personal justiciable interest. Relevant factors to be considered in determining whether a person is affected include:

    (1) whether the interest claimed is one protected by the law under which the application will be considered;

    (2) distance restrictions or other limitations imposed by law on the affected interest;

    (3) whether a reasonable relationship exists between the interest claimed and the activity regulated;

    (4) likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person;

OPIC's Response to Requests for Hearing

(5) likely impact of the regulated activity on use of the impacted natural resource by the person;

(6) for a hearing request on an application filed on or after September 1, 2015, whether the requestor timely submitted comments on the application that were not withdrawn; and

(7) for governmental entities, their statutory authority over or interest in the issues relevant to the application.

30 TAC § 55.203(c).

For applications filed on or after September 1, 2015, § 55.205(b) states that a hearing request by a group or association may not be granted unless all of the following requirements are met:

(1) comments on the application are timely submitted by the group or association;

(2) the request identifies, by name and physical address, one or more members of the group or association that would otherwise have standing to request a hearing in their own right;

(3) the interests the group or association seeks to protect are germane to the organization's purpose; and

(4) neither the claim asserted nor the relief requested requires the participation of the individual members in the case.

Under § 55.203(d), to determine whether a person is an affected person for the purpose of granting a hearing request for an application filed on or after September 1, 2015, the Commission may also consider the following:

(1) the merits of the underlying application and supporting documentation in the administrative record, including whether the application meets the requirements for permit issuance;

(2) the analysis and opinions of the executive director; and

(3) any other expert reports, affidavits, opinions, or data submitted by the executive director, the applicant, or hearing requestor.

Under 30 TAC § 55.211(c)(2)(A)(ii), for an application filed on or after September 1, 2015, the Commission shall grant a hearing request made by an affected person if the request raises disputed issues of fact that were raised by the affected person during the comment period, that were not withdrawn by filing a withdrawal letter with the Chief Clerk prior to the filing of the ED's RTC, and that are relevant and material to the Commission's decision on the application. Under § 55.211(c)(2)(B)–(D), the hearing request, to be granted, must also be timely filed with the Chief Clerk, pursuant to a right to hearing authorized by law, and comply with the requirements of § 55.201.

### III.     ANALYSIS OF HEARING REQUESTS

#### A.     Determination of Affected Person Status

*Anne Brockenbrough*

Anne Brockenbrough filed timely comments and a hearing request on June 29, 2022, as well as comments combined with a hearing request in the joint letter submitted on behalf of Wilbarger Creek Conservation Alliance on November 28, 2022. Ms. Brockenbrough's stated interests include concerns about flooding, water quality, and property damage. While issues pertaining to flooding and property damage fall outside of TCEQ's jurisdiction, Ms. Brockenbrough's concerns regarding water quality are protected by the law under which this application will be considered.

Ms. Brockenbrough listed her property's address as 11318 Jones Road, Manor, and according to her comments her property is located on Wilbarger Creek. The map prepared by the ED's staff shows that the property is located 3.21 miles downstream from the outfall. The joint request signed by Ms. Brokenbrough states that even though requestors' properties are located

nearly 5 miles from the proposed Wastewater Treatment Facility (WWTF), the fact that the creek flows at 100% effluent most of the year means their properties will be impacted. Accordingly, Ms. Brockenbrough stated that TCEQ should test the water in Wilbarger Creek downstream from the proposed WWTF before approving the permit. The ED's Response to Comments addressed this concern, stating that TCEQ has water quality information that is collected at an active Surface Water Quality Monitoring (SWQM) Station approximately 2.25 miles downstream of the Majestic Manor WWTF. In addition, there are other active SWQM stations further upstream and downstream on Wilbarger Creek in which current water quality data are being collected.

Given the intervening distance of over three miles between Ms. Brockenbrough's property and the proposed outfall, OPIC finds that she lacks the proximity needed to establish a personal justiciable interest which is distinct from interests common to the general public. Without a personal justiciable interest, a hearing requestor cannot qualify as an affected person. Further, the intervening distance diminishes any likelihood that the regulated activity will impact her health, safety, or use of property. Therefore, OPIC finds that Anne Brockenbrough does not qualify as an affected person.

*Marilyn Kelinske*

Marilyn Kelinske filed timely combined comments and a hearing request on June 30, 2022, in addition to comments combined with a hearing request in the joint letter submitted on behalf of Wilbarger Creek Conservation Alliance on November 28, 2022. Ms. Kelinske's request expresses concern about flooding, water quality, effects on wildlife, effects on domestic animals, and effects on livestock. Marilyn Kelinske listed her property's address as 6805 Ladera Norte, Austin, which according to the map prepared by the ED's staff, is located 2.89 miles from the outfall.

Given the distance between Ms. Kelenske's property and the proposed outfall, OPIC finds that she lacks the proximity needed to establish a personal justiciable interest which is distinct from interests common to the general public. Without a personal justiciable interest, a hearing requestor cannot qualify as an affected person. Further, the intervening distance diminishes any likelihood that the regulated activity will impact her health, safety, or use of property. Therefore, OPIC finds that Marilyn Kelinske does not qualify as an affected person.

*Jon Beall*

Jon Beall filed timely comments on July 5, 2022, as well as comments combined with a hearing request in the joint letter submitted on behalf of Wilbarger Creek Conservation Alliance on November 28, 2022. Mr. Beall's stated interests include concerns about flooding, water quality, effects on health and safety, and potential mechanical malfunctions. Concerns about water quality and effects on health and safety are interests protected by the law under which this application will be considered, while the others fall outside the jurisdiction of the TCEQ. Mr. Beall listed his property's address as 2503 Flora Cv., Austin., and the map prepared by the ED's staff shows that the property is located approximately 15.65 miles from the outfall.

Given the distance between Mr. Beall's property and the proposed outfall, OPIC finds that he lacks the proximity needed to establish a personal justiciable interest which is distinct from interests common to the general public. Without a personal justiciable interest, a hearing requestor cannot qualify as an affected person. Further, the intervening distance diminishes any likelihood that the regulated activity will impact his health, safety, or use of property. Therefore, OPIC finds that Jon Beall does not qualify as an affected person.

*Wilbarger Creek Conservation Alliance*

Jon Beall submitted timely comments on behalf of WCCA, as well as a timely hearing request on November 28, 2022. All prior requestors are also listed on the request letter for WCCA. Pursuant to 30 TAC § 55.205(b)(2), a request by a group or association must identify at least one member that would otherwise have standing to request a hearing in their own right. Given that OPIC has determined that none of the individual members listed on the WCCA request qualify as affected persons, OPIC cannot find that WCCA is an affected association in this matter.

**B.    Issues Raised**

Should the Commission find that any requestors are affected persons, the following issues were raised:

1.  Whether the draft permit is adequately protective of human health and safety *(Beal, WCCA)*;

2.  Whether the draft permit is adequately protective of livestock, wildlife including aquatic life, and the environment *(Kelinske, WCCA)*;

3.  Whether the draft permit is adequately protective of water quality *(Beal, Kelinske, Brockenbrough, WCCA)*; and

4.  Whether the draft permit adequately protects against flooding and erosion *(Beal, Kelinske, Brockenbrough, WCCA)*.

**C.    Issues Raised in the Hearing Requests Remain Disputed**

There is no agreement between the affected persons and the ED on the issues raised in the hearing requests. Thus, they remain disputed.

**D.    The Disputed Issues Are Issues of Fact**

If the Commission considers an issue to be one of fact, rather than one of law or policy, it is appropriate for referral to hearing if it meets all other applicable requirements. 30 TAC § 55.2ll(c)(2)(A). All issues raised by affected persons are issues of fact.

**E.**   **Issues Were Raised by the Requestors During the Comment Period**

All issues were raised by the affected persons during the comment period.

**F.**   **The Hearing Requests are Based on Issues Raised in Public Comments Which Have Not Been Withdrawn**

The hearing requests are based on timely comments that have not been withdrawn.

**G.**   **Issues That are Relevant and Material to the Decision on the Application**

The hearing requests raise some issues that are relevant and material to the Commission's decision under the requirements of 30 TAC §§ 55.201(d)(4)(B) and 55.211(c)(2)(A)(ii), and some that are not. To refer an issue to the State Office of Administrative Hearings (SOAH), the Commission must find that the issue is relevant and material to the Commission's decision to issue or deny the permit. Relevant and material issues are those governed by the substantive law under which the permit is to be issued. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-51 (1986).

*Water Quality, Human Health and Safety, Animal Life, and the Environment*

Requestors raised concerns about adverse effects to water quality and the consequential impacts on human health, animal life, including aquatic life, and the environment. The Commission is responsible for the protection of water quality under Texas Water Code Chapter 26 and 30 TAC Chapters 307 and 309. The Texas Surface Water Quality Standards (Standards) in Chapter 307 require that the proposed permit "maintain the quality of water in the state consistent with public health and enjoyment, propagation and protection of terrestrial and aquatic life, operation of existing industries, and … economic development of the state…." 30 TAC § 307.1. According to § 307.6(b)(4) of the Standards, "[w]ater in the state must be maintained to preclude adverse toxic effects on aquatic life, terrestrial life, livestock, or domestic animals, resulting from contact, consumption of aquatic organisms, consumption of water, or any combination of the three." Additionally, "[s]urface waters must not be toxic to man from ingestion of water,

OPIC's Response to Requests for Hearing

consumption of aquatic organisms, or contact with the skin, or to terrestrial or aquatic life." 30 TAC § 307.4(d). As Chapter 307 designates criteria for the regulation of water quality and the protection of human health and safety and terrestrial life, Issue nos. 1– 3 are relevant and material to the Commission's decision regarding this application and are appropriate for referral to SOAH.

*Flooding and Erosion*

Requestors raised concerns regarding an increased risk of flooding and erosion resulting from the proposed discharge. The TCEQ does not have jurisdiction to consider general concerns about flooding, nor does it have jurisdiction to address erosion. With respect to this application, TCEQ has jurisdiction over issues related to water quality under the Commission's Chapter 307 rules and site suitability under the Commission's Chapter 309 rules. These rules have not been interpreted to address concerns that a permitted discharge of treated wastewater effluent could cause an increased risk of flooding. In this matter, OPIC cannot find that the stated concerns can be distinguished from general concerns about an increased risk of flooding.

Similarly, with respect to erosion, under 30 TAC § 309.12, "[t]he Commission may not issue a permit for a new facility or for the substantial change of an existing facility unless it finds that the proposed site, when evaluated in light of the proposed design, construction, or operational features, minimizes possible contamination of water in the state." In making this determination under 30 TAC § 309.12(1), the Commission may consider active geologic processes and their impact on groundwater contamination. According to 30 TAC § 309.11(1), active geologic processes consist of any natural process which alters the surface and/or subsurface of the earth, including, but not limited to, erosion. Although Chapter 309 authorizes consideration of "active geological processes," OPIC interprets these regulatory provisions as being limited to specific existing conditions associated with a proposed site location, rather than potential erosion.

Therefore, OPIC finds that the issue of potential erosion is not relevant and material to the Commission's decision on this Application. Accordingly, OPIC cannot find that the requestors' concerns pertaining to flooding or erosion are relevant and material to the Commission's decision on this application.

**H.      Issues Recommended for Referral**

Should the Commission find any requestors to be an affected person, OPIC recommends referral of the following issues to SOAH:

1.  Whether the draft permit is adequately protective of human health and safety;

2.  Whether the draft permit is adequately protective of livestock, wildlife including aquatic life, and the environment; and

3.  Whether the draft permit is adequately protective of water quality;

**I.      Maximum Expected Duration of Hearing**

Commission rule 30 TAC § 50.115(d) requires that any Commission order referring a case to SOAH specify the maximum expected duration of the hearing by stating a date by which the judge is expected to issue a proposal for decision. The rule further provides that, for applications filed on or after September 1, 2015, the administrative law judge must conclude the hearing and provide a proposal for decision by the 180th day after the first day of the preliminary hearing, or a date specified by the Commission, whichever is earlier. 30 TAC § 50.115(d)(2). To assist the Commission in setting a date by which the judge is expected to issue a proposal for decision, and as required by 30 TAC § 55.209(e)(7), OPIC estimates that the maximum expected duration of a hearing on this Application would be 180 days from the first date of the preliminary hearing until the proposal for decision is issued.

## V. CONCLUSION

Having found that no requestors are affected persons in this matter, OPIC respectfully recommends the Commission deny all pending hearing requests. However, should the Commission find that any requestor is an affected person, Issue Nos. 1-3 specified in Section III. H. could be appropriately referred for a contested case hearing at SOAH.

Respectfully submitted,

Garrett T. Arthur
Public Interest Counsel

By:_____

Jennifer Jamison
Assistant Public Interest Counsel
State Bar No. 24108979
P.O. Box 13087, MC 103
Austin, Texas 78711-3087
(512) 239-6363  Phone
(512) 239-6377  Fax

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2023 the Office of Public Interest Counsel's Response to Requests for Hearing and Request for Reconsideration was filed with the Chief Clerk of the TCEQ and a copy was served to all persons listed on the attached mailing list via hand delivery, facsimile transmission, Inter-Agency Mail, electronic mail, or by deposit in the U.S. Mail.

Jennifer Jamison
_____
Jennifer Jamison

## MAILING LIST
## SWWC UTILITIES, INC.
## TCEQ DOCKET NO. 2023-0370-MWD

FOR THE APPLICANT
via electronic mail:

Jeffrey McIntyre, President
SWWC Utilities, Inc.
12535 Reed Road
Sugar Land, Texas 77478
jmcintyre@swwc.com

Joe Torralva, Design and Construction
Manager, Texas Utilities
SWWC Utilities, Inc.
1620 Grand Avenue Parkway, Suite 140
Pflugerville, Texas 78660
jtorralva@swwc.com

Jason Baze, P.E., Project Manager
Murfee Engineering Company, Inc.
1101 Capital of Texas Highway South
Suite D-100
Austin, Texas 78746
jbaze@murfee.com

FOR THE EXECUTIVE DIRECTOR
via electronic mail:

Anthony Tatu, Staff Attorney
Texas Commission on Environmental
Quality
Environmental Law Division MC-173
P.O. Box 13087
Austin, Texas 78711-3087
Tel: 512/239-0600  Fax: 512/239-0606
anthony.tatu@tceq.texas.gov

Melinda Luxemburg, Technical Staff
Texas Commission on Environmental
Quality
Water Quality Division MC-148
P.O. Box 13087
Austin, Texas 78711-3087
Tel: 512/239-4541  Fax: 512/239-4430
melinda.luxemburg@tceq.texas.gov

Ryan Vise, Director
Texas Commission on Environmental
Quality
External Relations Division
Public Education Program MC-108
P.O. Box 13087
Austin, Texas 78711-3087
Tel: 512/239-4000  Fax: 512/239-5678
pep@tceq.texas.gov

FOR ALTERNATIVE DISPUTE
RESOLUTION
via electronic mail:

Kyle Lucas, Attorney
Texas Commission on Environmental
Quality
Alternative Dispute Resolution MC-222
P.O. Box 13087
Austin, Texas 78711-3087
Tel: 512/239-0687  Fax: 512/239-4015
kyle.lucas@tceq.texas.gov

FOR THE CHIEF CLERK
via eFiling:

Docket Clerk
Texas Commission on Environmental
Quality
Office of Chief Clerk MC-105
P.O. Box 13087
Austin, Texas 78711-3087
Tel: 512/239-3300  Fax: 512/239-3311
https://www14.tceq.texas.gov/epic/eFiling/

REQUESTER(S):

Jonathan M. Beall
Wilbarger Creek Conservation Alliance
2503 Flora Cove
Austin, Texas  78746

Anne Stewart Brockenbrough
Elm Ridge Ranch
11318 Jones Road
Manor, Texas  78653

Marilyn Kelinske
15611 Littig Road
Manor, Texas  78653

Marilyn Kelinske
6805 Ladera Norte
Austin, Texas  78731

**Aakefa Khan**

| | |
|---|---|
| **From:** | melissa.schmidt@tceq.texas.gov |
| **Sent:** | Monday, April 3, 2023 4:22 PM |
| **To:** | EFiling |
| **Subject:** | Filing on Permit Number/Docket Number 2023-0370-MWd |
| **Attachments:** | SWWC _ OPIC  RHR_final_.pdf |

**FILING CONFIRMATION NUMBER** 285589352023093

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:** 2023-0370-MWD

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC, CN603264763

**FROM**

**FILED BY:**

**FILED FOR NAME:** Jennifer Jamison

**E-MAIL:** melissa.schmidt@tceq.texas.gov

**PHONE:** 512-239-4014

**DOCUMENT NAME:** SWWC _ OPIC RHR_final_.pdf

*Based on 30 TAC Section 1.10(h), the TCEQ General Counsel has waived the filing requirements of Section 1.10(c) to allow the filing of documents using this online system. The General Counsel also has waived the requirements of Section 1.10(e) so that the time of filing your documents is the time this online system receives your filings. Filings are considered timely if received by close of business (usually 5:00 p.m. CST) on the deadline date unless otherwise ordered. If your document is 20 pages or less (including cover letter, mailing list, and attachments) and it is for Commission consideration at an open meeting, the General Counsel has also waived the requirement of Section 1.10(d) to file paper copies with the Office of the Chief Clerk.*

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

CHRISTOPHER SMITH on behalf of Christopher Smith
Bar No. 24051349
chris.smith@smithjolin.com
Envelope ID: 108654272
Filing Code Description: Response
Filing Description: Appellees' Response Brief
Status as of 12/3/2025 10:46 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Christopher Smith | 24051349 | Chris.Smith@smithjolin.com | 12/3/2025 10:34:07 AM | SENT |
| Becky Jolin | 10856200 | Becky.Jolin@smithjolin.com | 12/3/2025 10:34:07 AM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 12/3/2025 10:34:07 AM | SENT |
| Sara Ferris | | sara.ferris@oag.texas.gov | 12/3/2025 10:34:07 AM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 12/3/2025 10:34:07 AM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 12/3/2025 10:34:07 AM | SENT |